Mark R. Vermeulen [State Bar No. 115381]
Law Office of Mark R. Vermeulen
755 Florida Street #4
San Francisco, CA 94110.2044
Telephone: 415.824.7533
Fax: 415.824.4833

Attorney for Petitioner
KENNETH VERNON

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

KENNETH VERNON,

    Petitioner,

v.

ANTHONY A. LAMARQUE,
    Warden,
and DOES 1-10,

    Respondents.

C No. 00 3311

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
**[28 U.S.C. § 2254]**

    Petitioner Kenneth Vernon, by the through counsel, hereby petitions for a writ of habeas corpus. By this verified Petition, Petitioner states as follows:

    1. The judgment of conviction and sentence which is the subject of this Petition was entered in the San Joaquin County Superior Court, Stockton, California (People v. Kenneth Vernon, San Joaquin County Superior Court, No. SC059609A). This petition concerns the criminal conviction and judgment arising from the jury trial in that action. In that action, Petitioner was convicted on March 7, 1997 of murder in the first degree (California Penal Code[1] § 187). The jury also found true the enhancement allegation that Petitioner personally used a firearm (§ 12022.5).

---

[1]     All further statutory references are to the California Penal Code unless specified otherwise.

- 1 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

2.  The judgment of conviction and sentence was entered on April 4, 1997. Petitioner was sentenced to state prison for a total term of 35 years to life (25 years to life on the § 187 conviction, plus 10 years on the § 12022.5 enhancement, with the 10-year determinate term to be served before the indeterminate term).

3.  Petitioner appealed from his conviction and judgment to the California Court of Appeal, Third Appellate District.  The Court of Appeal affirmed the trial court's judgment in an unpublished opinion issued March 8, 1999 (People v. Kenneth Jerome Vernon, California Court of Appeal, Third Appellate District No. C026244).

4.  From the appeal, Petitioner sought review in the California Supreme Court through a petition for review filed on April 16, 1999.  That petition was denied on June 16, 1999 (People v. Kenneth Jerome Vernon, California Supreme Court No. S078530).

5.  Subsequent to the appeal, Petitioner filed a petition for writ of habeas corpus in the San Joaquin County Superior Court, Stockton, California (Kenneth Vernon, On Habeas Corpus, San Joaquin County Superior Court).  That petition is pending.

6.  Grounds For Relief:  The grounds upon which Petitioner is being held in custody unlawfully and in violation of the U.S. Constitution are as follows:

A.  Claim One: Juror Misconduct By Failing To Disclose Material Information During Voir Dire

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when one or more of the jurors committed prejudicial misconduct by failing to disclose to the trial court and counsel, during voir dire, material information which demonstrated juror bias and knowledge.

Facts Underlying Claim One[2]

There were at least three instances in which jurors concealed material information and bias on voir dire.  First, one of the jurors (Linda Withers, who will be referred to herein as "Juror 1") is related to one of the key prosecution witnesses by marriage, and the Withers family has known Petitioner's family for many years.  The prosecution witness to whom Juror

---

[2]    Petitioner will also be seeking leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, requesting materials and information necessary to properly and fully litigate this Petition.

- 2 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1 is related is Doyle Dubois; Doyle Dubois' uncle is Tom Dubois, who is married to Lavanda Withers; Lavanda Withers is related to Juror 1. Additionally, Petitioner's family has known Lavanda Withers and the Withers family almost all of their lives. For example, Petitioner's father (William Vernon) has known Alan Withers almost all his life, having gone through school together in their childhood. Alan Withers and the Withers family are related to Juror 1. These relationships of Juror 1 were not revealed during voir dire.

Second, a second juror (referred to herein as "Juror 2") knew or was acquainted with Petitioner's uncle, Jack Vernon. This relationship likewise was not revealed during voir dire.

Third, a third juror (referred to herein as "Juror 3") was familiar with the means by which blood levels of d-amphetamine and amphetamine could show up in a person's blood, as demonstrated by the note submitted by the jury on March 5, 1997. That note states:

> "Q. Concerning blood levels of d-amphetamine and amphetamine found in [deceased victim] Robin McClary. There was no evidence produced to substantiate the use of amphetamines by inhalation, oral ingestion of [sic] injection. However, Robin McClary did suffer from allergies and a bronchial disorder.
> "If Robin took prescription medication for breathing and any over the counter medication for allergies or asthma those drugs will show a false positive test for amphetamines.
> "The statement by both defense and prosecution that she used amphetamine may not be valid."

This knowledge was relevant because levels of such substances were found in the deceased victim. This fact was relevant to the issue of whether the death constituted murder or manslaughter, and the degree of murder or type of manslaughter. Juror 3 did not reveal this knowledge and familiarity during voir dire. Furthermore, the trial court failed to admonish the jury when they submitted this note during deliberations.

B. <u>Claim Two: Juror Misconduct By Contact And Discussions With Third Parties</u>

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when one or more of the jurors committed prejudicial misconduct by having contact with third parties (namely, the deceased victim's mother, friends, and relatives, and the District Attorney).

- 3 -

1

Facts Underlying Claim Two

2

During the trial, several jurors had inappropriate and prejudicial contact with the

3

District Attorney, and with the deceased victim's mother, friends, and relatives. In connection

4

with the District Attorney, the juror contact occurred by the jurors conversing with the District

Attorney during recesses and breaks in the trial. In connection with the deceased victim's

5

mother, friends, and relatives, the juror contact likewise occurred during recesses and breaks in

6

the trial during which the jurors would converse with the deceased victim's family and friends

7

in the courtroom (which conversation sometimes also involved the District Attorney) and

8

outside the courthouse in or near an area where people would congregate to converse and to

9

smoke. In addition, the jurors on more than one occasion brought fruit and/or other food to the

10

District Attorney during the trial, which he accepted. During these various contacts, one or

11

more of the jurors discussed aspects of the case with the non-jurors and the jurors were

prejudicially influenced by these contacts.

12

13

C.  Claim Three: Prosecutorial Misconduct By Contact And Discussions With Jurors

14

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and

15

the right to confront and challenge the evidence received against him under the Fifth, Sixth and

Fourteenth Amendments to the United States Constitution when the prosecutor committed

16

prejudicial misconduct by having contact with the jurors and by facilitating communications

17

between jurors and third parties (namely, the deceased victim's mother, friends, and relatives).

18

Facts Underlying Claim Three

19

During the trial, the District Attorney had inappropriate and prejudicial contact with

20

several of the jurors and failed to report this contact to the Court and defense counsel. This

21

contact occurred through the District Attorney's conversing with the jurors during the recesses

and breaks in the trial. At times, this conversation also involved members of the deceased

22

victim's family, who were seated in the audience in the courtroom. The District Attorney

23

would engage in and facilitate three-way conversations with the jurors and the deceased

24

victim's family and friends. Improper and prejudicial contact also occurred by the District

25

Attorney accepting fruit and/or other food from the jurors during the trial. During the contacts

26

noted herein, one or more of the jurors discussed the case and the trial with the District

27

Attorney and were prejudicially influenced by these contacts.

– 4 –

28

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1

2      D.  Claim Four: Exclusion Of Public From Voir Dire

3           Petitioner was prejudicially deprived of his right to a public trial and to due process of

4      law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution due to the

       exclusion of the public (including Petitioner's family) from the courtroom during voir dire.

5           Facts Underlying Claim Four

6           During voir dire the public, including Petitioner's parents, was excluded from the

7      courtroom without reason or necessity.

8

9      E.  Claim Five: Trial Court's Refusal To Substitute Other Counsel For Second Trial

10          Petitioner was prejudicially deprived of his right to the effective assistance of counsel,

       to a fair trial, and to due process of law under the Fifth, Sixth and Fourteenth Amendments to

11     the U.S. Constitution due to the trial court's refusal to substitute counsel for the second trial

12     (after a mistrial was declared in the first trial of this matter when the jury was unable to reach a

13     verdict), due to the court's quick resetting and commencement of the second trial, and due to

14     trial counsel's consequent inability to provide Petitioner with adequate and effective

15     representation at the second trial.  There was no tactical reason for the failure of trial counsel to

       undertake the matters complained of herein and Petitioner was prejudiced by these actions.

16          Facts Underlying Claim Five

17          At the first jury trial in this matter, which took 22 days to complete, a mistrial was

18     declared on December 20, 1996 when the jury was unable to reach a verdict.  Counsel returned

19     to court on January 7, 1997.  Defense trial counsel informed the Court he was not prepared to

20     go forward on that date, that Petitioner and his family had no funds to retain him a second time,

21     and that he could not continue to represent Petitioner.  Among the reasons given by trial

22     counsel as to why he could not retry the case were that retrying the case (particularly on a tight

23     timeline) would impose a severe hardship on counsel, that counsel had many other trials set

24     and/or trailing (along with other cases) which he had had to put aside to try this case and to

25     which he must now attend, and that he would be unable to provide adequate and effective

       assistance at a second trial, all of which were exacerbated by the fact that trial counsel was a

26     sole practitioner.  Nevertheless, the trial court denied trial counsel's request.  The trial court

27     appointed the same trial counsel to try the case a second time, over counsel's strenuous

– 5 –

28

objection. Trial counsel thereupon requested a trial date of April 1997 in order to be able to prepare properly.  The District Attorney noted that he would be prepared to begin in January, and the trial court set the trial for January 27, 1997.  Trial counsel pleaded with the trial court for additional time, which requests were denied, the trial court stating: "You're under duress, [trial counsel], and the record should note that."

At the second trial, trial counsel failed to do undertake several matters necessary to the effective representation of Petitioner, all of which contributed to Petitioner receiving inadequate and ineffective assistance of counsel.  The actions which trial counsel failed to undertake or which he undertook ineffectively include the following: failure to conduct adequate investigation, including ballistics testing and consulting with forensics experts; failing to object to the exclusion of the public from the courtroom during voir dire and informing Petitioner's mother that she had to remain outside the courtroom during voir dire, failure to adequately question prospective juror Linda Withers regarding juror bias; failure to raise the issue regarding juror Linda Withers' bias at the earliest opportunity in the trial; failure to act as an effective and zealous advocate when trial counsel confirmed the trial judge's limited questioning of juror Linda Withers for bias during the trial; failure to review the presentence report prior to sentencing and failure to accept and employ the brief recess offered by the trial court to allow trial counsel to review the presentence report and to prepare for sentencing; and failure to preserve the trial files, including Petitioner's own trial file.  There was no tactical reason for trial counsel to fail to undertake these matters.

F.  Claim Six: Ineffective Assistance Of Counsel If Any Claims Are Deemed Previously Waived

If any of the claims or issues raised in this Petition are deemed waived by previous counsels' failure to timely raise and litigate the claim(s) and/or issue(s), Petitioner was prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and his right to due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, for there was no tactical reason not to raise these claims or issues, and Petitioner was prejudiced by these actions.

Facts Underlying Claim Six

See facts set forth in the preceding Claims, ante.

- 6 -

1

2      G. Claim Seven: Insufficiency Of Evidence To Convict Of First Degree Murder

3          Petitioner was prejudicially deprived of his right to due process of law under the Fifth

and Fourteenth Amendments to the U.S. Constitution because the evidence adduced at trial was

4      insufficient to support a conviction for murder in the first degree.  At most, the evidence

5      supported a conviction for murder in the second degree, or manslaughter.

6          Facts Underlying Claim Seven

7              i. Introduction

8          In this case, there was no question at trial as to who fatally shot the decedent, Robin

9      McClary.  Petitioner, in his own testimony, admitted that he had done so.  The issue at trial

concerned the type and degree of homicide: was this premeditated murder, second degree

10     murder, or manslaughter?

11         In the context of this insufficiency-of-evidence claim, the factual discussion here is

12     lengthy, of necessity.  It is derived from the trial transcripts.  For readability, the discussion is

13     categorized into the testimony of the key witnesses and/or the key events relevant to

establishing the claim.  The evidence adduced at trial was as follows.

14

15             ii. The gardener

16         On August 24, 1995, Robert Perry was to meet Petitioner at approximately 5:00 p.m. at

17     8201 Arroyo Way in Stockton, California to discuss gardening work.  Mr. Perry went by the

house at 3:00 or 4:00 p.m., but no one was home.  He returned shortly after 5:00 p.m., and

18     Petitioner answered the door.  Petitioner showed him around outside.  Mr. Perry asked

19     Petitioner if he could run power from either the garage or the house, and Petitioner brought out

20     an extension cord through the garage.

21         Mr. Perry began to trim the shrubs by the front door.  Another man came by to work on

22     a broken sprinkler on the side of the house.  The sprinkler man left but returned and began

talking to Petitioner in front of the house.  A woman (Robin McClary, who was Petitioner's

23     girlfriend and who is the deceased in this case) came out and listened to what they were saying.

24     Mr. Perry spoke to her, and she did not seem upset.  Thereafter, she and Petitioner re-entered

25     the house.

26         Mr. Perry worked his way to the side yard.  At one point he turned off his clippers and

27     heard a stereo and a television, which were "kind of loud."  He could also vaguely hear people

- 7 -

28     PTN. FOR WRIT OF HABEAS CORPUS
       BY A PERSON IN STATE CUSTODY

talking. While at the front of the house later, Mr. Perry heard "what sounded like a plate . . . being broke and a glass." Back at the side of the house, he heard someone walking heavily. In addition, he "heard off in the distance like a firecracker . . . ." Thereafter, there was a thump, like shoes being thrown.

About 15 to 25 minutes after Petitioner and Ms. McClary had gone back inside the house, Petitioner came out carrying what appeared to be clothes and a towel. He was wearing a T-shirt and a pair of shorts. He called to Robin to turn down the stereo. He then got into his truck.[3]

About 10 minutes later, Petitioner returned and stopped in front of the house. A red pickup pulled into the driveway, and a man got out and got into Petitioner's truck, which again left. The man in the red pickup was Doyle Dubois, who shared the house with Petitioner and Ms. McClary.

The two men returned 25 to 45 minutes later, shortly before 7:00 p.m. A young man had been waiting to talk to Petitioner about repairing the roof, and he spoke to Petitioner. Thereafter, Petitioner and Mr. Dubois went inside. Both ran out soon thereafter, screaming, "She's dead, she's dead."[4]

///
///

---

[3]     The total time that Petitioner was inside the house was not made clear at trial. Mr. Perry testified that it had been 20 to 25 minutes, but he told a deputy that same night that it had been about 10 minutes. At the first trial, he testified that it had "felt like 15 minutes." He also testified that Petitioner came out of the house 15 to 20 minutes after Mr. Perry had heard the last noise from inside the house, but he had previously testified that he thought it had been "maybe 5 minutes" thereafter. In any event, he told police that he had looked at his watch and believed that Petitioner had left at about 5:50 p.m.

[4]     Philip Mosqueda had been working on the sprinkler. He had been at the house the week before, when he repaired the air conditioning unit and checked the broken dishwasher, which could not be repaired. When he told Ms. McClary that the dishwasher needed to be replaced, she had not seemed upset.

On August 24, 1995, Mr. Mosqueda arrived at the house at approximately 4:45 p.m., knocking on the front door and telling Ms. McClary he would be working on the sprinkler. After two trips for parts, the job was finished, and Mr. Mosqueda went to the door. Petitioner and Ms. McClary came out, and they talked for a few minutes. Mr. Mosqueda did not smell any alcohol on Ms. McClary's breath, and she did not appear to be upset. Mr. Mosqueda left at approximately 5:30 p.m.

- 8 —

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

iii. The roommate

Doyle Dubois was living at 8201 Arroyo with Petitioner, Ms. McClary, and her son, Nicholas. Mr. Dubois' bedroom was in the southeast corner, Nicholas' was in the southwest area, and the north bedroom was occupied by Petitioner and Ms. McClary.

Mr. Dubois got off work at 5:00 p.m. He stopped at an auto parts store, a bank, and fast food place before heading home. On the way home, Mr. Dubois saw Petitioner in his truck. Petitioner asked Mr. Dubois if he wanted to go to a music store, and Mr. Dubois dropped off his truck at the house, seeing the gardener in the front yard. Mr. Dubois and Petitioner went to Tower Records in Petitioner's truck.

At the store, Petitioner somehow collided with the door, "hard." Inside the store, Petitioner seemed highly agitated and said he had been cut. He displayed cuts on his arm and leg. After talking to one of the clerks, Petitioner left, saying he was going to clean up his cuts.[5] When Petitioner returned ten minutes later, he seemed angry and said that he would not buy anything at that store. After leaving Tower Records, they went home.

Upon arriving back at the house, Mr. Dubois got his books and handgun out of his truck. A man came up and talked to Petitioner about the roof. Petitioner and Mr. Dubois then entered the house.

After Mr. Dubois asked why the phone was on the floor in the kitchen, Petitioner began calling to Ms. McClary. Petitioner walked through the house, seeming "upset and worried." When Petitioner looked into the bedroom, he said, "Oh, my God!"

Mr. Dubois saw Ms. McClary on the floor in the bed room.  There was a kitchen knife by her hand. Petitioner and Mr. Dubois went outside. At this point, Petitioner was crying. Mr. Dubois was carrying his gun, which he locked in his truck.

The next-door neighbor testified that sometime 6:00 and 7:00 p.m., he heard "pounding" at her door and found Petitioner in an "agitated" state, saying "Call 911. My girlfriend's been shot." Petitioner also stated, "I think she's been raped."

---

[5]     A Tower Records employee testified that at about 6:00 p.m., Petitioner and another man had approached the store. Petitioner had walked into the door as the other man was opening it. After they entered, they walked to the back for awhile. Petitioner then came to the counter and showed her the cuts on his arm and leg. She told him he could not have cut himself on the door, and she saw that the blood was already coagulated. Petitioner left alone and returned later.

– 9 –

1    Petitioner and Mr. Dubois sat down in the yard. Petitioner was very upset. He was
2    crying "hard" and saying that he could not believe that this had happened. At one point, he
3    vomited on the lawn.

     iv. The first officers at the scene

4    Sheriff's deputies arrived just before 7:00 p.m., finding Petitioner and Mr. Dubois on the
5    lawn. Petitioner was in a fetal position, crying and distraught. He said that his girlfriend was
6    in the house and had been shot.[6]

7    Police entered the house, finding the television at high volume. A pair of glasses was
8    on the floor in the living room, near the coffee table. A cordless telephone had been knocked to
9    the floor. In the hall were blood drops on the carpet. The bathroom window was on the floor,
     with the glass broken. Inside the bedroom was a woman lying face down on the floor. Her
10   pants and underpants were partially down, and a knife lay near her arms. A black purse was on
11   the corner of the bed nearest the body.

12   v. Examination of the house

13   The house had an entry hall, with the living room immediately to the left, and a kitchen
14   and dining room area farther down the hall to the right. Inside the living room was a couch
15   with a grease spot on the back. On the floor behind the couch was a piece of broken plate. A
     pair of glasses was on the floor by the coffee table, and there were blood spots on the living
16   room rug. Blood spots were located on the metal strip separating the living room rug from the
17   kitchen floor, and in the hallway.

18   On the floor of the dining area was part of a Cornish game hen. There was also a phone
19   with the wall plug missing.

20   In the kitchen was the telephone wall jack in which the plug and a piece of cord
21   remained. The garbage included pieces of a plate that matched the piece found behind the
     couch. Also in the garbage were two beer bottles and a Franzia wine container.[7]
22

23   _____

     [6]    Police had difficulty obtaining information from Petitioner because he was so upset. He
24   identified the woman as Robin McClary. He said he had gotten home from work, after which
     the gardener had arrived. Petitioner and Mr. Dubois had gone to Tower Records for about an
25   hour. When they got home, he and Mr. Dubois discovered Ms. McClary in the bedroom.

26   [7]    One of the first police in the house had been looking for something to use to cover the
     knife. He dumped out the kitchen garbage, intending to use the can to cover the knife. The
27   officer then saw a large bowl and decided to use it to cover the knife instead of the garbage can,

                                          - 10 -
28   PTN. FOR WRIT OF HABEAS CORPUS
     BY A PERSON IN STATE CUSTODY

1   The bathroom window screen was on the ground directly below the window. The

2   window itself was in the bathroom, with the frame and glass broken. Drops of blood were

3   located on the sink and countertop, on the floor, on the toilet paper roll, on the step leading

    down to the shower, and in the upper right-hand corner inside the shower.

4       In the north bedroom was a waterbed frame containing a regular mattress, with the

5   corner of the bed nearest the body knocked off its pedestal. A long bloodstain led from just

6   inside the door to the body. An open black purse was on the corner of the bed, and a knife was

7   on the floor. The door's strike-plate and jamb were broken.

8       A hunting bow and arrows were between the bed and the wall. A second phone was on

9   the floor, also with the wall plug missing. Near the phone was a gold chain broken in the

    middle. Two feet to the side of the door, and two feet above the floor, was a hole in the wall.

10  A bullet was imbedded in the stud behind the sheetrock.

11          vi.  The testimony of Ms. McClary's mother

12      Ms. McClary's mother testified that she last saw her daughter three or four days before

13  her death when she came to visit in her white Volkswagen with her son and Petitioner.

14  Petitioner's brother and sister-in-law came in another car.

15      Ms. McClary had a handgun when she visited. Ms. McClary's mother did not notice

    any injuries to her daughter's face. The Volkswagen was not running properly, and when they

16  left they rode home with Petitioner's brother. Police later found a box of 9- millimeter

17  cartridges in the glove compartment of the Volkswagen.

18          vii.  Petitioner's first statements to police, on the night of the homicide.

19      Deputy Mayoya interrogated Petitioner at the sheriff's department the evening of the

20  incident soon after 8:00 p.m. A videocassette tape of the interrogation was played at the trial.

    In that first statement, Petitioner denied any involvement in Ms. McClary's death. He asserted

21  that he left to go to the record store, leaving Ms. McClary in the house and the gardener

22  outside. He said he ran into Mr. Dubois, and the two went together to the record store and

23  returned after about an hour to find Ms. McClary dead.

24      Deputy Mayoya interrogated Petitioner again later that night at approximately 1:00

25  a.m., after Petitioner had been taken to the emergency room where a physician cleaned his

26  _____

27  which was left in the kitchen.

                                    - 11 -

28  PTN. FOR WRIT OF HABEAS CORPUS
    BY A PERSON IN STATE CUSTODY

injuries.[8]  In this second hour-long interrogation, Petitioner was advised of his rights, and the deputy told Petitioner that the deputy did not believe Petitioner's original story.  When Petitioner was accused of being involved, he denied it.  The deputy testified that his intention in this interrogation was to "float out theories" such as "maybe this is what happened," and he posed several different "theories."  The first theory was that this was perhaps an accident, which Petitioner denied.[9]  Another was that this involved self-defense, which Petitioner also denied.  The deputy conceded that he had raised these theories in the hope that Petitioner would adopt one that could be disproved.

viii.  The towels in the dumpster

A Sheriff's sergeant was told by Detective Mayoya that Petitioner had stated that he had cut himself at Tower Records and cleaned himself up at Burger King.  The sergeant checked the dumpsters in the nearby Payless shopping center, but they had been emptied.  Inside the Burger King dumpster were a large terry cloth bath towel and two other towels.

xi.  The August 27 telephone conversation

On August 27, Deputy Mayoya left a message at Petitioner's house, and Petitioner called back.  Petitioner was asked about his Browning Hi-Power pistol, because police had been unable to locate it.  Petitioner responded that Ms. McClary carried the gun in her purse most of the time.  When asked when Petitioner had last seen the gun, he answered that it had been on Wednesday (August 23).  When Petitioner was told that the gardener had said he had seen him carrying something out of the house, Petitioner denied it.  Petitioner was asked if dishes had been broken, and he said that they had not.  Petitioner also denied knowing how the bedroom door had been broken.

x.  The August 30 arrest and subsequent interrogations

Petitioner was arrested on August 30 at the cemetery just after Ms. McClary's funeral had ended.  He was taken to the Sheriff's office and he was again read his Miranda rights.  An interrogation was conducted that afternoon and a final interrogation was conducted at

---

[8]      It was stipulated that the physician would testify that the injuries were consistent with having been cut by a sharp object.

[9]      During the second interrogation, the deputy made reference to "accident" as many as fifty times.  During the fourth interrogation, Petitioner actually adopted the "accident" theory.

- 12 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1  approximately 6:30 p.m.[10]

2  Videotapes of both August 30 interrogations were played at trial. In the first August 30
3  interrogation, Petitioner was advised by Deputy Mayoya at length why Petitioner's story was
4  not credible. Petitioner denied involvement for some time. However, he eventually admitted that he had shot Ms. McClary, stating that it had been an accident.

5  After his arrest, Petitioner was put in a holding cell. During a periodic check, he was
6  found to have removed his socks and tied them around his neck. When asked what he was
7  doing, Petitioner responded that he couldn't face his parents. The knots were so tight that the
8  deputy was unable to untie them.

### xi. The forensic testimony

9
10  A criminalist from the Department of Justice tested a number of blood samples.
    Samples consistent with Ms. McClary's blood type were found on the living room carpet, the
11  bedroom floor, the door of the bathroom, a light blue bath towel from the Burger King
12  dumpster, and a dish towel from the Burger King dumpster. Samples consistent with
13  Petitioner's blood type were found on the "west shower wall", a dark blue bath towel from the
14  Burger King dumpster, and a light blue towel from the Burger King dumpster.

15  A criminalist had also gone to the house to do a bullet trajectory reconstruction using a
16  probe and a protractor. The criminalist testified that the angle of entry was approximately 80
    degrees from the wall (plus or minus 5 degrees) and approximately horizontal. When fired, the
17  gun would have been approximately two feet above the floor. The criminalist introduced into
18  evidence a photograph of an officer with his head in approximately the position which would
19  account for the wounds and the hole in the wall. He would have expected to see some blood
20  spatter if the decedent had been within 1-1/2 to 2 feet of that wall.

### xii. The autopsy

21
22  The forensic pathologist who performed the autopsy described a variety of injuries.
    There were superficial injuries in Ms. McClary around the face, including bruises on the lips, a
23  "pattern" bruise on the left cheek that might have been caused by a ring, and a one-inch scratch
24  on the chin. Her nose had not been broken and she had no black eyes, no swelling, and no open

25

26  [10]    At the time of his arrest, Petitioner did not know that the towels had been found. He
    found out for the first time on videotape that the police knew of the bloody towels.

27
                                                    - 13 -

28  PTN. FOR WRIT OF HABEAS CORPUS
    BY A PERSON IN STATE CUSTODY

cuts or lacerations.  There was a 1/4-inch by 1/8-inch abrasion to the left scapula, an abrasion next to the right elbow, and bruises to the left hip.  There were no injuries to the hands.

Below the thyroid prominence were four purple petechial contusions (caused by blunt force injuries), which could have been caused by pressure.  However, there were no internal neck injuries.

Also noted were petechial hemorrhages to the eyelids.  These can occur by various means, including pressure to the neck and direct trauma.[11]

There was a gunshot wound to the head, with the entrance point 1-1/2 inches behind the left ear with stipple marks, which generally indicates a shot fired from a distance of 18 to 24 inches.  The bullet did not enter the skull but passed through the large muscle on the left side of the neck in an almost level path with no significant front or back deviation.

There was blood on the right shirt sleeve which showed a pattern of lines.  The knife with the serrated edge found near the body could have caused that pattern.

Robin McClary was 5 feet 5 inches tall and weighed 124 pounds.  It was stipulated that ethyl alcohol (0.08% blood alcohol content) and methamphetamine (0.13 milligrams per liter) were detected in her blood.  For a woman Ms. McClary's size, 0.08% blood alcohol content would have required her to ingest a little over two drinks (e.g., 2 12-ounce beers or 8 ounces of wine).  An "effective level" of methamphetamine is present at 0.03 to 0.25 milligrams per liter, and methamphetamine makes a person agitated, irritable, paranoid, suspicious, and aggressive.

xiii.  Petitioner's testimony

Petitioner testified that he had known Ms. McClary in school and had become romantically involved with her in approximately March, 1995.  After a few weeks, she moved into his house with her son.

/ / /

/ / /

/ / /

---

[11]    The body was not moved until 3:00 a.m. The pathologist agreed that petechiae can occur as a result of lividity and decomposition. The pathologist deemed this possible, but not likely, for the following reasons: (1) seven to eight hours of decomposition is not long; (2) little decomposition was observed; and (3) there were fewer petechiae in the left eyelid as compared with the right, and the left side of the face had been down.

- 14 -

1       Before Ms. McClary moved in, Petitioner had purchased a 9-mm. Browning

2   "Hi-Power" handgun.[12]  Sometime in June, Ms. McClary began to carry the gun for protection.

3   They had been out shooting together, and she usually kept the gun in her purse.  Ms. McClary

4   got her hunting license sometime in July, after taking a gun safety class.

    When Petitioner left the gun with Ms. McClary, he would chamber a cartridge and

5   lower the hammer.  In order to fire the gun, all she would have to do is cock the hammer.

6       Petitioner and Ms. McClary had argued verbally perhaps three times before this

7   incident.  He described these arguments as "just kind of a huff and puff and ignore."

8       When Petitioner and Mr. Dubois had originally moved into the house, the dishwasher

9   was broken and the sprinklers and the air conditioner had not been working.  After Ms.

10  McClary moved in, it began to get hot, so Petitioner called the property manager several times

11  about the dishwasher and air conditioner in late April or May.  Petitioner never got a response,

12  but in August the landlord came by and was upset that the lawn was dying.  Petitioner

13  explained that the sprinkler was broken and that he had called the landlord without success

14  about the sprinkler, dishwasher and air conditioner.  The landlord said he would send his

gardener to see Petitioner.

15      About a week or so later, a three-day notice was served on Ms. McClary by the property

16  manager.  She called Petitioner at work, and he called the landlord who said that if they were

17  hiring a gardener to disregard the notice.  When Petitioner got home from work that day, a

18  repairman had already repaired the air conditioner but had said the dishwasher could not be

repaired.

19      On August 24, Petitioner got off work at 2:30 p.m.  He arrived home at 3:00 p.m. and

20  took Ms. McClary to the doctor at about 3:30 p.m.  When they arrived home a little after 4:00

21  p.m., they changed clothes and talked in the living room.  She had him sign papers for the

22  Department of Motor Vehicles.  He did not yet notice anything unusual about her behavior.

23      Ms. McClary started making dinner, while Petitioner began watching a movie.  She was

24  drinking wine, and he saw her have two glasses.  Again, Petitioner did not notice anything

unusual about her behavior.

25

---

26  [12]    This is a single-action, semi-automatic pistol.  The gun is cocked when a cartridge is
chambered.  Alternatively, a cartridge can be chambered and the hammer lowered; thereafter,

27  the gun must be cocked in order to fire.

- 15 -

28  PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1   The sprinkler repairman arrived at around 4:30 p.m. After Petitioner had shown him the
2   broken sprinkler, he left to get a part, and Petitioner went back inside. Petitioner and Ms.
3   McClary ate dinner in the living room.

4   As Petitioner was finishing dinner, at approximately 5:00 p.m., the gardener arrived.
    They looked at the job and agreed on a price. While the gardener went to his truck for his
5   tools, Petitioner showed the sprinkler repairman the sprinkler valves.

6   When Petitioner returned to the front of the house, Ms. McClary was on the front steps
7   talking to the gardener. Petitioner got an extension cord and plugged it into the garage for the
8   gardener. Petitioner and Ms. McClary walked over to the sprinkler repairman, and Ms.
9   McClary commented that he needed to replace all the sprinkler heads. When Petitioner told her
    that the sprinkler man knew what he was doing, she replied that she had lived in the country
10  and knew the sprinkler heads all needed to be replaced. At that time, she had not appeared
11  angry but had seemed to be becoming irritated.

12  At around 5:30 p.m., Petitioner and Ms. McClary went back inside the house. In the
13  living room, she began making comments about the landlord. She complained that the landlord
14  was sending his relatives to fix things when he should be paying a repairman. She began to get
15  "a little angrier" and said she would call the landlord herself. When Petitioner said that he had
    already talked to the landlord, she asked about the dishwasher, which he had already explained
16  was to be replaced in October, when the landlord had more money. Ms. McClary said that the
17  landlord had the money and that "that's bullshit." Her demeanor at this point was "irate and
18  getting loud."

19  As they were arguing, Petitioner knew that Ms. McClary had had a "couple of drinks"
20  but he did not know she had taken drugs. He did not learn that she had taken drugs until three
21  months after he was arrested.

22  Ms. McClary began saying that she would call and tell the landlord he needed to "get
23  this shit done." She said she was going to "jump his ass." When Petitioner replied that, if she
    did so, the landlord would "kick us out," she accused him of "taking the landlord's side, to fuck
24  [him]." Then she "stormed into the bedroom" and slammed the door.

25  Petitioner began to yell at Ms. McClary, telling her to "fucking knock it off, you've had
26  a few drinks." Petitioner went to the bedroom and started yelling at her about slamming the
27  door. She told him to "fuck off" and walked back to the living room, slamming the bedroom

                                        - 16 -

28  PTN. FOR WRIT OF HABEAS CORPUS
    BY A PERSON IN STATE CUSTODY

1  door again.

2  Petitioner walked to the living room and yelled at her again as she sat on the couch,

3  staring and angry. When he leaned over her, she put her hand in his face and pushed him back.

4  He did the same to her, pushing her on the right side of her face. He called her a "bitch" and

   turned to walk away.

5  Petitioner heard Ms. McClary jump up and he heard the sound of "glass banging

6  together." She swung a plate at him and it broke over his arm, cutting him, with one piece

7  flying into the kitchen. Petitioner then pushed her in her chest and face, and she went down

8  onto the couch and dropped the piece of plate she was holding. They continued yelling and

9  cursing at each other.

10  There was blood dripping from Petitioner's arm, and he saw blood dripping from her

   hand. After she walked into the bedroom, he threw the piece of plate that had landed in the

11  kitchen into the garbage.

12  She was in the bedroom "yelling and cussing." Petitioner went to the bedroom because

13  he knew she was cut, finding her by the bathroom door with bloody tissues in her hand. She

14  continued yelling and cursing about the landlord. He gave her a towel, and she began swinging

15  at him. Petitioner pushed her again, and she fell into the shower, knocking down the curtain

   rod. After she got up, she cursed Petitioner and tackled him onto   the bed, which collapsed.

16  She was on top, hitting him, and he hit her in the face. In the struggle on the bed, Mr. Vernon

17  received a cut to the inside of his lip.

18  Petitioner threw her off, and she landed beside the bed near the hunting bows and

19  arrows. When Petitioner got up, she hit him in the leg with an arrow that had a hunting tip. The

20  aluminum shaft hit Petitioner's leg, and when Ms. McClary "jerked it back," the blade cut the

21  side of his leg. When she tried to hit him again with the arrow, he jerked it from her hands and

   threw it into the corner.

22  She continued screaming. When Petitioner turned to grab a towel, he heard her yell that

23  she was going to kill him. When he turned back she was cocking the gun while on her knees.

24  He tackled her, wanting to get the gun away from her.

25  Petitioner testified that he had not wanted to be shot, and he had been angry, upset, and

26  scared. They struggled, and he wrested the gun from her and pulled away. He explained, ". . .

27  [I] just shot, I just reacted . . . I pulled away and I just pulled the trigger." Petitioner stated

   – 17 –

28  PTN. FOR WRIT OF HABEAS CORPUS
   BY A PERSON IN STATE CUSTODY

that he had not formed the thought that he "want[ed] to shoot her." Petitioner also testified as follows with regard to the shooting, "[It was] just all the emotions, it's just like there was no time to think at the time, it just happened, everything happened so quick."[13]

The bullet struck Ms. McClary as she was looking downward. This occurred within 10 to 15 minutes of their having re-entered the house after talking to the sprinkler repairman.

Upon being shot, Ms. McClary fell across Petitioner's legs, and he could see that she had been shot in the head. He "just sat there," not knowing what to do and thinking that no one would believe what had happened. He was scared to go to prison. Although he told police that this had been an accident, that was not true. He had decided to say it was an accident because the police kept repeating that they could understand if it had been an accident.

Petitioner got up and pulled Ms. McClary away from the door so that it could be opened. He walked to the living room, recalling that the gardener was outside. He looked out and saw the gardener continuing to work.

Petitioner returned to the bedroom and formed the idea of making it appear that somebody had broken in. When Petitioner grabbed a towel to wrap the gun, he saw the cartridge casing lying against the wall by the vanity, and he picked it up. He opened the sliding door to the bedroom. He closed and locked the bedroom door, and then kicked it open to make it look like a forced entry. He took the bathroom window out, threw it down, and pushed out the screen.

Petitioner threw the piece of broken plate on the living room couch into the trash. He took a knife from the kitchen counter to the bedroom, put blood on it, and placed it beside Ms. McClary, to simulate a fight. He pulled down her pants to suggest sexual assault. He pulled the phones in the bedroom and kitchen from the wall. He put the gun and towels in his truck and left.[14]

After Petitioner had driven two blocks, he saw Mr. Dubois on his way home. Petitioner felt that he couldn't let Mr. Dubois go home because Petitioner had just came from the house, so Petitioner asked Mr. Dubois if he wanted to go to the record store. Mr. Dubois agreed, and

---

[13] He admitted that at the first trial he had answered "yes" when asked whether he had "intended to shoot her" and had "intended to kill her."

[14] He denied having turned around and said "turn that TV down" as he was leaving the house after the shooting.

- 18 -

1    they drove in Petitioner's truck to Tower Records.

2        In order to explain the cuts on his arm and legs, Petitioner tried to walk through the

3    glass door at Tower Records, but that did not work. He told Mr. Dubois that he had cut himself

4    on the door and was going to clean up at Burger King. He drove behind Payless and threw the

   gun in a dumpster there. Then he drove to Burger King, cleaned up, and threw the towels in

5    their dumpster.

6        When they got home, he found a man in front talking to the gardener. Petitioner and Mr.

7    Dubois went past them and entered the house. Petitioner began calling to Ms. McClary, as if he

8    did not know what had happened. After he found her, he went to the neighbor's house to call

9    the police.

10        As the police arrived, Petitioner was on the lawn throwing up. He was crying real tears,

   because he had shot his girlfriend. He did not want to admit the truth because he "just was in

11    denial, didn't want to believe that [he] did something like that . . . ."

12        Petitioner did not tell police the truth in his first interrogations because he had "already

13    started lying." Later, Petitioner stated that this had been an accident, which also was not true.[15]

14    When he tied the socks around his neck, he was trying to kill himself out of shame.

15

16      H.  Claim Eight: Erroneous Jury Instruction Re: "Consciousness Of Guilt" Evidence

17        Petitioner was prejudicially deprived of his right to due process of law under the Fifth

   and Fourteenth Amendments to the U.S. Constitution due to the trial court's erroneously

18    instructing the jury that they were allowed to consider "consciousness of guilt" evidence to

19    affix the degree of murder, and due to the trial court's refusal to give an instruction requested

20    by the defense that would have clarified and limited the use of such evidence. Instructing the

21    jury in this manner erroneously permitted the jury to convict Petitioner of first degree murder

22    based on irrelevant and irrational inferences, rather than on inferences based on reason and

23

---

[15]    Before his arrest, Petitioner went to Michael King's house because he had falsely told

24    police that Mr. King might have had something to do with the homicide. He intended to get
   into an argument with Mr. King, as if he had been involved.

25        Mr. King testified that Robin had once been his girlfriend and had lived with him in
   1994. On August 30, 1995 at around 3:00 a.m., he saw Petitioner at his front door and saw

26    Petitioner's truck outside. He called 911 but hung up. When the 911 operator called him back,

27    he heard the truck start and leave.

28    PTN. FOR WRIT OF HABEAS CORPUS
   BY A PERSON IN STATE CUSTODY

1  rational experience.

2      <u>Facts Underlying Claim Eight</u>

3      The facts set forth in connection with Claim Seven, <u>ante</u>, are incorporated by reference.

4      As noted previously, Petitioner testified that he shot and killed the victim. The only issues for the jury related to Petitioner's mental state, namely: did he premeditate and

5  deliberate, or did he act in the heat of passion or with some other less culpable mental state.

6      Despite the limited issues at trial, the trial court instructed the jury with California Jury

7  Instructions – Criminal (hereinafter "CALJIC") 2.03, over defense objection. The instruction

8  advised the jury as follows:

9      CALJIC 2.03
        If you find before this trial the defendant made a willfully false or deliberately

10      misleading statement concerning the crime for which he is now being tried, you may
    consider such statement as a circumstance tending to prove a consciousness of guilt.

11          However, such conduct is not sufficient by itself to prove guilt and its weight
    and significance, if any, are matters for your determination.

12

13      Additionally, the trial court refused to give an instruction requested by the defense

14  which would have clarified CALJIC 2.03 by informing the jury of the proper parameters for
considering such evidence.  The requested instruction read as follows:

15          Evidence that the defendant attempted to hide or cover up the killing by false or

16      evasive statements made after the killing cannot be considered by you in determining
    whether the killing was deliberate and premeditated.

17

18  By the instructions given and refused, the jury was permitted to convict Petitioner based on
improper considerations in violation of his right to due process of law.

19

20      7.  Petitioner was represented at his trial and sentencing by appointed counsel Ralph

21  Cingcon of Stockton, California.  Petitioner was represented in his appeal and in his petition for

22  hearing to the California Supreme Court by appointed counsel Kyle Gee of Oakland,
California.  Petitioner is represented in his pending petition for writ of habeas corpus by current

23  counsel Mark R. Vermeulen.

24      8.  Petitioner is currently incarcerated at Salinas Valley State Prison, Soledad,

25  California by Warden Anthony A. Lamarque.  Petitioner has no sentence to serve other than the

26  sentence which is challenged by this Petition.

27                          - 20 –

28

## PRAYER

WHEREFORE, Petitioner Kenneth Vernon prays that this Court:

1. Issue a writ of habeas corpus to have Petitioner brought before the Court so that he may be discharged from his unconstitutional confinement and restraint;

2. Conduct a hearing at which proof may be entered concerning the allegations in this Petition, if necessary and appropriate;[16] and

3. Grant all other relief to which Petitioner may be entitled.

Date: September 12, 2000

Respectfully submitted,

_____

Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

---

[16] Petitioner will also be seeking leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, requesting that the Court order discovery of at least the following items from the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin County Superior Court No. SC059609A): (1) the names, addresses, and telephone numbers of the jurors (including alternate jurors); (2) the transcripts of the voir dire examination of the jurors (including alternate jurors); and (3) the exhibits from the trial.

- 21 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1

<u>VERIFICATION</u>

2

I, Mark R. Vermeulen, declare:

3

I am an attorney duly admitted to practice before this Court and I represent Petitioner

4

Kenneth Vernon.  My office is in San Francisco County.  In my capacity as attorney for

Petitioner I am making this verification on his behalf because he does not reside within the

5

county of my office and because these matters are more within my knowledge than his.

6

I have read the foregoing Petition For Writ Of Habeas Corpus and I declare under

7

penalty of perjury that the contents of the Petition are true to the best of my knowledge.

8

Executed on September 12, 2000 at San Francisco, CA.

9

10

11

_____

Mark R. Vermeulen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 22 –

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY