Mark R. Vermeulen [State Bar No. 115381]
Law Office of Mark R. Vermeulen
755 Florida Street  #4
San Francisco, CA  94110.2044
Telephone: 415.824.7533
Fax: 415.824.4833

Attorney for Petitioner
KENNETH VERNON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNETH VERNON,                    )     No. C 00-3311 MJJ
                                   )
        Petitioner,                )     **DECLARATION OF COUNSEL,**
                                   )     **WITH EXHIBITS, IN SUPPORT OF**
        v.                         )     **PETITIONER'S PROTECTIVE MOTION**
                                   )
ANTHONY A. LAMARQUE,               )
Warden, and DOES 1-10,             )
                                   )
        Respondents.               )
_____)

1   Mark R. Vermeulen [State Bar No. 115381]
    Law Office of Mark R. Vermeulen
2   755 Florida Street #4
3   San Francisco, CA 94110.2044
    Telephone: 415.824.7533
4   Fax: 415.824.4833

5   Attorney for Petitioner
    KENNETH VERNON
6

7                 UNITED STATES DISTRICT COURT

8                NORTHERN DISTRICT OF CALIFORNIA

9
    KENNETH VERNON,              )   No. C 00-3311 MJJ
10                               )
11      Petitioner,              )   **DECLARATION OF COUNSEL,**
                                 )   **WITH EXHIBITS, IN SUPPORT OF**
12      v.                       )   **PETITIONER'S PROTECTIVE MOTION**
                                 )
13  ANTHONY A. LAMARQUE,         )
    Warden, and DOES 1-10,       )
14                               )
15      Respondents.             )
    _____)
16

17      I, Mark R. Vermeulen, declare:

18      1. I am an attorney duly admitted to practice before this Court. I represent Petitioner

19  Kenneth Vernon in this action and in the related state court habeas proceedings.

20      2. I was hired by Mr. Vernon's parents to undertake representation of their son in these
    habeas proceedings after the direct appeal in the state courts had concluded.
21
        3. I have reviewed the records and filings relevant to these proceedings and the related
22
    state court proceedings, both on direct appeal and on habeas. I also earlier undertook efforts to
23
    obtain trial counsel's files and records and to investigate the claims presented in the instant
24  Petition and the related state court petition.

25      4. Along with an investigator I hired to assist us, I conducted an investigation into

26  various claims as they came to light. We continued to investigate the meritorious claims and to

27  present them in the instant Petition and in the state court petition, mindful of the federal filing

28  deadline. The claims investigated include those set forth in the Petition and other claims

                                   - 1 -
    DECL. OF COUNSEL, WITH EXH'S, IN
    SUPPORT OF PETITIONER'S PROTECTIVE MOT.

1   which, while appearing earlier to be potentially meritorious, appeared at the time of filing the

2   Petition to lack merit.  Those claims therefore were not included in the Petition, nor were they

3   included in the state court petition.  Rather than presenting the claims in piecemeal fashion as

4   they came to light, I felt it prudent to investigate the claims as fully as possible up to the federal

    filing deadline, and then to file the Petition to preserve the filing date.

5       5. The investigation of the claims in the petitions had been (and continues to be)

6   ongoing in that, among other matters, counsel's investigator has been attempting to identify,

7   locate, and interview the jurors with relevant information regarding the claims involving juror

8   and/or prosecutorial misconduct.  *See* Petition (Exhibit A, attached hereto), pp. 2-4 (Claims

9   One through Three); state court petition (Exhibit C), pp. 3-8 (Claims One through Three).  This

10  I have attempted to accomplish through both the state court and trial counsel.  However, the

11  state court has not acted upon Petitioner's request for the discovery of juror information, which

12  was filed with the state court petition in September 2000.  *See* Request For Discovery (Exhibit

13  F).  I recently requested that the state court act upon these earlier requests.  *See* Motion For

14  Ruling On Earlier-Filed Requests For Discovery (Filed Contemporaneously With Petition For

15  Writ Of Habeas Corpus) And For Reconsideration Of Denial Of Petition (Exhibit H).  That

    motion is pending.

16      6. Moreover, my efforts to obtain juror information from trial counsel have been

17  similarly unsuccessful.  I encountered serious difficulties and delays in communicating with

18  and in obtaining from trial counsel even the trial file and/or basic information.[1]  For example,

19  during the months of July-August, 2000, I attempted on numerous occasions to contact trial

20  counsel to obtain the trial file and to discuss the case, with little success.[2]  I first made actual

    contact with trial counsel in a telephone conversation on August 1, wherein I requested from

21

22      [1]  The trial files in the possession of trial counsel consisted of files that trial counsel
    used during the trial court proceedings, along with files that Petitioner himself had kept and

23  used during the pendency of the trial court proceedings, since Petitioner had turned over his
    files to trial counsel at the conclusion of the trial.  Petitioner's family had requested the return

24  of these files several times on earlier occasions but had not been provided the files by trial
    counsel.

25

26      [2]  I understand that at least a portion of the delays and difficulties in communication are
    attributable to trial counsel being involved in one or more other trials on other matters during

27  this time and to trial counsel being ill in August, 2000.

28                                                    - 2 -
    DECL. OF COUNSEL, WITH EXH'S, IN
    SUPPORT OF PETITIONER'S PROTECTIVE MOT.

1  trial counsel any information he had regarding the jurors, along with the trial file.  Trial counsel

2  informed me that he did not have any information regarding the jurors and that he did not know

3  where the trial file was located, but that he would look for the file.  I stressed the urgency of the

4  need for the trial file (given the imminent federal filing deadline) and I offered to travel to trial

   counsel's office in Stockton on short notice to pick up the trial file or, if need be, to look

5  through trial counsel's closed file storage area to locate the trial file.  I confirmed that I would

6  contact trial counsel again on August 4 to discuss the matter further and to make whatever

7  arrangements were necessary.  On the agreed-upon August 4 date (a Friday), I paged trial

8  counsel and left a voicemail, but received no response.  During the week of August 7-11, I left

9  various pages and voicemails for trial counsel, but received no response.  I left a voicemail for

   trial counsel again on August 16, again receiving no response.  On August 17, I sent a certified

10 letter to trial counsel, again requesting the trial file.  The return-receipt confirmed that trial

11 counsel received this letter on August 24, but I did not hear from trial counsel until we spoke

12 on August 31.  Trial counsel explained that he had been ill for a time and that he was

13 attempting to locate the trial file.  Trial counsel also explained, however, that the trial file may

14 have been destroyed or discarded.  Trial counsel noted that his home (where he believes the

15 trial file had been located) had suffered serious damage in or about May 2000 when a water

   pipe broke, flooding much of the first floor (where his files were stored).  Trial counsel

16 explained that as a result, many files had been damaged irreparably and others had been thrown

17 out.  Trial counsel did agree to make arrangements whereby my investigator could travel to trial

18 counsel's home and office to seek to locate and take custody of the trial file.  Through that,

19 only approximately one box of files was located and turned over, this occurring on September

20 5, 2000, just nine (9) days before the September 14, 2001 AEDPA filing deadline.  In my

21 experience, in a case such as this (involving first degree murder charges, two trials, and a

   sentence of 35 years to life), the trial file would be considerably more extensive than the

22 limited materials provided to me by trial counsel.

23 / / /

24 / / /

25 / / /

26

27                                              - 3 -

28 DECL. OF COUNSEL, WITH EXH'S, IN
   SUPPORT OF PETITIONER'S PROTECTIVE MOT.

7. **Exhibits**: Attached hereto, and listed below, are true and correct copies of documents and pleadings submitted in this Court and in the related state court proceedings, which are as referenced as exhibits in the accompany Petitioner's Protective Motion For Immediate Determination Of Exhaustion Status, For Equitable Or Other Tolling, And For Order Holding Petition In Abeyance Pending Exhaustion In State Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2001 at San Francisco, CA.

_____
Mark R. Vermeulen
Attorney for Petitioner KENNETH VERNON

- 4 -

DECL. OF COUNSEL, WITH EXH'S, IN
SUPPORT OF PETITIONER'S PROTECTIVE MOT.

1

## EXHIBITS

2
3
Exhibit A:    *Petition For Writ Of Habeas Corpus By A Person In State Custody [28 U.S.C. § 2254]* (filed in U.S. District Court)

4
Exhibit B:    *Order Dismissing Writ Of Habeas Corpus* (U.S. District Court)

5
6
Exhibit C:    *Petition For Writ Of Habeas Corpus* (San Joaquin County Superior Court, No. SC059609A)

7
Exhibit D:    *Appellant's Petition For Review* (California Supreme Court, No. S078530)

8
9
Exhibit E:    *Order* (of the California Supreme Court denying petition for review) (California Supreme Court, No. S078530)

10
Exhibit F:    *Request For Discovery In Connection With Petition For Writ Of Habeas Corpus* (San Joaquin County Superior Court, No. SC059609A)

11
12
Exhibit G:    *Order* (denying state court petition) (San Joaquin County Superior Court, No. SC059609A)

13
Exhibit H:    *Motion For Ruling On Earlier-Filed Requests For Discovery (Filed Contemporaneously With Petition For Writ Of Habeas Corpus) And For Reconsideration Of Denial Of Petition* (San Joaquin County Superior Court, No. SC059609A)

14
15
16
[end]

17
18
19
20
21
22
23
24
25
26
27
28

- 5 -

DECL. OF COUNSEL, WITH EXH'S, IN
SUPPORT OF PETITIONER'S PROTECTIVE MOT.

Exhibit A:
*Petition For Writ Of Habeas Corpus By A Person In State Custody*
*[28 U.S.C. § 2254]*
(filed in U.S. District Court)

Mark R. Vermeulen [State Bar No. 115381]
Law Office of Mark R. Vermeulen
755 Florida Street #4
San Francisco, CA 94110.2044
Telephone: 415.824.7533
Fax: 415.824.4833

Attorney for Petitioner
KENNETH VERNON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**C 00     3311**

| | |
|---|---|
| KENNETH VERNON, | ) |
| | ) |
| Petitioner, | ) **PETITION FOR WRIT OF HABEAS** |
| | ) **CORPUS BY A PERSON** |
| v. | ) **IN STATE CUSTODY** |
| | ) **[28 U.S.C. § 2254]** |
| ANTHONY A. LAMARQUE, | ) |
| Warden, | ) |
| and DOES 1-10, | ) |
| | ) |
| Respondents. | ) |
| | ) |

Petitioner Kenneth Vernon, by the through counsel, hereby petitions for a writ of habeas

corpus. By this verified Petition, Petitioner states as follows:

1. The judgment of conviction and sentence which is the subject of this Petition was

entered in the San Joaquin County Superior Court, Stockton, California (People v. Kenneth

Vernon, San Joaquin County Superior Court, No. SC059609A). This petition concerns the

criminal conviction and judgment arising from the jury trial in that action. In that action,

Petitioner was convicted on March 7, 1997 of murder in the first degree (California Penal

Code[1] § 187). The jury also found true the enhancement allegation that Petitioner personally

used a firearm (§ 12022.5).

---

[1]    All further statutory references are to the California Penal Code unless specified

otherwise.

- 1 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

2. The judgment of conviction and sentence was entered on April 4, 1997. Petitioner was sentenced to state prison for a total term of 35 years to life (25 years to life on the § 187 conviction, plus 10 years on the § 12022.5 enhancement, with the 10-year determinate term to be served before the indeterminate term).

3. Petitioner appealed from his conviction and judgment to the California Court of Appeal, Third Appellate District. The Court of Appeal affirmed the trial court's judgment in an unpublished opinion issued March 8, 1999 (<u>People v. Kenneth Jerome Vernon</u>, California Court of Appeal, Third Appellate District No. C026244).

4. From the appeal, Petitioner sought review in the California Supreme Court through a petition for review filed on April 16, 1999. That petition was denied on June 16, 1999 (<u>People v. Kenneth Jerome Vernon</u>, California Supreme Court No. S078530).

5. Subsequent to the appeal, Petitioner filed a petition for writ of habeas corpus in the San Joaquin County Superior Court, Stockton, California (<u>Kenneth Vernon, On Habeas Corpus</u>, San Joaquin County Superior Court). That petition is pending.

6. <u>Grounds For Relief:</u> The grounds upon which Petitioner is being held in custody unlawfully and in violation of the U.S. Constitution are as follows:

A. <u>Claim One: Juror Misconduct By Failing To Disclose Material Information During Voir Dire</u>

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when one or more of the jurors committed prejudicial misconduct by failing to disclose to the trial court and counsel, during voir dire, material information which demonstrated juror bias and knowledge.

<u>Facts Underlying Claim One</u>[2]

There were at least three instances in which jurors concealed material information and bias on voir dire. First, one of the jurors (Linda Withers, who will be referred to herein as "Juror 1") is related to one of the key prosecution witnesses by marriage, and the Withers family has known Petitioner's family for many years. The prosecution witness to whom Juror

---

[2]    Petitioner will also be seeking leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, requesting materials and information necessary to properly and fully litigate this Petition.

- 2 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

1 is related is Doyle Dubois; Doyle Dubois' uncle is Tom Dubois, who is married to Lavanda Withers; Lavanda Withers is related to Juror 1. Additionally, Petitioner's family has known Lavanda Withers and the Withers family almost all of their lives. For example, Petitioner's father (William Vernon) has known Alan Withers almost all his life, having gone through school together in their childhood. Alan Withers and the Withers family are related to Juror 1. These relationships of Juror 1 were not revealed during voir dire.

Second, a second juror (referred to herein as "Juror 2") knew or was acquainted with Petitioner's uncle, Jack Vernon. This relationship likewise was not revealed during voir dire.

Third, a third juror (referred to herein as "Juror 3") was familiar with the means by which blood levels of d-amphetamine and amphetamine could show up in a person's blood, as demonstrated by the note submitted by the jury on March 5, 1997. That note states:

"Q. Concerning blood levels of d-amphetamine and amphetamine found in [deceased victim] Robin McClary. There was no evidence produced to substantiate the use of amphetamines by inhalation, oral ingestion of [sic] injection. However, Robin McClary did suffer from allergies and a bronchial disorder.

"If Robin took prescription medication for breathing and any over the counter medication for allergies or asthma those drugs will show a false positive test for amphetamines.

"The statement by both defense and prosecution that she used amphetamine may not be valid."

This knowledge was relevant because levels of such substances were found in the deceased victim. This fact was relevant to the issue of whether the death constituted murder or manslaughter, and the degree of murder or type of manslaughter. Juror 3 did not reveal this knowledge and familiarity during voir dire. Furthermore, the trial court failed to admonish the jury when they submitted this note during deliberations.

B. Claim Two: Juror Misconduct By Contact And Discussions With Third Parties

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when one or more of the jurors committed prejudicial misconduct by having contact with third parties (namely, the deceased victim's mother, friends, and relatives, and the District Attorney).

- 3 -

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

Facts Underlying Claim Two

During the trial, several jurors had inappropriate and prejudicial contact with the District Attorney, and with the deceased victim's mother, friends, and relatives. In connection with the District Attorney, the juror contact occurred by the jurors conversing with the District Attorney during recesses and breaks in the trial. In connection with the deceased victim's mother, friends, and relatives, the juror contact likewise occurred during recesses and breaks in the trial during which the jurors would converse with the deceased victim's family and friends in the courtroom (which conversation sometimes also involved the District Attorney) and outside the courthouse in or near an area where people would congregate to converse and to smoke. In addition, the jurors on more than one occasion brought fruit and/or other food to the District Attorney during the trial, which he accepted. During these various contacts, one or more of the jurors discussed aspects of the case with the non-jurors and the jurors were prejudicially influenced by these contacts.

C.  Claim Three: Prosecutorial Misconduct By Contact And Discussions With Jurors

Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when the prosecutor committed prejudicial misconduct by having contact with the jurors and by facilitating communications between jurors and third parties (namely, the deceased victim's mother, friends, and relatives).

Facts Underlying Claim Three

During the trial, the District Attorney had inappropriate and prejudicial contact with several of the jurors and failed to report this contact to the Court and defense counsel. This contact occurred through the District Attorney's conversing with the jurors during the recesses and breaks in the trial. At times, this conversation also involved members of the deceased victim's family, who were seated in the audience in the courtroom. The District Attorney would engage in and facilitate three-way conversations with the jurors and the deceased victim's family and friends. Improper and prejudicial contact also occurred by the District Attorney accepting fruit and/or other food from the jurors during the trial. During the contacts noted herein, one or more of the jurors discussed the case and the trial with the District Attorney and were prejudicially influenced by these contacts.

– 4 –

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

D.  Claim Four: Exclusion Of Public From Voir Dire

Petitioner was prejudicially deprived of his right to a public trial and to due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution due to the exclusion of the public (including Petitioner's family) from the courtroom during voir dire.

Facts Underlying Claim Four

During voir dire the public, including Petitioner's parents, was excluded from the courtroom without reason or necessity.

E.  Claim Five: Trial Court's Refusal To Substitute Other Counsel For Second Trial

Petitioner was prejudicially deprived of his right to the effective assistance of counsel, to a fair trial, and to due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution due to the trial court's refusal to substitute counsel for the second trial (after a mistrial was declared in the first trial of this matter when the jury was unable to reach a verdict), due to the court's quick resetting and commencement of the second trial, and due to trial counsel's consequent inability to provide Petitioner with adequate and effective representation at the second trial.  There was no tactical reason for the failure of trial counsel to undertake the matters complained of herein and Petitioner was prejudiced by these actions.

Facts Underlying Claim Five

At the first jury trial in this matter, which took 22 days to complete, a mistrial was declared on December 20, 1996 when the jury was unable to reach a verdict.  Counsel returned to court on January 7, 1997.  Defense trial counsel informed the Court he was not prepared to go forward on that date, that Petitioner and his family had no funds to retain him a second time, and that he could not continue to represent Petitioner.  Among the reasons given by trial counsel as to why he could not retry the case were that retrying the case (particularly on a tight timeline) would impose a severe hardship on counsel, that counsel had many other trials set and/or trailing (along with other cases) which he had had to put aside to try this case and to which he must now attend, and that he would be unable to provide adequate and effective assistance at a second trial, all of which were exacerbated by the fact that trial counsel was a sole practitioner.  Nevertheless, the trial court denied trial counsel's request.  The trial court appointed the same trial counsel to try the case a second time, over counsel's strenuous

– 5 –

objection. Trial counsel thereupon requested a trial date of April 1997 in order to be able to prepare properly. The District Attorney noted that he would be prepared to begin in January, and the trial court set the trial for January 27, 1997. Trial counsel pleaded with the trial court for additional time, which requests were denied, the trial court stating: "You're under duress, [trial counsel], and the record should note that."

At the second trial, trial counsel failed to do undertake several matters necessary to the effective representation of Petitioner, all of which contributed to Petitioner receiving inadequate and ineffective assistance of counsel. The actions which trial counsel failed to undertake or which he undertook ineffectively include the following: failure to conduct adequate investigation, including ballistics testing and consulting with forensics experts; failing to object to the exclusion of the public from the courtroom during voir dire and informing Petitioner's mother that she had to remain outside the courtroom during voir dire, failure to adequately question prospective juror Linda Withers regarding juror bias; failure to raise the issue regarding juror Linda Withers' bias at the earliest opportunity in the trial; failure to act as an effective and zealous advocate when trial counsel confirmed the trial judge's limited questioning of juror Linda Withers for bias during the trial; failure to review the presentence report prior to sentencing and failure to accept and employ the brief recess offered by the trial court to allow trial counsel to review the presentence report and to prepare for sentencing; and failure to preserve the trial files, including Petitioner's own trial file. There was no tactical reason for trial counsel to fail to undertake these matters.

F. Claim Six: Ineffective Assistance Of Counsel If Any Claims Are Deemed Previously Waived

If any of the claims or issues raised in this Petition are deemed waived by previous counsels' failure to timely raise and litigate the claim(s) and/or issue(s), Petitioner was prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and his right to due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, for there was no tactical reason not to raise these claims or issues, and Petitioner was prejudiced by these actions.

Facts Underlying Claim Six

See facts set forth in the preceding Claims, ante.

– 6 –

G. Claim Seven: Insufficiency Of Evidence To Convict Of First Degree Murder

Petitioner was prejudicially deprived of his right to due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution because the evidence adduced at trial was insufficient to support a conviction for murder in the first degree. At most, the evidence supported a conviction for murder in the second degree, or manslaughter.

Facts Underlying Claim Seven

i. Introduction

In this case, there was no question at trial as to who fatally shot the decedent, Robin McClary. Petitioner, in his own testimony, admitted that he had done so. The issue at trial concerned the type and degree of homicide: was this premeditated murder, second degree murder, or manslaughter?

In the context of this insufficiency-of-evidence claim, the factual discussion here is lengthy, of necessity. It is derived from the trial transcripts. For readability, the discussion is categorized into the testimony of the key witnesses and/or the key events relevant to establishing the claim. The evidence adduced at trial was as follows.

ii. The gardener

On August 24, 1995, Robert Perry was to meet Petitioner at approximately 5:00 p.m. at 8201 Arroyo Way in Stockton, California to discuss gardening work. Mr. Perry went by the house at 3:00 or 4:00 p.m., but no one was home. He returned shortly after 5:00 p.m., and Petitioner answered the door. Petitioner showed him around outside. Mr. Perry asked Petitioner if he could run power from either the garage or the house, and Petitioner brought out an extension cord through the garage.

Mr. Perry began to trim the shrubs by the front door. Another man came by to work on a broken sprinkler on the side of the house. The sprinkler man left but returned and began talking to Petitioner in front of the house. A woman (Robin McClary, who was Petitioner's girlfriend and who is the deceased in this case) came out and listened to what they were saying. Mr. Perry spoke to her, and she did not seem upset. Thereafter, she and Petitioner re-entered the house.

Mr. Perry worked his way to the side yard. At one point he turned off his clippers and heard a stereo and a television, which were "kind of loud." He could also vaguely hear people

– 7 –

talking. While at the front of the house later, Mr. Perry heard "what sounded like a plate . . . being broke and a glass." Back at the side of the house, he heard someone walking heavily. In addition, he "heard off in the distance like a firecracker . . . ." Thereafter, there was a thump, like shoes being thrown.

About 15 to 25 minutes after Petitioner and Ms. McClary had gone back inside the house, Petitioner came out carrying what appeared to be clothes and a towel. He was wearing a T-shirt and a pair of shorts. He called to Robin to turn down the stereo. He then got into his truck.[3]

About 10 minutes later, Petitioner returned and stopped in front of the house. A red pickup pulled into the driveway, and a man got out and got into Petitioner's truck, which again left. The man in the red pickup was Doyle Dubois, who shared the house with Petitioner and Ms. McClary.

The two men returned 25 to 45 minutes later, shortly before 7:00 p.m. A young man had been waiting to talk to Petitioner about repairing the roof, and he spoke to Petitioner. Thereafter, Petitioner and Mr. Dubois went inside. Both ran out soon thereafter, screaming, "She's dead, she's dead."[4]

///

///

---

[3]     The total time that Petitioner was inside the house was not made clear at trial. Mr. Perry testified that it had been 20 to 25 minutes, but he told a deputy that same night that it had been about 10 minutes. At the first trial, he testified that it had "felt like 15 minutes." He also testified that Petitioner came out of the house 15 to 20 minutes after Mr. Perry had heard the last noise from inside the house, but he had previously testified that he thought it had been "maybe 5 minutes" thereafter. In any event, he told police that he had looked at his watch and believed that Petitioner had left at about 5:50 p.m.

[4]     Philip Mosqueda had been working on the sprinkler. He had been at the house the week before, when he repaired the air conditioning unit and checked the broken dishwasher, which could not be repaired. When he told Ms. McClary that the dishwasher needed to be replaced, she had not seemed upset.

On August 24, 1995, Mr. Mosqueda arrived at the house at approximately 4:45 p.m., knocking on the front door and telling Ms. McClary he would be working on the sprinkler. After two trips for parts, the job was finished, and Mr. Mosqueda went to the door. Petitioner and Ms. McClary came out, and they talked for a few minutes. Mr. Mosqueda did not smell any alcohol on Ms. McClary's breath, and she did not appear to be upset. Mr. Mosqueda left at approximately 5:30 p.m.

- 8 -

### iii. The roommate

Doyle Dubois was living at 8201 Arroyo with Petitioner, Ms. McClary, and her son, Nicholas. Mr. Dubois' bedroom was in the southeast corner, Nicholas' was in the southwest area, and the north bedroom was occupied by Petitioner and Ms. McClary.

Mr. Dubois got off work at 5:00 p.m. He stopped at an auto parts store, a bank, and fast food place before heading home. On the way home, Mr. Dubois saw Petitioner in his truck. Petitioner asked Mr. Dubois if he wanted to go to a music store, and Mr. Dubois dropped off his truck at the house, seeing the gardener in the front yard. Mr. Dubois and Petitioner went to Tower Records in Petitioner's truck.

At the store, Petitioner somehow collided with the door, "hard." Inside the store, Petitioner seemed highly agitated and said he had been cut. He displayed cuts on his arm and leg. After talking to one of the clerks, Petitioner left, saying he was going to clean up his cuts.[5] When Petitioner returned ten minutes later, he seemed angry and said that he would not buy anything at that store. After leaving Tower Records, they went home.

Upon arriving back at the house, Mr. Dubois got his books and handgun out of his truck. A man came up and talked to Petitioner about the roof. Petitioner and Mr. Dubois then entered the house.

After Mr. Dubois asked why the phone was on the floor in the kitchen, Petitioner began calling to Ms. McClary. Petitioner walked through the house, seeming "upset and worried." When Petitioner looked into the bedroom, he said, "Oh, my God!"

Mr. Dubois saw Ms. McClary on the floor in the bed room. There was a kitchen knife by her hand. Petitioner and Mr. Dubois went outside. At this point, Petitioner was crying. Mr. Dubois was carrying his gun, which he locked in his truck.

The next-door neighbor testified that sometime 6:00 and 7:00 p.m., he heard "pounding" at her door and found Petitioner in an "agitated" state, saying "Call 911. My girlfriend's been shot." Petitioner also stated, "I think she's been raped."

---

[5]  A Tower Records employee testified that at about 6:00 p.m., Petitioner and another man had approached the store. Petitioner had walked into the door as the other man was opening it. After they entered, they walked to the back for awhile. Petitioner then came to the counter and showed her the cuts on his arm and leg. She told him he could not have cut himself on the door, and she saw that the blood was already coagulated. Petitioner left alone and returned later.

– 9 –

Petitioner and Mr. Dubois sat down in the yard. Petitioner was very upset. He was crying "hard" and saying that he could not believe that this had happened. At one point, he vomited on the lawn.

### iv. The first officers at the scene

Sheriff's deputies arrived just before 7:00 p.m., finding Petitioner and Mr. Dubois on the lawn. Petitioner was in a fetal position, crying and distraught. He said that his girlfriend was in the house and had been shot.[6]

Police entered the house, finding the television at high volume. A pair of glasses was on the floor in the living room, near the coffee table. A cordless telephone had been knocked to the floor. In the hall were blood drops on the carpet. The bathroom window was on the floor, with the glass broken. Inside the bedroom was a woman lying face down on the floor. Her pants and underpants were partially down, and a knife lay near her arms. A black purse was on the corner of the bed nearest the body.

### v. Examination of the house

The house had an entry hall, with the living room immediately to the left, and a kitchen and dining room area farther down the hall to the right. Inside the living room was a couch with a grease spot on the back. On the floor behind the couch was a piece of broken plate. A pair of glasses was on the floor by the coffee table, and there were blood spots on the living room rug. Blood spots were located on the metal strip separating the living room rug from the kitchen floor, and in the hallway.

On the floor of the dining area was part of a Cornish game hen. There was also a phone with the wall plug missing.

In the kitchen was the telephone wall jack in which the plug and a piece of cord remained. The garbage included pieces of a plate that matched the piece found behind the couch. Also in the garbage were two beer bottles and a Franzia wine container.[7]

---

[6] Police had difficulty obtaining information from Petitioner because he was so upset. He identified the woman as Robin McClary. He said he had gotten home from work, after which the gardener had arrived. Petitioner and Mr. Dubois had gone to Tower Records for about an hour. When they got home, he and Mr. Dubois discovered Ms. McClary in the bedroom.

[7] One of the first police in the house had been looking for something to use to cover the knife. He dumped out the kitchen garbage, intending to use the can to cover the knife. The officer then saw a large bowl and decided to use it to cover the knife instead of the garbage can,

- 10 -

The bathroom window screen was on the ground directly below the window. The window itself was in the bathroom, with the frame and glass broken. Drops of blood were located on the sink and countertop, on the floor, on the toilet paper roll, on the step leading down to the shower, and in the upper right-hand corner inside the shower.

In the north bedroom was a waterbed frame containing a regular mattress, with the corner of the bed nearest the body knocked off its pedestal. A long bloodstain led from just inside the door to the body. An open black purse was on the corner of the bed, and a knife was on the floor. The door's strike-plate and jamb were broken.

A hunting bow and arrows were between the bed and the wall. A second phone was on the floor, also with the wall plug missing. Near the phone was a gold chain broken in the middle. Two feet to the side of the door, and two feet above the floor, was a hole in the wall. A bullet was imbedded in the stud behind the sheetrock.

### vi. The testimony of Ms. McClary's mother

Ms. McClary's mother testified that she last saw her daughter three or four days before her death when she came to visit in her white Volkswagen with her son and Petitioner. Petitioner's brother and sister-in-law came in another car.

Ms. McClary had a handgun when she visited. Ms. McClary's mother did not notice any injuries to her daughter's face. The Volkswagen was not running properly, and when they left they rode home with Petitioner's brother. Police later found a box of 9- millimeter cartridges in the glove compartment of the Volkswagen.

### vii. Petitioner's first statements to police, on the night of the homicide.

Deputy Mayoya interrogated Petitioner at the sheriff's department the evening of the incident soon after 8:00 p.m. A videocassette tape of the interrogation was played at the trial. In that first statement, Petitioner denied any involvement in Ms. McClary's death. He asserted that he left to go to the record store, leaving Ms. McClary in the house and the gardener outside. He said he ran into Mr. Dubois, and the two went together to the record store and returned after about an hour to find Ms. McClary dead.

Deputy Mayoya interrogated Petitioner again later that night at approximately 1:00 a.m., after Petitioner had been taken to the emergency room where a physician cleaned his

which was left in the kitchen.

- 11 -

injuries.[8] In this second hour-long interrogation, Petitioner was advised of his rights, and the deputy told Petitioner that the deputy did not believe Petitioner's original story. When Petitioner was accused of being involved, he denied it. The deputy testified that his intention in this interrogation was to "float out theories" such as "maybe this is what happened," and he posed several different "theories." The first theory was that this was perhaps an accident, which Petitioner denied.[9] Another was that this involved self-defense, which Petitioner also denied. The deputy conceded that he had raised these theories in the hope that Petitioner would adopt one that could be disproved.

### viii. The towels in the dumpster

A Sheriff's sergeant was told by Detective Mayoya that Petitioner had stated that he had cut himself at Tower Records and cleaned himself up at Burger King. The sergeant checked the dumpsters in the nearby Payless shopping center, but they had been emptied. Inside the Burger King dumpster were a large terry cloth bath towel and two other towels.

### xi. The August 27 telephone conversation

On August 27, Deputy Mayoya left a message at Petitioner's house, and Petitioner called back. Petitioner was asked about his Browning Hi-Power pistol, because police had been unable to locate it. Petitioner responded that Ms. McClary carried the gun in her purse most of the time. When asked when Petitioner had last seen the gun, he answered that it had been on Wednesday (August 23). When Petitioner was told that the gardener had said he had seen him carrying something out of the house, Petitioner denied it. Petitioner was asked if dishes had been broken, and he said that they had not. Petitioner also denied knowing how the bedroom door had been broken.

### x. The August 30 arrest and subsequent interrogations

Petitioner was arrested on August 30 at the cemetery just after Ms. McClary's funeral had ended. He was taken to the Sheriff's office and he was again read his <u>Miranda</u> rights. An interrogation was conducted that afternoon and a final interrogation was conducted at

---

[8]    It was stipulated that the physician would testify that the injuries were consistent with having been cut by a sharp object.

[9]    During the second interrogation, the deputy made reference to "accident" as many as fifty times. During the fourth interrogation, Petitioner actually adopted the "accident" theory.

– 12 –

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

approximately 6:30 p.m.[10]

Videotapes of both August 30 interrogations were played at trial. In the first August 30 interrogation, Petitioner was advised by Deputy Mayoya at length why Petitioner's story was not credible. Petitioner denied involvement for some time. However, he eventually admitted that he had shot Ms. McClary, stating that it had been an accident.

After his arrest, Petitioner was put in a holding cell. During a periodic check, he was found to have removed his socks and tied them around his neck. When asked what he was doing, Petitioner responded that he couldn't face his parents. The knots were so tight that the deputy was unable to untie them.

xi.  The forensic testimony

A criminalist from the Department of Justice tested a number of blood samples. Samples consistent with Ms. McClary's blood type were found on the living room carpet, the bedroom floor, the door of the bathroom, a light blue bath towel from the Burger King dumpster, and a dish towel from the Burger King dumpster. Samples consistent with Petitioner's blood type were found on the "west shower wall", a dark blue bath towel from the Burger King dumpster, and a light blue towel from the Burger King dumpster.

A criminalist had also gone to the house to do a bullet trajectory reconstruction using a probe and a protractor. The criminalist testified that the angle of entry was approximately 80 degrees from the wall (plus or minus 5 degrees) and approximately horizontal. When fired, the gun would have been approximately two feet above the floor. The criminalist introduced into evidence a photograph of an officer with his head in approximately the position which would account for the wounds and the hole in the wall. He would have expected to see some blood spatter if the decedent had been within 1-1/2 to 2 feet of that wall.

xii.  The autopsy

The forensic pathologist who performed the autopsy described a variety of injuries. There were superficial injuries in Ms. McClary around the face, including bruises on the lips, a "pattern" bruise on the left cheek that might have been caused by a ring, and a one-inch scratch on the chin. Her nose had not been broken and she had no black eyes, no swelling, and no open

---

[10]    At the time of his arrest, Petitioner did not know that the towels had been found. He found out for the first time on videotape that the police knew of the bloody towels.

- 13 -

cuts or lacerations. There was a 1/4-inch by 1/8-inch abrasion to the left scapula, an abrasion next to the right elbow, and bruises to the left hip. There were no injuries to the hands.

Below the thyroid prominence were four purple petechial contusions (caused by blunt force injuries), which could have been caused by pressure. However, there were no internal neck injuries.

Also noted were petechial hemorrhages to the eyelids. These can occur by various means, including pressure to the neck and direct trauma.[11]

There was a gunshot wound to the head, with the entrance point 1-1/2 inches behind the left ear with stipple marks, which generally indicates a shot fired from a distance of 18 to 24 inches. The bullet did not enter the skull but passed through the large muscle on the left side of the neck in an almost level path with no significant front or back deviation.

There was blood on the right shirt sleeve which showed a pattern of lines. The knife with the serrated edge found near the body could have caused that pattern.

Robin McClary was 5 feet 5 inches tall and weighed 124 pounds. It was stipulated that ethyl alcohol (0.08% blood alcohol content) and methamphetamine (0.13 milligrams per liter) were detected in her blood. For a woman Ms. McClary's size, 0.08% blood alcohol content would have required her to ingest a little over two drinks (e.g., 2 12-ounce beers or 8 ounces of wine). An "effective level" of methamphetamine is present at 0.03 to 0.25 milligrams per liter, and methamphetamine makes a person agitated, irritable, paranoid, suspicious, and aggressive.

xiii.  Petitioner's testimony

Petitioner testified that he had known Ms. McClary in school and had become romantically involved with her in approximately March, 1995. After a few weeks, she moved into his house with her son.

/ / /

/ / /

/ / /

---

[11]    The body was not moved until 3:00 a.m. The pathologist agreed that petechiae can occur as a result of lividity and decomposition. The pathologist deemed this possible, but not likely, for the following reasons: (1) seven to eight hours of decomposition is not long; (2) little decomposition was observed; and (3) there were fewer petechiae in the left eyelid as compared with the right, and the left side of the face had been down.

- 14 -

Before Ms. McClary moved in, Petitioner had purchased a 9-mm. Browning "Hi-Power" handgun.[12] Sometime in June, Ms. McClary began to carry the gun for protection. They had been out shooting together, and she usually kept the gun in her purse. Ms. McClary got her hunting license sometime in July, after taking a gun safety class.

When Petitioner left the gun with Ms. McClary, he would chamber a cartridge and lower the hammer. In order to fire the gun, all she would have to do is cock the hammer.

Petitioner and Ms. McClary had argued verbally perhaps three times before this incident. He described these arguments as "just kind of a huff and puff and ignore."

When Petitioner and Mr. Dubois had originally moved into the house, the dishwasher was broken and the sprinklers and the air conditioner had not been working. After Ms. McClary moved in, it began to get hot, so Petitioner called the property manager several times about the dishwasher and air conditioner in late April or May. Petitioner never got a response, but in August the landlord came by and was upset that the lawn was dying. Petitioner explained that the sprinkler was broken and that he had called the landlord without success about the sprinkler, dishwasher and air conditioner. The landlord said he would send his gardener to see Petitioner.

About a week or so later, a three-day notice was served on Ms. McClary by the property manager. She called Petitioner at work, and he called the landlord who said that if they were hiring a gardener to disregard the notice. When Petitioner got home from work that day, a repairman had already repaired the air conditioner but had said the dishwasher could not be repaired.

On August 24, Petitioner got off work at 2:30 p.m. He arrived home at 3:00 p.m. and took Ms. McClary to the doctor at about 3:30 p.m. When they arrived home a little after 4:00 p.m., they changed clothes and talked in the living room. She had him sign papers for the Department of Motor Vehicles. He did not yet notice anything unusual about her behavior.

Ms. McClary started making dinner, while Petitioner began watching a movie. She was drinking wine, and he saw her have two glasses. Again, Petitioner did not notice anything unusual about her behavior.

---

[12]     This is a single-action, semi-automatic pistol. The gun is cocked when a cartridge is chambered. Alternatively, a cartridge can be chambered and the hammer lowered; thereafter, the gun must be cocked in order to fire.

– 15 –

The sprinkler repairman arrived at around 4:30 p.m. After Petitioner had shown him the broken sprinkler, he left to get a part, and Petitioner went back inside. Petitioner and Ms. McClary ate dinner in the living room.

As Petitioner was finishing dinner, at approximately 5:00 p.m., the gardener arrived. They looked at the job and agreed on a price. While the gardener went to his truck for his tools, Petitioner showed the sprinkler repairman the sprinkler valves.

When Petitioner returned to the front of the house, Ms. McClary was on the front steps talking to the gardener. Petitioner got an extension cord and plugged it into the garage for the gardener. Petitioner and Ms. McClary walked over to the sprinkler repairman, and Ms. McClary commented that he needed to replace all the sprinkler heads. When Petitioner told her that the sprinkler man knew what he was doing, she replied that she had lived in the country and knew the sprinkler heads all needed to be replaced. At that time, she had not appeared angry but had seemed to be becoming irritated.

At around 5:30 p.m., Petitioner and Ms. McClary went back inside the house. In the living room, she began making comments about the landlord. She complained that the landlord was sending his relatives to fix things when he should be paying a repairman. She began to get "a little angrier" and said she would call the landlord herself. When Petitioner said that he had already talked to the landlord, she asked about the dishwasher, which he had already explained was to be replaced in October, when the landlord had more money. Ms. McClary said that the landlord had the money and that "that's bullshit." Her demeanor at this point was "irate and getting loud."

As they were arguing, Petitioner knew that Ms. McClary had had a "couple of drinks" but he did not know she had taken drugs. He did not learn that she had taken drugs until three months after he was arrested.

Ms. McClary began saying that she would call and tell the landlord he needed to "get this shit done." She said she was going to "jump his ass." When Petitioner replied that, if she did so, the landlord would "kick us out," she accused him of "taking the landlord's side, to fuck [him]." Then she "stormed into the bedroom" and slammed the door.

Petitioner began to yell at Ms. McClary, telling her to "fucking knock it off, you've had a few drinks." Petitioner went to the bedroom and started yelling at her about slamming the door. She told him to "fuck off" and walked back to the living room, slamming the bedroom

– 16 –

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

door again.

Petitioner walked to the living room and yelled at her again as she sat on the couch, staring and angry. When he leaned over her, she put her hand in his face and pushed him back. He did the same to her, pushing her on the right side of her face. He called her a "bitch" and turned to walk away.

Petitioner heard Ms. McClary jump up and he heard the sound of "glass banging together." She swung a plate at him and it broke over his arm, cutting him, with one piece flying into the kitchen. Petitioner then pushed her in her chest and face, and she went down onto the couch and dropped the piece of plate she was holding. They continued yelling and cursing at each other.

There was blood dripping from Petitioner's arm, and he saw blood dripping from her hand. After she walked into the bedroom, he threw the piece of plate that had landed in the kitchen into the garbage.

She was in the bedroom "yelling and cussing." Petitioner went to the bedroom because he knew she was cut, finding her by the bathroom door with bloody tissues in her hand. She continued yelling and cursing about the landlord. He gave her a towel, and she began swinging at him. Petitioner pushed her again, and she fell into the shower, knocking down the curtain rod. After she got up, she cursed Petitioner and tackled him onto the bed, which collapsed. She was on top, hitting him, and he hit her in the face. In the struggle on the bed, Mr. Vernon received a cut to the inside of his lip.

Petitioner threw her off, and she landed beside the bed near the hunting bows and arrows. When Petitioner got up, she hit him in the leg with an arrow that had a hunting tip. The aluminum shaft hit Petitioner's leg, and when Ms. McClary "jerked it back," the blade cut the side of his leg. When she tried to hit him again with the arrow, he jerked it from her hands and threw it into the corner.

She continued screaming. When Petitioner turned to grab a towel, he heard her yell that she was going to kill him. When he turned back she was cocking the gun while on her knees. He tackled her, wanting to get the gun away from her.

Petitioner testified that he had not wanted to be shot, and he had been angry, upset, and scared. They struggled, and he wrested the gun from her and pulled away. He explained, ". . . [I] just shot, I just reacted . . . I pulled it away and I just pulled the trigger." Petitioner stated

- 17 -

that he had not formed the thought that he "want[ed] to shoot her."   Petitioner also testified as follows with regard to the shooting, "[It was] just all the emotions, it's just like there was no time to think at the time, it just happened, everything happened so quick."[13]

The bullet struck Ms. McClary as she was looking downward.  This occurred within 10 to 15 minutes of their having re-entered the house after talking to the sprinkler repairman.

Upon being shot, Ms. McClary fell across Petitioner's legs, and he could see that she had been shot in the head.  He "just sat there," not knowing what to do and thinking that no one would believe what had happened.  He was scared to go to prison.  Although he told police that this had been an accident, that was not true.  He had decided to say it was an accident because the police kept repeating that they could understand if it had been an accident.

Petitioner got up and pulled Ms. McClary away from the door so that it could be opened.  He walked to the living room, recalling that the gardener was outside.  He looked out and saw the gardener continuing to work.

Petitioner returned to the bedroom and formed the idea of making it appear that somebody had broken in.  When Petitioner grabbed a towel to wrap the gun, he saw the cartridge casing lying against the wall by the vanity, and he picked it up.  He opened the sliding door to the bedroom.  He closed and locked the bedroom door, and then kicked it open to make it look like a forced entry.  He took the bathroom window out, threw it down, and pushed out the screen.

Petitioner threw the piece of broken plate on the living room couch into the trash.  He took a knife from the kitchen counter to the bedroom, put blood on it, and placed it beside Ms. McClary, to simulate a fight.  He pulled down her pants to suggest sexual assault.  He pulled the phones in the bedroom and kitchen from the wall.  He put the gun and towels in his truck and left.[14]

After Petitioner had driven two blocks, he saw Mr. Dubois on his way home.  Petitioner felt that he couldn't let Mr. Dubois go home because Petitioner had just came from the house, so Petitioner asked Mr. Dubois if he wanted to go to the record store.  Mr. Dubois agreed, and

---

[13]    He admitted that at the first trial he had answered "yes" when asked whether he had "intended to shoot her" and had "intended to kill her."

[14]    He denied having turned around and said "turn that TV down" as he was leaving the house after the shooting.

- 18 -

they drove in Petitioner's truck to Tower Records.

In order to explain the cuts on his arm and legs, Petitioner tried to walk through the glass door at Tower Records, but that did not work. He told Mr. Dubois that he had cut himself on the door and was going to clean up at Burger King. He drove behind Payless and threw the gun in a dumpster there. Then he drove to Burger King, cleaned up, and threw the towels in their dumpster.

When they got home, he found a man in front talking to the gardener. Petitioner and Mr. Dubois went past them and entered the house. Petitioner began calling to Ms. McClary, as if he did not know what had happened. After he found her, he went to the neighbor's house to call the police.

As the police arrived, Petitioner was on the lawn throwing up. He was crying real tears, because he had shot his girlfriend. He did not want to admit the truth because he "just was in denial, didn't want to believe that [he] did something like that . . . ."

Petitioner did not tell police the truth in his first interrogations because he had "already started lying." Later, Petitioner stated that this had been an accident, which also was not true.[15] When he tied the socks around his neck, he was trying to kill himself out of shame.

H. Claim Eight: Erroneous Jury Instruction Re: "Consciousness Of Guilt" Evidence

Petitioner was prejudicially deprived of his right to due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution due to the trial court's erroneously instructing the jury that they were allowed to consider "consciousness of guilt" evidence to affix the degree of murder, and due to the trial court's refusal to give an instruction requested by the defense that would have clarified and limited the use of such evidence. Instructing the jury in this manner erroneously permitted the jury to convict Petitioner of first degree murder based on irrelevant and irrational inferences, rather than on inferences based on reason and

---

[15]    Before his arrest, Petitioner went to Michael King's house because he had falsely told police that Mr. King might have had something to do with the homicide. He intended to get into an argument with Mr. King, as if he had been involved.

Mr. King testified that Robin had once been his girlfriend and had lived with him in 1994. On August 30, 1995 at around 3:00 a.m., he saw Petitioner at his front door and saw Petitioner's truck outside. He called 911 but hung up. When the 911 operator called him back, he heard the truck start and leave.

- 19 -

rational experience.

### Facts Underlying Claim Eight

The facts set forth in connection with Claim Seven, <u>ante</u>, are incorporated by reference.

As noted previously, Petitioner testified that he shot and killed the victim. The only issues for the jury related to Petitioner's mental state, namely: did he premeditate and deliberate, or did he act in the heat of passion or with some other less culpable mental state.

Despite the limited issues at trial, the trial court instructed the jury with California Jury Instructions – Criminal (hereinafter "CALJIC") 2.03, over defense objection. The instruction advised the jury as follows:

> CALJIC 2.03
> If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt.
> However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination.

Additionally, the trial court refused to give an instruction requested by the defense which would have clarified CALJIC 2.03 by informing the jury of the proper parameters for considering such evidence.  The requested instruction read as follows:

> Evidence that the defendant attempted to hide or cover up the killing by false or evasive statements made after the killing cannot be considered by you in determining whether the killing was deliberate and premeditated.

By the instructions given and refused, the jury was permitted to convict Petitioner based on improper considerations in violation of his right to due process of law.

7. Petitioner was represented at his trial and sentencing by appointed counsel Ralph Cingcon of Stockton, California.  Petitioner was represented in his appeal and in his petition for hearing to the California Supreme Court by appointed counsel Kyle Gee of Oakland, California.  Petitioner is represented in his pending petition for writ of habeas corpus by current counsel Mark R. Vermeulen.

8. Petitioner is currently incarcerated at Salinas Valley State Prison, Soledad, California by Warden Anthony A. Lamarque.  Petitioner has no sentence to serve other than the sentence which is challenged by this Petition.

- 20 –

PTN. FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

## PRAYER

WHEREFORE, Petitioner Kenneth Vernon prays that this Court:

1. Issue a writ of habeas corpus to have Petitioner brought before the Court so that he may be discharged from his unconstitutional confinement and restraint;

2. Conduct a hearing at which proof may be entered concerning the allegations in this Petition, if necessary and appropriate;[16] and

3. Grant all other relief to which Petitioner may be entitled.

Date: September 12, 2000                    Respectfully submitted,

**ORIGINAL SIGNED BY MARK R. VERMEULEN**

_____

Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

---

[16]    Petitioner will also be seeking leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, requesting that the Court order discovery of at least the following items from the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin County Superior Court No. SC059609A): (1) the names, addresses, and telephone numbers of the jurors (including alternate jurors); (2) the transcripts of the voir dire examination of the jurors (including alternate jurors); and (3) the exhibits from the trial.

- 21 –

<u>VERIFICATION</u>

I, Mark R. Vermeulen, declare:

I am an attorney duly admitted to practice before this Court and I represent Petitioner Kenneth Vernon. My office is in San Francisco County. In my capacity as attorney for Petitioner I am making this verification on his behalf because he does not reside within the county of my office and because these matters are more within my knowledge than his.

I have read the foregoing Petition For Writ Of Habeas Corpus and I declare under penalty of perjury that the contents of the Petition are true to the best of my knowledge.

Executed on September 12, 2000 at San Francisco, CA.

**ORIGINAL SIGNED BY**
**MARK R. VERMEUL**

_____
Mark R. Vermeulen

Exhibit B:
*Order Dismissing Writ Of Habeas Corpus*
(U.S. District Court)

FILED

OCT 3 0 2000

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KENNETH VERNON,

              Petitioner,

   v.

ANTHONY A. LAMARQUE, Warden, and
DOES 1-10,

           Respondents.

No. C 00-3311 MJJ

**ORDER DISMISSING WRIT OF *HABEAS CORPUS***

On October 12, 2000, Petitioner Kenneth Vernon ("Vernon") filed with this Court a petition for *habeas corpus* under 28 U.S.C. § 2254. The petition states that subsequent to the direct appeal of his conviction in the California appellate courts, Vernon filed a petition for writ of *habeas corpus* in the San Joaquin County Superior Court, Stockton, California. According to the petition, the state petition is currently pending.

Dismissal of Vernon's petition is required by the *habeas* exhaustion doctrine. A prisoner in state custody who wishes to challenge either the fact or length of his confinement by filing a federal petition for writ of *habeas corpus* must first exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every issue he seeks to raise in federal court. *See* 28 U.S.C. § 2254(b),(c). The exhaustion requirement is not satisfied if there is a pending post-conviction proceeding in state court. *See Sherwood v. Tomkins*, 716 F.2d 632, 634 (9th Cir.1983). When an appeal or collateral challenge of a state criminal conviction is pending, a would-be federal *habeas*

1  petitioner must await the outcome of the state court action before his state remedies are exhausted,

2  even where the issue to be challenged in the writ of *habeas corpus* has been finally settled in the state

3  courts. *See id.* Even if the federal constitutional question raised by the petitioner cannot be resolved

4  in a pending state action, that action may result in the reversal of the petitioner's conviction on some

5  other ground, thereby mooting the federal question. *See id.*

6    Vernon indicates in his petition that he has a post-conviction proceeding currently pending in

7  California court.   Until that proceeding is concluded, a *habeas* petition in this court is premature.

8  Therefore, Vernon's petition is DISMISSED without prejudice to Vernon filing a new petition after

9  all of his state court post-conviction proceedings have concluded.

10

11    **IT IS SO ORDERED.**

12

13  Dated:  10/30/2000

          MARTIN J. JENKINS
          UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

Exhibit C:
*Petition For Writ Of Habeas Corpus*
(San Joaquin County Superior Court, No. SC059609A)

1  Mark R. Vermeulen [State Bar No. 115381]
Law Office of Mark R. Vermeulen
2  755 Florida Street #4
San Francisco, CA  94110.2044
3  Telephone: 415.824.7533
Fax: 415.824.4833
4

5  Attorney for Petitioner
KENNETH VERNON
6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                            COUNTY OF SAN JOAQUIN
10

11  KENNETH VERNON,                    )    No. SC059609 A
                                       )
12            Petitioner,              )    **PETITION FOR WRIT**
                                       )    **OF HABEAS CORPUS**
13       On Habeas Corpus.             )
                                       )
14                                     )

15

16  TO THE HONORABLE PRESIDING JUDGE OF THE SUPERIOR COURT:

17       Petitioner, Kenneth Vernon, by the through his attorney, hereby petitions for a writ of

habeas corpus and by this verified Petition states as follows:

18       1. Petitioner was the defendant in the criminal action entitled <u>People v. Kenneth Vernon</u>,

19  San Joaquin County Superior Court, No. SC059609A.  This petition concerns the criminal

20  conviction and judgment arising from the jury trial in that action.  In that jury trial, Petitioner was

21  convicted on March 7, 1997 of murder in the first degree (Penal Code[1] § 187).  The jury also

22  found true the enhancement allegation that Petitioner personally used a firearm (§ 12022.5).

23       2. Petitioner was sentenced to state prison on April 4, 1997 to a total term of 35 years to

24  life (25 years to life on the § 187 conviction, plus 10 years on the § 12022.5 enhancement, with

the 10-year determinate term to be served before the indeterminate term).

25       3. Petitioner was represented in the trial court by Ralph Cingcon, Esq., 5250 Claremont

26  Ave., #221, Stockton, CA  95207.

27

28  [1]    All further statutory references are to the Penal Code unless specified otherwise.

                              - 1 -

4. Petitioner appealed from his conviction and judgment to the Court of Appeal, Third Appellate District. The Court of Appeal affirmed the trial court's judgment in an unpublished opinion issued March 8, 1999 (People v. Kenneth Jerome Vernon, Court of Appeal, Third Appellate District, No. C026244). The issues raised on appeal were as follows: (1) Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder; (2) Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and (3) whether Defendant/Petitioner's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

5. Petitioner was represented on appeal by Kyle Gee, Esq., 2626 Harrison Street, Oakland, CA 94612.

6. Petitioner sought review in the California Supreme Court through a petition for review filed on April 16, 1999. That petition was denied on June 16, 1999 (People v. Kenneth Jerome Vernon, California Supreme Court No. S078530). The issues raised in the petition for review were as follows: (1) Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder; (2) Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and (3) whether Defendant/Petitioner's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

7. Other than direct appeal, Petitioner has not filed any other petitions, applications, or motions in any court with respect to this conviction and judgment.

8. Petitioner is illegally restrained of his liberty in that he is in the custody of the State of California Department of Corrections and his continued confinement in connection with this case is unlawful. Petitioner asserts the following grounds for relief.

/ / /

/ / /

/ / /

- 2 -

9. <u>First Ground For Relief:  Juror Misconduct By Failing To Disclose Material Information During Voir Dire</u>

One or more of the jurors committed prejudicial misconduct by failing to disclose to the Court and counsel during voir dire material information which demonstrated juror bias and knowledge.  By this misconduct Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 16 of the California Constitution.

a. <u>Supporting facts for First Ground For Relief</u>:[2]

There were at least three instances in which jurors concealed material information and bias on voir dire.  First, one of the jurors (Linda Withers, who will be referred to herein as "Juror 1") is related to one of the key prosecution witnesses by marriage, and the Withers family has known Petitioner's family for many years.  The prosecution witness to whom Juror 1 is related is Doyle Dubois; Doyle Dubois' uncle is Tom Dubois, who is married to Lavanda Withers; Lavanda Withers is related to Juror 1.  Additionally, Petitioner's family has known Lavanda Withers and the Withers family almost all of their lives.  For example, William Vernon has known Alan Withers almost all his life, having gone through school together in their childhood.  Alan Withers and the Withers family are related to Juror 1.  (See Exhibit A: Declaration of Ernestine Vernon; and Exhibit B: Declaration of William Vernon.)  These relationships of Juror 1 were not revealed during voir dire.

Second, a second juror (referred to herein as "Juror 2") knew or was acquainted with Petitioner's uncle, Jack Vernon.  (See Exhibits A & B, and Exhibit C: Declaration of Shirley Washburn.)  This relationship likewise was not revealed during voir dire.

Third, a third juror (referred to herein as "Juror 3") was familiar with the means by which blood levels of d-amphetamine and amphetamine could show up in a person's blood, as demonstrated by the note submitted by the jury on March 5, 1997.  (See Exhibit D: Juror note re: blood levels of d-amphetamine and amphetamine.)  That note states:

---

[2]    Petitioner has filed herewith a Request For Discovery through which he seeks materials and information necessary to properly and fully litigate this Petition.  He respectfully requests that the Court consider and grant the discovery requested at the earliest opportunity.  As noted in the prayer of this Petition, he also requests an evidentiary hearing.

"Q. Concerning blood levels of d-amphetamine and amphetamine found in [deceased victim] Robin McClary.  There was no evidence produced to substantiate the use of amphetamines by inhalation, oral ingestion of [sic] injection.  However, Robin McClary did suffer from allergies and a bronchial disorder.

"If Robin took prescription medication for breathing and any over the counter medication for allergies or asthma those drugs will show a false positive test for amphetamines.

"The statement by both defense and prosecution that she used amphetamine may not be valid."

This knowledge was relevant because levels of such substances were found in the deceased victim.  This fact was relevant to the issue of whether the death constituted murder or manslaughter, and the degree of murder or type of manslaughter.  Juror 3 did not reveal this knowledge and familiarity during voir dire.  Furthermore, the jury was not admonished upon submitting this note during deliberations.

b.  Supporting authority for First Ground For Relief:[3]

Any analysis of a claim of juror misconduct must "begin with the proposition that one accused of a crime has a constitutional right to a trial by impartial jurors."  In re Hitchings (1993) 6 Cal.4th 97, 110 [24 Cal.Rptr.2d 74, 860 P.2d 466]; U.S. Const. Amend. VI, XIV; Cal. Const., art. I, § 16; see Jeffries v. Wood (9th Cir. 1997) (en banc) 114 F.3d 1484 (juror misconduct implicates constitutional rights guaranteed by the Sixth and Fourteenth Amendments); Marino v. Vasquez (9th Cir. 1987) 812 F.2d 499.  A juror's concealment of bias or prejudice, like other forms of juror misconduct, denies a defendant his Sixth Amendment right to a fair trial by an impartial jury.  Dyer v. Calderon (9th Cir. 1998) 151 F.3d 970 (en banc); Burton v. Johnson (10th Cir. 1991) 948 F.2d 1150; U.S. v. Eubanks (9th Cir. 1979) 591 F.2d 513.  A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct.  Hitchings, supra, 6 Cal.4th at pp. 110-111; People v. Castaldia (1959) 51 Cal.2d 569, 572 [335 P.2d 104]; People v. Blackwell (1987) 191 Cal.App.3d 925, 929 [236 Cal.Rptr. 803]; People v. Diaz (1984) 152 Cal.App.3d 926, 932 [200 Cal.Rptr. 77].

Voir dire examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors.  McDonough

---

[3]  The authority set forth in this Petition is provided in summary form.  Petitioner reserves the right to submit additional authority and briefing in support of his claims.

1  Power Equipment, Inc. v. Greenwood (1984) 464 U.S. 548, 554 (plur. op. of Rehnquist, J.).

2  Failure to allow or conduct sufficient questioning in voir dire violates the right to a fair trial and

3  the right to trial by an impartial jury under the Sixth Amendment of the U.S. Constitution and the

4  Due Process Clause of the Fourteenth Amendment.  Mu'min v. Virginia (1991) 500 U.S. 415;

   Johnson v. Mississippi (1988) 486 U.S. 578; Turner v. Murray (1986) 476 U.S. 28; Caldwell v.

5  Mississippi (1985) 472 U.S. 320; see also U.S. v. Herndon (6th Cir. 1998) 156 F.3d 629 (trial

6  judge failed to conduct adequate investigation into juror's alleged bias after information surfaced

7  calling into question the veracity of juror's voir dire answers); Dyer v. Calderon (9th Cir. 1998)

8  151 F.3d 970.

9        The presence of a biased juror introduces a structural defect not subject to harmless error

10 analysis.  Dyer v. Calderon, 151 F.3d 970 (9th Cir. 1998) (en banc).  The prejudice analysis for

11 misconduct is different from and less tolerant than the "harmless-error analysis" for ordinary error

12 at trial.  People v. Holloway (1990) 50 Cal.3d 1098, 1110; see People v. Marshall (1990) 50

   Cal.3d 907, 951.  As a general rule, juror misconduct "raises a presumption of prejudice that may

13 be rebutted by proof that no prejudice actually resulted."  Hitchings, supra, 6 Cal.4th at p. 118.

14      Moreover, even if only one juror was unduly biased or improperly influenced, a defendant

15 is deprived of his Sixth Amendment right to an impartial panel of twelve unprejudiced jurors and

16 the conviction must be vacated.  People v. Nesler (1997) 16 Cal.4th 561; Holloway, supra, 50

17 Cal.3d 1098.  As the Supreme Court stated unanimously in Holloway, the "[d]efendant was

18 entitled to be tried by 12, not 11, impartial and unprejudiced jurors.  Because a defendant charged

   with a crime has a right to the unanimous verdict of 12 impartial jurors, it is settled that a

19 conviction cannot stand if even a single juror has been improperly influenced."  50 Cal.3d at p.

20 1112 (internal quotations and citations omitted.)

21      Even in cases in which the state's case is strong, the possibility of prejudice from juror

22 misconduct "is underlined by the fact that the jury deliberated for a long time . . . ."  Marino v.

23 Vasquez (9th Cir. 1987) 812 F.2d 499, 506; see also, Parker v. Gladden (1966) 385 U.S. 363,

24 365 (twenty-six hours); Gibson v. Clanon (9th Cir. 1980) 633 F.2d 851 (nine hours); People v.

25 Carfenza (1982) 37 Cal.3d 897, 907 (California Supreme Court holds that even only twelve hours

26 of deliberation is a "graphic illustration" of the closeness of a case).

27

28

                                           - 5 -

1    Where potential misconduct appears from a juror's failure to disclose material information

2  on voir dire, additional discovery is appropriate.[4]  Zamudio v. Superior Court (1998) 64

3  Cal.App.4th 24 [74 Cal.Rtr.2d 765] (on showing of potential misinformation on voir dire,

4  defendant was entitled to juror questionnaires which were not otherwise discoverable).

5    An evidentiary hearing is appropriate here.  The California Supreme Court has "strongly

6  disapproved" the practice of deciding claims of jury misconduct without an evidentiary hearing
   when the facts underlying the claim may be in issue:

7       [W]e strongly disapprove of the substitution of unsworn police reports, and summaries for
        affidavits or testimony of the percipient witnesses.  A hearing in open court would have
8       been particularly appropriate to ascertain the relevant facts in this matter . . . .

9  People v. Pierce (1979) 24 Cal.3d 199 (emphasis added) (reversal required where juror discussed

10  case with prosecution witness); see also Hitchings, supra, 6 Cal.4th at p. 102 (Supreme Court

11  appointed a referee to resolve factual matters after petitioner had stated a prima facie case for

12  relief in habeas corpus petition).

13    Any doubt as to the proper course to be followed by a trial court confronting an allegation

14  of juror misconduct was resolved by People v. Burgener (1986) 41 Cal.3d 505.  In Burgener, the

15  Supreme Court found that a trial court did not adequately investigate a mid-trial claim of possible

16  intoxication on the part of a juror.  While the Court did not find the evidence of intoxication in the

17  appellate record sufficient to qualify for reversal on appeal, it made clear that the defendant could

18  obtain an evidentiary hearing at which jurors could be called by means of a petition for a writ of
   habeas corpus.

19       Claims of jury misconduct may be raised in a petition for habeas corpus.  (See, e.g., In re
        Lessard (1965) 62 Cal.2d 497 [42 Cal.Rptr. 583, 399 P.2d 39].)  And in habeas corpus
20       proceedings the opportunity for an evidentiary hearing will allow defendant's allegations to
        be more fully explored. (See §§ 1483, 1484.)  If presented in a verified petition, an
21       allegation of jury misconduct in this case would undoubtedly present a colorable claim
        entitling defendant to an evidentiary hearing at which defendant would be able to produce
22       evidence of Juror M.'s condition and behavior.  (See Pope, supra, 23 Cal.3d at p. 428.)

23

24  Burgener, supra, 41 Cal.3d at p. 522.)

25

26

_____

27  [4]    Petitioner has filed herewith a Request For Discovery seeking discovery relevant and
   necessary to these claims.

28

10.  Second Ground For Relief:  Juror Misconduct By Contact And Discussions With Third Parties

One or more of the jurors committed prejudicial misconduct by having contact with third parties (namely, the deceased victim's mother, friends, and relatives, and the District Attorney). By this misconduct Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, sections 15 and 16 of the California Constitution.

a.  Supporting facts for Second Ground For Relief:

During the trial, several jurors had inappropriate and prejudicial contact with the District Attorney, and with the deceased victim's mother, friends, and relatives.  (See Exhibits A, B, & C.) In connection with the District Attorney, the juror contact occurred by the jurors conversing with the District Attorney during recesses and breaks in the trial.  In connection with the deceased victim's mother, friends, and relatives, the juror contact likewise occurred during recesses and breaks in the trial during which the jurors would converse with the deceased victim's family and friends in the courtroom (which conversation sometimes also involved the District Attorney) and outside the courthouse in or near an area that people would congregate to converse and to smoke. In addition, the jurors on more than one occasion brought fruit and/or other food to the District Attorney during the trial, which he accepted.  During these various contacts, one or more of the jurors discussed aspects of the case with the non-jurors and the jurors were prejudicially influenced by these contacts.

b.  Supporting authority for Second Ground For Relief:

Reversal of a conviction is proper where jurors have contact with third parties during the trial.  See U.S. v. Maree & Brooks (9th Cir. 1991) 934 F.2d 196 (conviction reversed because juror discussed case with friends who said that people like the defendant should be incarcerated); Church v. Sullivan (10th Cir. 1991) 942 F.2d 1501 (jailer's wife spoke to jurors about her opinion of defendants); U.S. v. Gaffney (M.D.Fla. 1987) 676 F.Supp. 1544 (several people talk with jury about the case; court reverses conviction in spite of fact that jurors' accounts of the misconduct conflicted).  Petitioner also incorporates the authority set forth in section 9.b. of this Petition, "Supporting authority for First Ground For Relief," ante.

- 7 -

11. <u>Third Ground For Relief: Prosecutorial Misconduct By Contact And Discussions With Jurors</u>

The prosecutor at trial committed prejudicial misconduct by having contact with the jurors and by facilitating communications between jurors and third parties (namely, the deceased victim's mother, friends, and relatives). By this misconduct Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, sections 15 and 16 of the California Constitution.

a. <u>Supporting facts for Third Ground For Relief</u>:

During the trial, the District Attorney had inappropriate and prejudicial contact with several of the jurors and failed to report this contact to the Court and defense counsel. (See Exhibits A, B, & C.) This contact occurred through the District Attorney's conversing with the jurors during the recesses and breaks in the trial. At times, this conversation also involved members of the deceased victim's family, who were seated in the audience in the courtroom. The District Attorney would engage in and facilitate three-way conversations with the jurors and members of the deceased victim's family. Improper and prejudicial contact also occurred by the District Attorney accepting fruit and/or other food from the jurors during the trial. During the contacts noted herein, one or more of the jurors discussed the case and the trial with the District Attorney and were prejudicially influenced by these contacts.

b. <u>Supporting authority for Third Ground For Relief</u>:

Petitioner incorporates the authority set forth in section 9.b. of this Petition, "Supporting authority for First Ground For Relief," <u>ante</u>.

12. <u>Fourth Ground For Relief: Exclusion Of Public From Voir Dire</u>

Petitioner was prejudicially deprived of his right to a public trial and to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, section 15 of the California Constitution, due to the exclusion of the public (including Petitioner's family) from the courtroom during voir dire.

a. <u>Supporting facts for Fourth Ground For Relief</u>:

During voir dire the public, including Petitioner's parents, was excluded from the courtroom. (See Exhibit A.)

- 8 -

b.  Underline{Supporting authority for Fourth Ground For Relief}:

A defendant's right to a public trial under the Sixth Amendment to the U.S. Constitution is violated by closing the courtroom and excluding members of the public, including a defendant's family, during the proceedings.  Vidal v. Williams (2nd Cir. 1994) 31 F.3d 67, cert. denied, 513 U.S. 1102 (1995).

13.  Fifth Ground For Relief: Trial Court's Refusal To Substitute Other Counsel For Second Trial

Petitioner was prejudicially deprived of his right to the effective assistance of counsel, to a fair trial, and to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, sections 15 and 16 of the California Constitution, due to the trial court's refusal to substitute counsel for the second trial (after a mistrial occurred in the first trial when the jury was unable to reach a verdict), due to the court's quick resetting of the second trial and due to trial counsel's consequent inability to provide Petitioner with adequate and effective representation at the second trial, and there was no tactical reason for the failure of trial counsel to undertake the matters complained of herein.

a.  Supporting facts for Fifth Ground For Relief:

At the first jury trial in this matter, which took 22 days to complete, a mistrial was declared on December 20, 1996 when the jury was unable to reach a verdict.  Counsel returned to court on January 7, 1997.  Defense trial counsel informed the Court he was not prepared to go forward on that date, that Petitioner and his family had no funds to retain him a second time, and that he could not continue to represent Petitioner.  Among the reasons given as to why trial counsel could not retry the case were that retrying the case, particularly on a tight timeline, would impose a severe hardship on counsel, that counsel had many other trials set and/or trailing (along with other cases) which he had had to put aside to try this case and to which he must attend, and that he would be unable to provide adequate and effective assistance at a second trial, all of which were exacerbated by the fact that trial counsel was a sole practitioner.  Nevertheless, the Court denied trial counsel's request to withdraw.  The Court appointed the same counsel to try the case a second time, over counsel's strenuous objection.  Trial counsel thereupon requested a trial date of April 1997 in order to be able to prepare properly.  The District Attorney asked for a January trial date, and the Court set the trial for January 27, 1997.  Trial counsel pleaded with the Court

- 9 -

1  for additional time, which requests were denied, the Court stating: "You're under duress, [trial

2  counsel] Cingcon, and the record should note that."

3       At the second trial, trial counsel failed to do several things, all of which contributed to

   Petitioner receiving inadequate and ineffective assistance of counsel.  The actions which trial

4  counsel failed to undertake or which he undertook ineffectively include the following: failure to

5  conduct adequate investigation, including ballistics testing and consulting with forensics experts;

6  failing to object to the exclusion of the public from the courtroom during voir dire and informing

7  Ernestine they she had to remain outside the courtroom during voir dire, failure to adequately

8  question prospective juror Linda Withers regarding juror bias; failure to raise the issue regarding

9  juror Linda Withers' bias at the earliest opportunity in the trial; failure to act as an effective and

10 zealous advocate when trial counsel confirmed the trial judge's limited questioning of juror Linda

   Withers for bias during the trial; failure to review the presentence report prior to sentencing and

11 failure to accept and employ the brief recess offered by the Court to allow trial counsel to review

12 the presentence report and to prepare for sentencing; and failure to preserve the trial files,

13 including Petitioner's own trial file.

14      b.  Supporting authority for Fifth Ground For Relief:

15      Requiring a defendant to choose between incompetent counsel and no counsel at all

16 implicates the fundamental fairness and accuracy of the proceeding, and the erroneous denial of

17 motion to substitute counsel is not subject to harmless error analysis.  Crandell v. Bunnell (9th

18 Cir. 1998) 144 F.3d 1213; see also Strickland v. Washington, 466 U.S. 668 (1984); People v.

   Pope (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], McDaniel v.

19 District Court (Jones) (9th Cir. 1997) 127 F.3d 886 (petitioner showed good cause for discovery

20 where claims were not speculative, contained factual allegations, and asserted exhaustion, and

21 where appellate counsel apparently destroyed petitioner's entire file which may have contained

22 some of the materials petition sought from the state).

23

24      14.  Sixth Ground For Relief: Ineffective Assistance Of Counsel If Any Claims Are

25 Deemed Previously Waived

26      If any of the claims or issues raised in this Petition are deemed waived through previous

27 counsels' failure to timely raise and litigate the claim(s) and/or issue(s), Petitioner was

   prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and

28

1  his right to due process of law under the Sixth and Fourteenth Amendments to the U.S.

2  Constitution and under article I, sections 15 and 16 of the California Constitution, for there was

3  no tactical reason not to raise these claims or issues, and Petitioner was prejudiced thereby.

    a. <u>Supporting facts for Sixth Ground For Relief</u>:

4      <u>See</u> facts set forth in the preceding Grounds For Relief, <u>ante.</u>

5      b. <u>Supporting authority for Sixth Ground For Relief</u>:

6      <u>See</u> authority set forth in the preceding Grounds For Relief, <u>ante</u>. <u>See also</u> <u>People v.</u>

7  <u>Silvey</u> (1997) 58 Cal.App.4th 1320 [68 Cal.Rptr.2d 681] ("Because claims of ineffective

8  assistance of counsel are often more appropriately litigated in a habeas corpus proceeding, the

9  rules generally prohibiting raising an issue on habeas corpus that was, or could have been, raised

10  on appeal would not bar an ineffective assistance claim on habeas corpus" (quoting <u>People v.</u>

11  <u>Tello</u> (1997) 15 Cal.4th 264, 267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]).)

12      15. This Petition is filed in advance of the statutory deadline for filing the related federal

13  petition under the Anti-Terrorism and Effective Death Penalty Act (AEDPA). The federal

14  petition will raise the federal issues raised previously in the direct appeal from the conviction and

15  judgment in the underlying case (<u>People v. Kenneth Vernon</u>, San Joaquin County Superior Court,

16  No. SC059609A), along with the claims presented here. Any passage of time in connection with

17  the filing of the instant Petition is explained as follows:

18      a. Petitioner is indigent. He has been incarcerated since his arrest in or about September,

19  1995, and he has been in the custody of the California Department of Corrections since his

20  sentencing in or about April, 1997. During much of this time he has been under lockdown such

21  that communication with his family is difficult or, in practical terms, impossible. He is not able

22  (and has not been able) to conduct the investigation or litigation of this matter, and he cannot fund

23  the investigation and/or litigation of this matter. As the Court is aware, he is not entitled to

24  appointed counsel in connection with habeas proceedings. (<u>Pennsylvania v. Finley</u> (1987) 481

25  U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539.) His family has only recently (i.e., in August, 2000)

26  been able to obtain the funds necessary to hire habeas counsel to draft and litigate the instant

27  petition and the related federal petition and, similarly, the funds necessary for the investigation of
these claims.

28

b.  Petitioner, through counsel and counsel's investigator, has been conducting an investigation into various claims that have come to light.  These claims include the claims set forth in this Petition, along with other claims which, while appearing earlier to be potentially meritorious, now appear to lack merit, and which are therefore not a part of this Petition.  The investigation of the claims in this Petition has been (and is) ongoing in that, among other matters, counsel's investigator has been attempting to identify, locate, and interview the jurors with relevant information regarding the claims.  Counsel has been unable to obtain information about the jurors from trial counsel (for explanation re: lack of communication and lack of ability to obtain trial files, see paragraph 15.c., *post*) and counsel has therefore had to investigate these claims from scant information.  Rather than present these claims in piecemeal fashion, Petitioner, through recently-retained counsel, has continued to investigate the meritorious claims and to present them here, mindful of the federal filing deadline.

c.  The investigation of these claims has been complicated by difficulties that counsel has encountered in communicating with and in obtaining the trial files and information from trial counsel.[5]  During the months of July-August, 2000, counsel attempted on numerous occasions to contact trial counsel to obtain the trial files and to discuss the case, with little success.[6]  First actual contact with trial counsel was made in a telephone conversation on August 1, wherein counsel requested from trial counsel any information he had regarding the jurors, along with the trial files.  Trial counsel informed counsel that trial counsel did not have any information regarding the jurors and that he did not know where the file was located, but that trial counsel would look for the file.  Counsel stressed the urgency of the need for the files (given the imminent federal filing deadline) and offered to travel to trial counsel's office in Stockton on short notice to pick up the files or, if need be, to look through trial counsel's closed file storage area to locate the files.  Counsel confirmed that he would contact trial counsel again on August 4 to discuss the matter

---

[5]     The trial files in the possession of trial counsel consisted of files that trial counsel used during the trial court proceedings, along with files that Petitioner himself had kept and used during the pendency of the trial court proceedings, as Petitioner had turned over his files to trial counsel at the conclusion of the trial.  Petitioner's family had requested the return of these files at an earlier time but had not been able to obtain the files.

[6]     Counsel understands that at least a portion of the delays and difficulties in communication are attributable to trial counsel being involved in one or more other trials during this time and to trial counsel being ill in August, 2000.

- 12 -

1  further and to make whatever arrangements were necessary. On the agreed-upon August 4 date

2  (a Friday), counsel paged trial counsel and left a voicemail, but received no response. During the

3  week of August 7-11, counsel left various pages and voicemails for trial counsel, but received no

4  response. Counsel left a voicemail for trial counsel again on August 16, again receiving no

5  response. On August 17, counsel sent a certified letter to trial counsel, again requesting the file.

6  The return-receipt confirmed that trial counsel received this letter on August 24, but counsel did

7  not hear from trial counsel until they spoke on August 31. Trial counsel explained that he had

8  been ill for a time and that he was attempting to locate the files. Trial counsel also explained,

9  however, that the files may have been destroyed or discarded. Trial counsel noted that his home

10 (where he believes the trial file had been located) had suffered serious damage in or about May

11 2000 when a water pipe broke, flooding much of the first floor (where files were stored). Trial

12 counsel explained that as a result, many files had been damaged irreparably and others had been

13 thrown out. Trial counsel did agree to make arrangements whereby counsel's investigator could

14 travel to trial counsel's home and office to seek to locate and take custody of the trial files.

Through that, only one box of files was located and turned over, this occurring on September 5,

2000.

15      16. Petitioner requests an evidentiary hearing to further develop the allegations contained

16 in this Petition and to examine other witnesses from whom declarations have not yet been

17 obtained.

18      17. Petitioner does not have any petition, appeal, or other matter pending in any court.

19      18. Petitioner has no plain, speedy, or adequate remedy at law.

20      19. Petitioner is currently incarcerated at Salinas Valley State Prison, Soledad, California

by Warden A.A. Lamarque.

21  / / /

22  / / /

23  / / /

24

25

26

27

28

- 13 -

1

## PRAYER

2    WHEREFORE, Petitioner respectfully requests that this Court:

3    1. Issue a writ of habeas corpus or order to show cause to inquire into the lawfulness of

Petitioner's conviction and sentence;

4    2. Order that discovery be produced as set forth in the Request For Discovery In

5    Connection With Petition For Writ Of Habeas Corpus filed herewith;

6    3. Order an evidentiary hearing, with Petitioner being personally present at the hearing;

7    4. After full consideration of this matter, set aside the conviction of Petitioner; and

8    5. Grant Petitioner whatever further relief is appropriate in the interest of justice.

9

10   Date: September 8, 2000                    Respectfully submitted,

11

12

13                                             Mark R. Vermeulen
                                               Attorney for Petitioner
14                                             KENNETH VERNON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Mark R. Vermeulen, declare:

I am an attorney duly admitted to practice before this Court and I represent Petitioner Kenneth Vernon. My office is in San Francisco County. In my capacity as attorney for Petitioner I am making this verification on his behalf because he does not reside within the county of my office and because these matters are more within my knowledge than his.

I have read the foregoing Petition For Writ Of Habeas Corpus and declare under penalty of perjury under the laws of the State of California that the contents of the Petition are true to the best of my knowledge.

Executed on September 8, 2000 at San Francisco, CA.

_____
Mark R. Vermeulen

EXHIBIT A
DECLARATION OF ERNESTINE VERNON

## DECLARATION

I, Ernestine Vernon, do declare and state the following:

1.    I am a resident of the State of California, and over the age of
      eighteen years, and

2.    I am the mother of Kenneth Vernon, and the wife of William
      Vernon, and

3.    I was personally present on almost every day of both trials of my
      son, Kenneth, at the San Joaquin County Courthouse in Stockton,
      California, and

4.    From time to time, my husband William, also came to the
      courthouse to observe the trials. Also, from time to time, my
      friend, Shirley Washburn, would also accompany me to the
      courthouse and sit with me in the courtroom or out in the hallway
      outside of the courtroom, and

5.    During the course of the second trial, I recall an incident where
      Shirley Washburn, William, and myself were sitting on the bench
      outside of the courtroom. This was either before the beginning
      of the day's proceedings, or while the court was in recess,
      taking a break, or the like. As we were sitting there, I
      observed a man to drop something just in front of my husband,
      William. As the man was bending down to pick up the object, he
      turned to William and asked if William was the brother of Jack
      Vernon. William replied that he was, and the man responded by
      saying, "Oh. Good." The man then walked away, and

6.    Later, when court had resumed, and I was sitting in the courtroom
      observing the trial, I noticed that the man that had contact with
      William in the hallway was a juror. I recall that my friend,
      Shirley Washburn, drew my attention to that juror by asking me if
      that was the man that had talked to William in the hallway, and

7.  From time to time, I also observed that the prosecutor in the trial, Mr. Schultz, would engage in conversations with members of the jury, during the recesses and breaks. Mr. Schultz would usually be standing in front of the juror's box when he engaged in these conversations. Further, Mr. Schultz would also engage in and help facillitate "three-way conversations" with the juror's and members of the victim's family, who were seated in the audience. I personally witnessed members of the victim's family engage in conversation directly with members of the jury during these breaks and recesses, and

8.  I also observed on a number of occasions that one of the jurors would bring food to the courtroom where she would share it with other jurors as well as with the prosecutor, Mr. Schultz, and also, on occasion, with the bailiffs, the court clerk, and the court reporter, and

9.  At the beginning of the second trial, I was informed by Mr. Cingcon that I could not be in the courtroom during the process where the jury was picked. Mr. Cingcon told us that there wasn't enough room for me to be there. After the jury was picked, we returned to the courtroom. The jury was then brought in and opening arguments were made. During the opening arguments, I noticed that there was a member of the jury that I knew. After opening arguments were completed, I then had an opportunity to inform the defense attorney, Mr. Cingcon, that I knew one of the jurors, and

10. I recognized the juror as a member of the Withers family, whose members I, and my husband, had known for many years. Further, I believed that the juror, as well as the relatives of that juror, either knew or was related to one of the witnesses in our son's case. That witness was Doyle Dubois, Jr. We both believed that the juror we saw was Linda Withers, and was related to the Withers family of Stockton. Both my husband and I had known many

members of the Withers family for almost all of our lives.  In
fact, my son Kenneth played little league baseball with the
Withers' children.  My husband had known an Alan Withers almost
all of his life, as they had gone through school together since
they were children.  Alan is a member of the Withers family.
Further, we both knew Lavanda Withers, who was a friend of ours
for many years.  Lavanda is married to Tom Dubois, who is the
uncle of Doyle Dubois, Jr. (the prosecution witness in this
case).  Two or three days later, my husband came to the courtroom
and he also noticed Linda Withers to be a member of the jury.
Without prompting, he asked me "What is a Withers doing on the
jury?", and

11.  On one or more occasion, as either William, myself, and/or
     Shirley Washburn were coming from or going to the courthouse, we
     observed that there was an area set aside for people to smoke
     cigarettes.  We observed that some of the members of our son's
     jury would congregate there.  On one or more occasion, we
     observed that there were other people in that same area and that
     they would be talking with the jurors.  These other people whom I
     saw talking with the jurors included members of the victim's
     family.

I declare, under penalty of perjury, that the foregoing is true
and correct, and would so testify in any court of law.

Executed this _5_ day of _September_, 20_0 0_, at
_Stockton_, California.

Signed: _Ernestine Vernon_
                Ernestine Vernon

Witnessed by: _Sanford Glickman_

Print Name: _SANFORD GLICKMAN_

**EXHIBIT B**
**DECLARATION OF WILLIAM VERNON**

### DECLARATION

I, William Vernon, do declare and state the following:

1.  I am a resident of the State of California, and over the age of eighteen years, and

2.  I am the father of Kenneth Vernon, and the husband of Ernestine Vernon, and

3.  On occasion, I was personally present at the trial of my son, Kenneth, at the San Juaquin County Courthouse in Stockton, California. I could not attend the trials every day as I was employed and could not leave work as I had wished, and

4.  On the occasions that I was able to attend the second trial, my wife, Ernestine would be in attendance. Also, on occasion, our friend, Shirley Washburn, would also accompany my wife to court. Shirley would sit with her in the courtroom or out in the hallway outside of the courtroom, and

5.  During the course of the second trial, I recall an incident where Shirley Washburn, Ernestine, and myself were sitting on the bench outside of the courtroom. This was either before the beginning of the day's proceedings, or while the court was in recess, taking a break, or the like. As we were sitting there, I observed a man to drop something just in front of me. As the man was bending down to pick up the object, he turned to me and asked if I was the brother of Jack Vernon. I replied that I was, and the man responded by saying, "Oh. Good." The man then walked away, and

6.  Later, when court had resumed, and I was sitting in the courtroom observing the trial, I noticed that the man who had contact with me in the hallway was a juror, and

7.   From time to time, I observed that the prosecutor in the trial,
     Mr. Schultz, would engage in very friendly conversations with
     various members of the jury, during the recesses and breaks.  Mr.
     Schultz would usually be standing in front of the raised platform
     area where the jurors were sitting, when he engaged in these
     conversations.  I observed the jurors and Mr. Schultz to be
     laughing and smiling during these exchanges, and

8.   I also observed on several occasions, during the breaks and
     recesses, that the prosecutor would converse wtih members of the
     victim's family who were seated in the audience in the courtroom.
     Various members of the jury were also present during these
     conversations.  At times, the prosecutor, members of the victim's
     family and members of the jury would engage in these
     conversations all together.  The conversations were friendly and
     jovial, and

9.   About two to three days after the opening arguements of the
     second trial took place, I had occasion to come to the courtroom
     to observe the trial.  Upon sitting down in the audience, I
     immediately recognized that one of the jurors looked very
     familiar to me.  The juror resembled many members of the Withers
     family, whose members I have known for almost all my life.  I
     believed that the juror in question was Linda Withers, and was
     related to the members of the Withers family that I knew.  My son
     Kenneth played little league baseball with the Withers children,
     and

10.  Further, both my wife and I believed that the juror, as well as
     the relatives of that juror, either knew or was related to one of
     the prosecution witnesses in our son's case.  That witness was
     Doyle Dubois, Jr.  Doyle Dubois, Jr. was the nephew of Tom
     Dubois.  Tom's wife is Lavanda, whose maiden name is Lavanda
     Withers.  Both my wife and I have known both Tom and Lavanda for
     many years,  and

11.  On one or more occasion, as Ernestine, myself, and/or Shirley
     Washburn were coming from or going to the courthouse, we observed
     that there was an outside area set aside for people to smoke
     cigarettes.  We observed that some of the members of our son's
     jury would congregate there.  On one or more occasion, we
     observed that there were other people in that same area and that
     they would be talking with the jurors.  These other people whom I
     saw talking with the jurors included members of the victim's
     family.

I declare, under penalty of perjury, that the foregoing is true
and correct, and would so testify in any court of law.

Executed this _5th_ day of ___September___, 20_00_, at
_Stockton_____, California.

Signed: _William Vernon_____
                William Vernon


Witnessed by: _Sanford Glickman_____

Print name: _SANFORD GLICKMAN_____

EXHIBIT C
DECLARATION OF SHIRLEY WASHBURN

## DECLARATION

I, Shirley Washburn, do state and declare the following:

1.  I am a resident of the State of California and over the age of eighteen years, and

2.  I am a friend of Ernestine Elaine Vernon and William Vernon, who are the parents of defendant Kenneth Vernon, and

3.  During the course of the second trial of Kenneth Vernon, I accompanied my friend, Ernestine Vernon, to the courthouse for the purpose of providing moral support for her, and

4.  On some of the occasions that I accompanied Ernestine to court, her husband William would also be present, and

5.  I recall a time when I had accompanied Ernestine to court, that William Vernon was also present. We were sitting out in the hallway outside of the courtroom where the trial was being held. I recall a specific occasion wherein a man had contact directly with William Vernon. It is my recollection that the man asked William if he was the brother or a relative of another person by the last name of Vernon. I do not recall the specific name that he mentioned. William answered that he was in fact, a relative of that person, and

6.  After that man had contact with William Vernon, I was in the courtroom while the trial was in session. I then recognized the man (previously referred to in paragraph five above, that had contact with William Vernon in the hallway) as being a member of the jury, and

7.  I personally witnessed the prosecutor in the case, a Mr. Schultz, during breaks and while the trial was not in session, to be

engaged in conversation with various members of the jury. Mr. Schultz usually was standing in the raised area where the jury seats were located when he engaged in this dialogue, and

8.    I personally witnessed a member of the jury to bring some light food (such as fruit and the like) into the courtroom. She shared this food with various members of the jury, as well as the prosecutor, Mr. Schultz. This happened on more than one occasion when I was present.

I declare, under penalty of perjury, that the foregoing is true and correct, and would so testify in any court of law.

Signed this __5th__, day of __September__, 20 __00__, at __Stockton__, California.

Signed: _Shirley Washburn_
                Shirley Washburn

Witnessed by: _Sanford Glickman_
Print name: _SANFORD GLICKMAN_

**EXHIBIT D**
**JUROR NOTE RE: BLOOD LEVELS OF D-AMPHETAMINE**
**AND AMPHETAMINE**

- Commitments Exchanged
- Journal Entry
- Thoughts & Ideas
- Agendas (telephone, meetings)
- Conversations

MONTH _____ YEAR _____

**DAILY RECORD OF EVENTS**

DATE _____

Q. CONCERNING BLOOD LEVELS OF D-AMPHETAMINE AND AMPHETAMINE FOUND IN ROBIN McCLARY. THERE WAS NO EVIDENCE PRODUCED TO SUBSTANTIATE THE USE OF AMPHETAMINES BY- INHALATION - ORAL INGESTION OF INJECTION. HOWEVER, ROBIN McCLARY DID SUFFER FROM ALLERGIES AND A BRONCHIAL DISORDER.

IF ROBIN TOOK PRESCRIPTION MEDICATION FOR BREATHING AND AN OVER THE COUNTER MEDICATION FOR ALLERGIES OR ASTHMA - THOSE DRUGS WILL SHOW A FALSE POSITIVE TEST FOR AMPHETAMINES -

THE STATEMENT BY BOTH DEFENSE AND PROSECUTION THAT SHE USED AMPHETAMINES MAY NOT BE VALID.

**RECEIVED**

MAR 05 1997

JEANNE MILLSAPS, Clerk

TRUDY C. CLARK

Deputy Clerk

©1992 Franklin Quest Co. Printed in U.S.A.    Classic Form #4001

## PROOF OF SERVICE

FILED
00 SEP 11 PM 1:36
JEAN MILLSAPS, CLERK
BY ENEDINA LISITSIN
DEPUTY

I declare that I am employed in the County of San Francisco, California. I am over the age of eighteen years and not a party to this case. My business address is 755 Florida St. #4, San Francisco, California 94110.2044

On the date set forth below, I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS

in the following manner:
  X Mail        __Overnight Mail      __Hand Delivery      __Fax
on the following persons or entities:

District Attorney's Office
222 E. Weber Ave., Room 202
Stockton, CA  95202

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 9, 2000 at San Francisco, CA.

Mark R. Vermeulen

Exhibit D:
*Appellant's Petition For Review*
(California Supreme Court, No. S078530)

SUPREME COURT COPY

S078530

No. 3 Crim. C026244

SUPREME COURT
FILED

IN THE SUPREME COURT

OF THE

STATE OF CALIFORNIA

APR 1 6 1999

Robert Wandruff Clerk

DEPUTY

---

PEOPLE OF THE STATE OF
CALIFORNIA,

      Plaintiff and
      Respondent,

vs.

KENNETH JEROME VERNON,

      Defendant and
      Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

SUPREME COURT

No._____

---

APPELLANT'S PETITION FOR REVIEW

---

After Decision in the Court of Appeal
Third Appellate District
Appeal from the Superior Court of San Joaquin County
Honorable F. Clark Sueyres, Judge

---

KYLE GEE
(State Bar #065895)
2626 Harrison Street
Oakland, CA 94612
(510) 839-9230

Attorney for Appellant
KENNETH JEROME VERNON

## TOPICAL INDEX

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . .  ii

APPELLANT'S PETITION FOR REVIEW BY THE SUPREME COURT . .  1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . .  2

REASONS REVIEW SHOULD BE GRANTED  . . . . . . . . . . .  3

BRIEF IN SUPPORT OF PETITION FOR REVIEW . . . . . . . .  5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . .  5

I     THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A
      VERDICT OF GUILTY OF PREMEDITATED AND DELIBERATE
      FIRST DEGREE MURDER UNDER THE DUE PROCESS CLAUSES. . 18

II    THE TRIAL COURT ERRED IN REFUSING A SPECIAL DEFENSE
      INSTRUCTION REGARDING THE JURY'S CONSIDERATION OF
      PLANNING, MOTIVE, AND THE METHOD OF KILLING IN
      RELATION TO ITS RESOLUTION OF THE ISSUES OF PRE-
      MEDITATION AND DELIBERATION. . . . . . . . . . . . . 23

III   MR. VERNON'S DUE PROCESS RIGHTS WERE VIOLATED WHEN
      THE TRIAL COURT INSTRUCTED ON FALSE STATEMENTS AS
      EVIDENCE OF CONSCIOUSNESS OF GUILT, AND IN REFUSING
      A SPECIAL DEFENSE INSTRUCTION ON THE LIMITED ROLE
      OF "CONSCIOUSNESS OF GUILT" EVIDENCE. . . . . . . .  25

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Tot* v. *United States* (1943) 319 U.S. 463     28

*Ulster County Court* v. *Allen* (1979) 442 U.S. 140     26

*United States* v. *Gainey* (1965) 380 U.S. 63     28

## STATE CASES

*People* v. *Anderson* (1968) 70 Cal.2d 15     seriatim

*People* v. *Caldwell* (1955) 43 Cal.2d 864     18

*People* v. *Cartier* (1960) 54 Cal.2d 300     20

*People* v. *Cole* (1956) 47 Cal.2d 99     20

*People* v. *Crandell* (1988) 46 Cal.3d 833     25, 26, 28

*People* v. *Ford* (1966) 65 Cal.2d 41     19

*People* v. *Haskett* (1982) 30 Cal.3d 841     24

*People* v. *Hillary* (1965) 62 Cal.2d 692     20

*People* v. *Kemp* (1961) 55 Cal.2d 458     20

*People* v. *Morris* (1988) 46 Cal.3d 1     21

*People* v. *Munoz* (1984) 157 Cal.App.3d 999     20

*People* v. *Nicolaus* (1991) 54 Cal.3d 551     26, 28

*People* v. *Perez* (1992) 2 Cal.4th 1117     3, 20, 21

*People* v. *Rowland* (1982) 134 Cal.App.3d 1     20

*People* v. *Sanchez, supra*, 12 Cal.4th at 32     24

*People* v. *Stroble* (1951) 36 Cal.2d 615     20

*People* v. *Wharton* (1991) 53 Cal.3d 522     24

## FEDERAL CONSTITUTIONAL PROVISIONS

Fifth Amendment                                    26

Fourteenth Amendment                        25, 26, 28


## CALIFORNIA CONSTITUTIONAL PROVISIONS

Art. I, § 15                                          26


## CALIFORNIA RULES OF COURT

Rule 29                                                 1


## MISCELLANEOUS

CALJIC 2.03                                        25, 26

Wigmore, *Evidence*, (Chadbourn Rev. 1979)          27

IN THE SUPREME COURT

OF THE

STATE OF CALIFORNIA

---

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) |
| Plaintiff and Respondent, | ) ) ) ) |
| vs. | ) ) |
| KENNETH JEROME VERNON, | ) ) ) |
| Defendant and Appellant. | ) ) |

## APPELLANT'S PETITION FOR REVIEW

### BY THE SUPREME COURT

TO: The Honorable RONALD M. GEORGE, Chief Justice, and to the Honorable Associate Justices of the Supreme Court:

Appellant KENNETH JEROME VERNON petitions this Court for review of the unpublished opinion of the Third District Court of Appeal, filed on March 8, 1999, a copy of which is appended.

It is respectfully submitted that review should be granted to settle significant issues of law and to ensure uniformity of decision (Rule 29, California Rules of Court).

1

## ISSUES PRESENTED FOR REVIEW

A.  Was there substantial evidence under the Due Process
    Clauses to support a verdict of guilty of premeditated
    and deliberate first degree murder?

B.  Did the trial court err in refusing a special defense
    instruction regarding the jury's consideration of plan-
    ning, motive, and the method of killing -- the so-called
    "*Anderson* guidelines"[1] -- in relation to its resolution
    of the issues of premeditation and deliberation?

C.  Were Mr. Vernon's due process rights violated when the
    trial court instructed on false statements as evidence
    of consciousness of guilt, and in refusing a special
    defense instruction on the limited role of "conscious-
    ness of guilt" evidence, where the issue at trial was
    not guilt of homicide but the degree of guilt?

---

[1]  *People* v. *Anderson* (1968) 70 Cal.2d 15.

2

## REASONS REVIEW SHOULD BE GRANTED

In this case, there was no question that Mr. Vernon shot and killed his live-in girlfriend, as he admitted as much in statements to police and in his testimony. There was also no question that he initially tried to avoid responsibility for the homicide by concocting a "killed by an intruder" theory and in lying to police. The trial issues all revolved around the degree of guilt -- first degree murder, second degree murder, or manslaughter -- and the mental states attendant to those levels of criminal homicide.

All three of Mr. Vernon's issues on appeal related in one way or another to these questions. The first focused on the sufficiency of the evidence of premeditation and deliberation, which brings into play the so-called "*Anderson* guidelines," which this Court in *People* v. *Perez* (1992) 2 Cal.4th 1117, 1125 declared to be "descriptive, not normative." Mr. Vernon submits that, in that determination, the Court has unintentionally cut the lower appellate courts somewhat adrift in terms of how one analyzes sufficiency of the evidence claims in first degree murder cases. He submits further that the evidence was insufficient, even under the new and less-structured standards.

The second issue involves the extent and manner in which the *Anderson* guidelines should play a role in the jury's analysis of the evidence of premeditation and deliberation. Mr. Vernon argued that -- even if "descriptive, not norma-

3

tive" guidelines -- it was appropriate to give on defense request a "pinpoint" instruction which directed the jury to consider those guidelines in making its determination of the issues of premeditation and deliberation.

The third issue is whether "consciousness of guilt" should be a factor which a jury considers not where the trial issue is guilt of homicide -- a conceded issue -- but the degree of homicide. In other words, does a person who commits manslaughter or second degree murder have a quantitatively different "consciousness of guilt" than does a person who commits first degree murder.

Mr. Vernon urges this Court to grant review on all three issues.


Dated:  April 13, 1999          Respectfully submitted,

                                _____
                                KYLE GEE

                                Attorney for Appellant
                                KENNETH JEROME VERNON

4

## BRIEF IN SUPPORT OF PETITION FOR REVIEW

### STATEMENT OF THE CASE

Mr. Vernon was convicted by a jury of first degree murder, with Penal Code section 12022.5 firearm use.[2]

Mr. Vernon's first jury trial commenced on November 8, 1996. CT 327.[3] After deliberations over four days, the jury was unable to agree on a verdict, and a mistrial was declared. CT 364, 366, 371, 373.

The second jury trial commenced on January 28, 1997. CT 484. After deliberations on March 5, 6 and 7, 1997, the jury returned its verdict and finding at 4:15 p.m. on March 7th. CT 518, 520, 521, 532.

On April 4, 1997, Mr. Vernon was sentenced to prison for an indeterminate term of twenty-five-years-to-life, enhanced by the aggravated term of ten years for firearm use. CT 644, 646. Notice of Appeal was timely filed that same day. CT 648. This appeal follows.

### STATEMENT OF FACTS

For the purposes of this Petition, Mr. Vernon will rely on the factual summary at pages 2 through 9 of the opinion, with the following additions:

---

[2] All code references are to the Penal Code, unless otherwise noted.

[3] Clerk's Transcript.

5

On August 24, 1995, a gardener went to 8201 Arroyo Way in Stockton. The gardener began to trim the shrubs by the front door. RT 34-36, 39-41, 45-46, 88.[4]

A sprinkler repairman arrived and began talking to Mr. Vernon in front of the house. A woman came out and listened to what they were saying. Thereafter, the woman and Mr. Vernon re-entered the house. The woman was Mr. Vernon's girlfriend, Robin McClary. RT 51-53, 56, 63.

The gardener worked his way to the side yard. At one point he turned off his clippers and heard a stereo and a television, which were "kind of loud." He could also "vaguely" hear people talking. RT 47-49, 57-58.

While at the front of the house the gardener heard "what sounded like a plate ... being broke and a glass." Back at the side of the house, he heard someone walking "heavily." In addition, he "heard off in the distance like a firecracker ...." Thereafter, there was a thump, like shoes being thrown. RT 58-61, 86, 94.

Some 15 to 25 minutes after Mr. Vernon and the woman had gone back inside the house, Mr. Vernon came out carrying what appeared to be clothes and a towel. He called to "Robin" to turn down the stereo. He then got into his truck. RT 62-66, 68-69.[5]

---

[4]/ Reporter's Transcript.

[5]/ The total time that Mr. Vernon was inside the house was not clear. The gardener's various estimates ranged from 10 to 25 minutes. RT 87, 91-92, 102, 269.

6

About ten minutes later, Mr. Vernon returned and stopped in front of the house. A red pickup pulled into the drive-way, and a man got out and got into Mr. Vernon's truck, which again left. The man in the red pickup was Doyle Dubois, who shared the house with Mr. Vernon and Ms. McClary. RT 68-69.

The two men returned 25 to 45 minutes later, a little before 7:00 p.m. Mr. Vernon and Mr. Dubois went inside. Both ran out soon thereafter, screaming, "She's dead. She's dead." RT 71-73, 75.

Doyle Dubois testified that he got off work at 5:00 p.m. On the way home, Mr. Dubois saw Mr. Vernon in his truck. Mr. Vernon asked if he wanted to go to a music store, and Mr. Dubois dropped off his truck at the house, seeing the garden-er in the front yard. Mr. Dubois and Mr. Vernon went to Tower Records in Mr. Vernon's truck. RT 156-157, 164-174.

At the store, Mr. Vernon somehow collided with the door. Inside the store, Mr. Vernon seemed highly agitated and said he had been cut. Mr. Vernon left, saying he was going to clean up his cuts. RT 177-181.

When Mr. Vernon returned ten minutes later, he seemed angry. After leaving Tower Records, they went home. RT 182-183.

Mr. Vernon walked through the house, seeming "upset and worried." When Mr. Vernon looked into the bedroom, he said, "Oh, my God." Mr. Dubois saw Ms. McClary on the floor in the bedroom. There was a kitchen knife by her hand. RT 187-193.

7

The next-door neighbor heard "pounding" at her door and found Mr. Vernon in an "agitated" state. He said, "Call 911. My girlfriend's been shot." He also stated, "I think she's been raped." RT 131-135.

Sheriff's deputies arrived just before 7:00 p.m., finding Mr. Vernon and Mr. Dubois on the lawn. Mr. Vernon said that his girlfriend was in the house and had been shot. RT 220-221, 224-226.

A hunting bow and arrows were found between the bed and the wall. Two feet to the side of the door, and two feet above the floor, was a hole in the wall. A bullet was imbedded in the wall. RT 534, 540-544, 562-563, 565, 568.

Deputy Mayoya interviewed Mr. Vernon at the sheriff's department on August 24, 1995. In that first statement, Mr. Vernon denied involvement in Ms. McClary's death. Deputy Mayoya interviewed Mr. Vernon again later that night, after Mr. Vernon had been taken to the emergency room where a physician cleaned his injuries. It was stipulated that the physician would testify that the injuries were consistent with having been cut by a sharp object. RT 701-702.

Mr. Vernon was arrested on August 30th, at the cemetery just after Ms. McClary's funeral. An interview was done that afternoon, and a final interview was done at approximately 6:30 p.m. RT 713-714, 717.

In the first interview, Mr. Vernon was advised by Deputy Mayoya why his story was not credible. Mr. Vernon eventually

8

admitted that it was he who had shot Ms. McClary, but stated that it had been an accident.

The autopsy revealed a gunshot to Ms. McClary's head, with an entrance one-and-one-half inches behind the left ear with stipple marks, which generally indicate a shot fired from a distance of 18 to 24 inches. The bullet did not enter the skull but passed through the large muscle on the left side of the neck. RT 381-385, 417.

Ms. McClary was five' five" and weighed 124 pounds. It was stipulated that methamphetamine (0.13 milligrams per liter) and ethyl alcohol were detected. An "effective level" for methamphetamine was 0.03 to 0.25. Methamphetamine may make a person agitated, irritable, paranoid, suspicious, and aggressive. RT 387, 391-392, 438-439, 834.

Her blood alcohol level had apparently been .08. For a woman her size, this would have required "a little" over two drinks (e.g., two 12-ounce beers or eight ounces of wine). RT 616.

Mr. Vernon testified that he had known Ms. McClary in school and had become romantically involved with her in approximately March. After a few weeks, she moved into his house with her son. RT 921-922.

Before Ms. McClary moved in, Mr. Vernon had purchased a 9 millimeter Browning "Hi-Power."[6] Sometime in June, Ms.

---

[6]/ This is a single-action, semi-automatic pistol. The gun is cocked when a cartridge is chambered. Alternatively, a cartridge can be chambered and the hammer lowered; thereaf-

McClary began to carry the gun for protection. They had been shooting together, and she usually kept the gun in her purse. Ms. McClary got her hunting license sometime in July. RT 938-941.

Mr. Vernon and Ms. McClary had argued verbally perhaps three times. He described these arguments as "just kind of a huff and puff and ignore." RT 946-947.

When Mr. Vernon and Mr. Dubois had originally moved into the house, the dishwasher was broken and the sprinklers and air conditioner were not working. After Ms. McClary moved in, it began to get hot, so he called the property manager several times about the dishwasher and air conditioner "in May, late April or May." RT 922-924.

Mr. Vernon never got a response, but in August the landlord came by and was upset that the lawn was dying. Mr. Vernon explained that the sprinkler was broken and that he had called without success about the sprinkler, dishwasher and air conditioner. The landlord said he would send his gardener to see Mr. Vernon. RT 924-925.

About a week or so later, a three-day notice was served on Ms. McClary by the property manager. She called Mr. Vernon at work, and he called the landlord who said that if they were hiring a gardener to disregard the notice. When Mr. Vernon got home from work that day, a repairman had al-

---

ter, the gun must be cocked in order to fire. RT 793-795, 805.

10

ready repaired the air conditioner but had said the dishwasher could not be repaired. RT 925-926.

On August 24th, Mr. Vernon got off work at 2:30 p.m. He arrived home at 3:00 p.m. and took Ms. McClary to the doctor at about 3:30 p.m. RT 930-931.

When they arrived home a little after 4:00 p.m., they changed clothes and talked in the living room. He did not yet notice anything unusual about her behavior. RT 932-934, 936.

Ms. McClary started making dinner, while Mr. Vernon began watching a movie. She was drinking wine, and he saw her have two glasses. Again, Mr. Vernon did not notice anything unusual about her behavior. RT 936, 947-949.

The sprinkler repairman arrived at around 4:30 p.m. After Mr. Vernon had shown him the broken sprinkler, he left to get a part, and Mr. Vernon went back inside. Mr. Vernon and Ms. McClary ate dinner in the living room. RT 949-950.

As Mr. Vernon was finishing dinner, at approximately 5:00 p.m., the gardener arrived. They looked at the job and agreed on a price. While the gardener went to his truck for his tools, Mr. Vernon showed the sprinkler repairman the sprinkler valves. RT 951-952.

When Mr. Vernon returned to the front of the house, Ms. McClary was on the front steps talking to the gardener. Mr. Vernon and Ms. McClary walked over to the sprinkler repairman, and Ms. McClary commented that he needed to replace all

11

the sprinkler heads.  When Mr. Vernon told her that the sprinkler man knew what he was doing, she replied that she had lived in the country and knew the sprinkler heads all needed to be replaced.  At that time, she had not appeared angry but had seemed to be becoming irritated because the sprinklers weren't working.  RT 953-954, 1035.

At around 5:30 p.m., Mr. Vernon and Ms. McClary went back inside the house.  In the living room, she began making comments about the landlord.  She complained that the land-lord was sending his relatives to fix things when he should be paying a repairman.  RT 954-956.

Ms. McClary began to get "a little angrier" and said she would call the landlord herself.  When Mr. Vernon said that he had already talked to the landlord, she asked about the dishwasher, which he had already explained was to be replaced in October, when the landlord had more money.  Ms. McClary said that he had the money and "that's bullshit."  Her de-meanor at this point was "irate and getting loud."  RT 957.

As they were arguing, Mr. Vernon knew that Ms. McClary had had a "couple of drinks" but he did not know she had taken drugs.  He did not learn that she had taken drugs until three months after he was arrested.  RT 994, 1299.

Ms. McClary began saying that she would call and tell the landlord he needed to "get this shit done."  She was going to "jump his ass."  When Mr. Vernon replied that, if she did so, the landlord would "kick us out," she accused him

12

of "taking the landlord's side, to fuck [him]."   Then she "stormed into the bedroom" and slammed the door.   RT 958-959.

Mr. Vernon began to curse Ms.McClary, telling her to "fucking knock it off, you've had a few drinks."   Mr. Vernon went to the bedroom and started yelling at her about slamming the door.  She told him to "fuck off" and walked back to the living room, slamming the bedroom door again.  RT 959-960.

Mr. Vernon walked to the living room and started yelling at her again as she sat on the couch, "staring" and angry. When he leaned over her, yelling, she put her hand in his face and pushed him back.  He did the same to her, pushing "with some force" on the right side of her face.  He called her a "bitch" and turned to walk away.  RT 960-962.

Mr. Vernon heard Ms. McClary jump up and the sound of "glass banging together."  She swung a plate at him, and it broke over his arm, cutting him.  One piece flew into the kitchen.  RT 963, 1076

When Mr. Vernon pushed her in her chest and face, she went down onto the couch and dropped the piece of plate she was holding.  They continued yelling and cursing at each other.  RT 964-965, 1076.

There was blood dripping from Mr. Vernon's arm, and he saw blood dripping from her hand.  After she walked into the bedroom, he threw the piece of plate that had landed in the kitchen into the garbage.  RT 965, 1082.

13

She was in the bedroom "yelling and cussing." Mr.
Vernon went to the bedroom because he knew she was cut,
finding her by the bathroom door, with bloody tissues in her
hand. She continued yelling and cursing about the landlord.
He gave her a towel, and she began swinging at him. Mr.
Vernon pushed her again, and she fell into the shower, knock-
ing down the curtain rod. RT 966-967, 1110.

After she got up, she cursed Mr. Vernon and tackled him
onto the bed, which collapsed. She was on top, hitting him,
and he hit her face, "pretty hard." While on the bed, Mr.
Vernon got a cut to the inside of his lip. RT 968-969, 1092.

Mr. Vernon threw her off, and she landed beside the bed
near hunting bows and arrows. When he got up, she hit him in
the leg with an arrow which had a hunting tip. The aluminum
shaft hit Mr. Vernon's leg, and when Ms. McClary "jerked it
back," the blade cut the side of his leg. When she tried to
hit him again with the arrow, he jerked it from her hands and
threw it into the corner. RT 907-973, 1128-1129.

She continued screaming. When Mr. Vernon turned to grab
a towel, he heard her yell that she was going to kill him.
When he turned back she was cocking the gun while on her
knees. He tackled her, wanting to get the gun away from her.
RT 974-977.

Mr. Vernon testified that he had not wanted to be shot,
and he had been angry, upset, and scared. They struggled,
but he wrested the gun from her and pulled away. He ex-

14

plained: "... [I] just shot, I just reacted."   "I pulled it away and I just pulled the trigger." Mr. Vernon denied having formed the thought that he "want[ed] to shoot her." The bullet struck Ms. McClary as she was looking downward. This occurred within ten to fifteen minutes of their having re-entered the house after talking to the sprinkler repair-man.  RT 978-979, 1151-1152, 1157, 1165-1166.

Mr. Vernon testified as follows with regard to the shooting:  "Just all the emotions, it's just like there was no time to think at the time, it just happened, everything happened so quick."  However, he admitted that at the first trial, he had answered "yes" when asked whether he had "intended to shoot her" and had "intended to kill her."  RT 1155-1156.

Ms. McClary fell across Mr. Vernon's legs, and he could see that she had been shot in the head.  He "just sat there," not knowing what to do and thinking that no one would believe what had happened.  He was scared to go to jail.  He had decided to say it was an accident because the police kept repeating that they could understand if it had been an accident.  RT 980-981, 1164, 1166.

Mr. Vernon got up and pulled Ms. McClary away from the door so that it could be opened.  He walked to the living room, recalling that the gardener was outside.  He looked out and saw the gardener continuing to work.  RT 982-983.

15

Mr. Vernon returned to the bedroom and formed the idea of making it appear that somebody had broken in. When Mr. Vernon grabbed a towel to wrap the gun, he saw the cartridge casing lying against the wall by the vanity, and he picked it up. He opened the sliding door to the bedroom. He closed and locked the bedroom door, and then kicked it open to make it look like a forced entry. He took the bathroom window out, threw it down, and pushed out the screen. RT 986, 1176, 1181-1182.

Mr. Vernon threw the piece of broken plate on the living room couch in the trash. He took a knife from the kitchen counter to the bedroom, put blood on it, and placed it beside Ms. McClary, to simulate a fight. He pulled down her pants to suggest sexual assault. He pulled the phones in the bedroom and kitchen from the wall. He put the gun and towels in his truck and left. RT 987, 1084, 1194.

After Mr. Vernon had driven two blocks, he saw Mr. Dubois on his was home. "... I was like I can't let him go home, 'cause I just came from the house." So he asked Mr. Dubois if he wanted to go to a record store, Mr. Dubois agreed, and they drove in Mr. Vernon's truck to Tower Records. RT 988-989.

In order to explain the cuts on his arm and legs, he tried to walk through the glass door at Tower Records, but that did not work. He told Mr. Dubois that he had cut himself on the door and was going to clean up at Burger King.

16

He drove behind Payless and threw the gun in a dumpster there.  Then he drove to Burger King, cleaned up, and threw the towels in their dumpster.  RT 988-989.

I

## THERE WAS NO SUBSTANTIAL EVIDENCE TO SUPPORT A VERDICT OF GUILTY OF PREMEDITATED AND DELIBERATE FIRST DEGREE MURDER UNDER THE DUE PROCESS CLAUSES.

Mr. Vernon presents this argument for several reasons. First, there was no "planning" evidence to establish a deliberate plan to kill, "'carried on coolly and steadily, [especially] according to a *preconceived design*.'" *People* v. *Caldwell* (1955) 43 Cal.2d 864, 869; emphasis added. Shooting one's girlfriend inside their shared house, while a gardener and repairman were working outside, shows no planning at all. Furthermore, the argument, the homicide, and the effort to avoid responsibility took only 15 to 25 minutes.

Second, the prior relationship between Mr. Vernon and Ms. McClary did not suggest a motive of a type supporting "an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]." *People* v. *Anderson* (1968) 70 Cal.2d 15, 27. An argument after dinner is not a motive of the type required by *Anderson*.

Finally, the nature of the killing -- a violent outburst with a single shot -- was deadly not so "particular and exacting" a manner of causing death "that the defendant must have intentionally killed according to a preconceived design

18

to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts" relating to planning or the relationship with the victim. *Id.*

Murder is presumptively of the second degree, and a first degree murder conviction must be reduced on appeal to second degree in the absence of substantial evidence to support the first degree finding. *People v. Ford* (1966) 65 Cal.2d 41, 51. The proper approach to a sufficiency analysis in this context was developed in the leading case of *People v. Anderson, supra.* Its tripartite analysis is well-known.

> The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).
>
> *People v. Anderson, supra,* 70 Cal.2d at 26-27.

19

The cases reviewed in *Anderson* reveal the types of
evidence the Court would look for to establish type (1), (2),
or (3) evidence. *See People v. Hillary* (1965) 62 Cal.2d 692;
*People v. Kemp* (1961) 55 Cal.2d 458; *People v. Cartier* (1960)
54 Cal.2d 300; *People v. Stroble* (1951) 36 Cal.2d 615; and
*People v. Cole* (1956) 47 Cal.2d 99. *Anderson* also specifi-
cally held that post-offense conduct could not be relied upon
to establish the pre-offense state of mind.

> Finally, the defendant in *Granados,* as
> here, attempted to "cover up" the crime by
> lying to the brother and the mother of the
> victim. Although this type of evidence may
> possibly bear on defendant's state of mind
> *after* the killing, it is irrelevant to ascer-
> taining defendant's state of mind immediately
> prior to, or during, the killing. Evasive
> conduct shows fear: it cannot support the
> double inference that defendant planned to
> hide his crime at the time he committed it
> and that therefore defendant committed the
> crime with premeditation and deliberation.

> *Id.* at 32.[7]

Mr. Vernon is well aware that this Court made clear in
1992 that the so-called "*Anderson* guidelines are descriptive,
not normative." *People v. Perez* (1992) 2 Cal.4th 1117, 1125.

> In identifying categories of evidence
> bearing on premeditation and deliberation,
> *Anderson* did not purport to establish an
> exhaustive list that would exclude all other
> types and combinations of evidence that could

---

[7]/  Moreover, cases since *Anderson* are significant. *See*
*People v. Rowland* (1982) 134 Cal.App.3d 1; and *People v. Mu-
noz* (1984) 157 Cal.App.3d 999.

20

support a finding of premeditation and delib-
eration. (*People v. Anderson, supra*, 70
Cal.2d at p. 27.) .... The *Anderson* fac-
tors, while helpful for purposes of review,
are not a sine qua non to finding first de-
gree premeditated murder, nor are they exclu-
sive.

> *People* v. *Perez, supra*, 2
> Cal.4th at 1125.

On the facts in *Perez*, the Court found sufficient evi-
dence of premeditation and deliberation.  Those facts includ-
ed advanced planning of a surreptitious entry of a house; a
surprise attack;  a beating; stabbing with one knife, which
broke; a search for another knife; and a motive for the
killing. *Id.*, at 1126-1127.

Yet the analysis in Mr. Vernon's case is rendered easier
by the several similarities between the facts of his case and
those in *Anderson* itself.  Here Mr. Vernon had been living
with the deceased, Ms. McClary, for some months; in *Anderson*,
the defendant had lived for eight months with a woman and her
three daughters, the youngest (age 10) being the victim.  In
both *Anderson* and this case the defendant failed to reveal
his crime and lied about what had happened.  Here Ms. McClary
sustained a single gunshot wound; in *Anderson*, many more
wounds -- over 60 in number -- were inflicted.  Here and in
*Anderson* there was mere speculation as to the motive.

One final point must be made, and that is that "specula-
tion" is no substitute for proof.  *See People v. Morris*

21

(1988) 46 Cal.3d 1, 21.  There was not sufficient evidence to establish premeditation and deliberation, without resort to "speculation" or "conjecture."  Under the Due Process Clauses of both the United States and California Constitutions, the judgment should be ordered to one of second degree murder.

22

## II

**THE TRIAL COURT ERRED IN REFUSING A SPECIAL DEFENSE INSTRUCTION REGARDING THE JURY'S CONSIDERATION OF PLANNING, MOTIVE, AND THE METHOD OF KILLING IN RELATION TO ITS RESOLUTION OF THE ISSUES OF PREMEDITATION AND DELIBERATION.**

The defense requested, and the trial court denied, a special instruction based on *People* v. *Anderson*, *supra*, 70 Cal.2d 15. RT 1345. The instruction as proposed read as follows:

> Before you may find that the killing in this case was deliberate and premeditated you must find evidence of planning activity, motive to kill, and a calculated killing; or extremely strong evidence of planning activity; or evidence of motive to kill, in conjunction with either planning activity or a calculated killing.
>
> Planning activity refers to facts about how and what the defendant did before the actual killing which show that he was engaged in activity directed toward and intended to result in the killing.
>
> Motive to kill refers to a reason for the killing which may be inferred from defendant's prior relationship and/or conduct with the victim.
>
> A calculated killing, as opposed to an explosion of violence, may be inferred from facts about the nature of the killing and its commission in a particular and exacting manner such that the defendant must have intentionally killed according to a preconceived design to take the victim's life in a particular way for a reason.

> CT 566.

23

Mr. Vernon submits that it was error to have rejected the proposed instruction, with no effort to modify it to remedy whatever defect it might have had. As this Court has stated:

> .... [W]e apply the tripartite test of *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal. Rptr. 550, 447 P.2d 942], in deciding whether the evidence is sufficient to support a finding of premeditation and deliberation based on these three factors: (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. (*Id.*, at pp. 26-27; *People v. Wharton* (1991) 53 Cal.3d 522, 546-547 [280 Cal.Rptr. 631, 809 P.2d 290] [hereafter *Wharton*]; cf. *People v. Haskett* (1982) 30 Cal.3d 841, 849, fn. 1 [180 Cal.Rptr. 640, 640 P.2d 776].) "[T]his court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson*, *supra*, 70 Cal.2d at p. 27.)
>
> We have recently explained that the *Anderson* factors do not establish normative rules, but instead provide guidelines for our analysis.
>
> *People v. Sanchez*, *supra*, 12 Cal.4th at 32.

Mr. Vernon is aware of no case holding that the jury must be instructed on the *Anderson* guidelines. As a matter of logic, however, he submits that if an appellate court will be evaluating the jury's decision based on the *Anderson* guidelines, then there is a compelling reason to advise the jury of the very guidelines against which its decision will be subsequently judged on appeal.

24

III

MR. VERNON'S DUE PROCESS RIGHTS WERE VIOLATED
WHEN THE TRIAL COURT INSTRUCTED ON FALSE STATEMENTS
AS EVIDENCE OF CONSCIOUSNESS OF GUILT, AND IN REFUSING
A SPECIAL DEFENSE INSTRUCTION ON THE LIMITED
ROLE OF "CONSCIOUSNESS OF GUILT" EVIDENCE.

As already explained, Mr. Vernon testified that he shot
and killed Ms. McClary.  There only issues for the jury
related to Mr. Vernon's mental state, to wit:  did he premed-
itate and deliberate, and did he act in the heat of passion.
Despite the limited issues, CALJIC 2.03 was given, over
defense objection.  RT 1324.  At the same time, the trial
court refused to give at defense request a special instruc-
tion (RT 1345), which would have told the jury:

> Evidence that the defendant attempted to
> hide or cover up the killing by false or
> evasive statements made after the killing
> cannot be considered by you in determining
> whether the killing was deliberate and pre-
> meditated.

CT 567.

Together, these decisions constituted a violation of
California case law and of the Due Process Clause.

A similar argument was presented in *People* v. *Crandell*
(1988) 46 Cal.3d 833, in relation to CALJIC 2.03 and 2.06,
two of the several "consciousness of guilt" instructions.
This Court rejected the argument, concluding that jurors
would not understand CALJIC 2.03 and 2.06 to "address the
defendant's mental state at the time of the offense."  There-

25

after, the Court in *People* v. *Nicolaus* (1991) 54 Cal.3d 551
rejected the identical argument, where the challenged in-
structions were CALJIC 2.03 and 2.52.

The constitutional problem discussed in *Crandell* and
*Nicolaus* was as follows:  In a criminal case, an instruction
which allows a jury to draw irrelevant and irrational infer-
ences violates the defendant's rights to due process of law.
United States Constitution, Amendments V and XIV;  California
Constitution, Art. I, § 15.  As the United States Supreme
Court explained in *Ulster County Court* v. *Allen* (1979) 442
U.S. 140, even an "entirely permissive evidentiary presump-
tion" will violate the Due Process Clause where "there is no
rational basis that the trier of fact could make the connec-
tion permitted by the inference."  Under such circumstances,
the risk arises "that an explanation of the permissible
inference to a jury, or its use by a jury, has caused the
presumptively rational fact finder to make an erroneous
factual determination."  *Id*. at 157.

The following observation about human nature is illumi-
nating:

> "It is a principle of human nature -- and
> every man is conscious of it, I apprehend --
> that, if he does an act which he is conscious
> is wrong, his conduct will be along a certain
> line.  He will pursue a certain course not in
> harmony with the conduct of a man who is
> conscious that he has done an act which is
> innocent, right, and proper.  The truth is --
> and it is an old scriptural adage -- 'that
> the wicked flee when no man pursueth, but the
> righteous are as bold as a lion.'  Men who

26

> are conscious of right have nothing to fear.
> They do not hesitate to confront a jury of
> their country, because that jury will protect
> them.  It will shield them and the more light
> there is let in upon their case the better it
> is for them.  We are all conscious of that
> condition, and it is therefore a proposition
> of the law that, when a man flees, the fact
> that he does so may be taken against him.
>
>                    2 Wigmore, *Evidence*,
>                    (Chadbourn Rev. 1979), at
>                    128.

This statement displays, with clarity, the limitations
of the "consciousness of guilt" concept.  It recognizes that
the utility of such evidence is confined to distinguishing
between individuals who are entirely innocent and those who
have a consciousness of some degree of guilt.  In short,
conduct alleged to reflect "consciousness of guilt" is too
blunt an instrument to distinguish between types of mens rea,
where identity and the fact of substantial criminal responsi-
bility are established.

In addition, this Court has recognized that evidence of
concealment after crime does not show the perpetrator's state
of mind at the time of his crime:

> Evasive conduct shows fear:  it cannot sup-
> port the double inference that defendant
> planned to hide his crime at the time he
> committed it and that therefore defendant
> committed the crime with premeditation and
> deliberation.
>
>           *          *          *
>
> [Evidence of the statements and conduct of
> defendant after the killing] is highly proba-
> tive of whether defendant committed the

27

crime, but it does not bear upon the state of
the defendant's mind at the time of the com-
mission of the crime.

> *People* v. *Anderson*, 70
> Cal.2d at 32-33.

This Court in neither *Crandell* nor *Nicolaus* mentioned
*Anderson*, and both *Crandell* nor *Nicolaus* made clear that the
"saving grace" of the consciousness-of-guilt instructions was
that they would not under the circumstances of those cases be
interpreted in a manner so as to permit use of the evidence
in a manner akin to that condemned in *Anderson*.  It is clear
that *Anderson* continues to represent this Court's definitive
view on this question.

Accordingly, in a case where the sole issues relate to
intent at the time of a homicide, instructions permitting
inferences on intent and mental state allow the jury to draw
irrelevant and irrational inferences.  The instructions given
and refused permitted the jury to draw only an irrational
inference.  The Due Process Clause prohibits a state from
basing a conviction upon an inference which does not have a
basis in "reason and experience."  See *United States* v.
*Gainey* (1965) 380 U.S. 63, 66-67; and *Tot* v. *United States*
(1943) 319 U.S. 463, 467-468.

28

## CONCLUSION

For the reasons stated, Mr. Vernon respectfully urges that this Court should grant review. On review, the judgment of conviction should be reduced to one of second degree murder, or reversed in its entirety.

Dated: April 13, 1999          Respectfully submitted,


_____
KYLE GEE

Attorney for Appellant
KENNETH JEROME VERNON

29

Exhibit E:
*Order*
(of the California Supreme Court denying petition for review)
(California Supreme Court, No. S078530)

Third Appellate District No. C026244
S078530
IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, Respondent

v.

KENNETH JEROME VERNON, Appellant

SUPREME COURT
**FILED**

JUN 1 6 1999

Robert Wandruff Clerk

DEPUTY

Appellant's petition for review DENIED.

Chief Justice

Exhibit F:
*Request For Discovery In Connection With*
*Petition For Writ Of Habeas Corpus*
(San Joaquin County Superior Court, No. SC059609A)

1  Mark R. Vermeulen [State Bar No. 115381]
   Law Office of Mark R. Vermeulen
2  755 Florida Street #4
   San Francisco, CA 94110.2044
3  Telephone: 415.824.7533
   Fax: 415.824.4833
4

FILED

OO SEP 11 PM 1: 36

JEANNE WILLIAMS, CLERK
CALIFORNIA COURTS
BY_____ DEPUTY

5  Attorney for Petitioner
   KENNETH VERNON
6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
10                       COUNTY OF SAN JOAQUIN

11  KENNETH VERNON,           )   No. SC059609 A
                              )
12            Petitioner,     )   REQUEST FOR DISCOVERY
                              )   IN CONNECTION WITH PETITION
13  On Habeas Corpus.         )   FOR WRIT OF HABEAS CORPUS
                              )
14  _____ )

15          Petitioner Kenneth Vernon hereby requests that the following discovery be ordered

16  produced in connection with the Petition For Writ Of Habeas Corpus filed herewith:

17          1. All transcripts of the voir dire examination of the jurors (including alternate jurors) in

18  the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin

19  County Superior Court, No. SC059609A).

20          2. The names, addresses and telephone numbers of all jurors (including alternate jurors)

21  in the case from which the underlying conviction arises.

22          Petitioner requests that this discovery be ordered produced prior to the date on which

23  any traverse/denial is due and sufficiently in advance of that date so that Petitioner, through

24  counsel, may adequately and effectively review and investigate the information involved in the

25  discovery.

26  Date: September 8, 2000
                              _____
27                            Mark R. Vermeulen
                              Attorney for Petitioner
28                            KENNETH VERNON

                                    - 1 -

1

## PROOF OF SERVICE

2

I declare that I am employed in the County of San Francisco, California. I am over the

3

age of eighteen years and not a party to this case. My business address is:

4

755 Florida St. #4, San Francisco, California 94110.2044

5

On the date set forth below, I served the attached:

6

REQUEST FOR DISCOVERY IN CONNECTION WITH PETITION FOR WRIT OF
HABEAS CORPUS

7

in the following manner:

8

 X  Mail        __Overnight Mail        __Hand Delivery        __Fax
on the following persons or entities:

9

10

District Attorney's Office
222 E. Weber Ave., Room 202

11

Stockton, CA  95202

12

13

I declare under penalty of perjury that the foregoing is true and correct.

14

Executed on September 9, 2000 at San Francisco, CA.

15

16

_____

Mark R. Vermeulen

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit G:
*Order*
(denying state court petition)
(San Joaquin County Superior Court, No. SC059609A)

FILED
SUPERIOR COURT-STOCKTON
01 OCT -1 PM 1: 09
JEANNE MIL_____
BY_____
DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Petition of

KENNETH VERNON

For Writ of Habeas Corpus.

CASE NO. SC-059609 A

ORDER

TO: KENNETH VERNON, and his attorney of record, MARK R. VERMEULEN:

It appearing that a petition for a Writ of Habeas Corpus having been filed herein on September 11, 2000, and good cause appearing therefor, IT IS HEREBY ORDERED that the Petition for Writ of Habeas Corpus is **denied** for the reasons indicated.

**REASON:** Counsel for petitioner has raised several grounds for this habeas corpus writ.

Juror Misconduct--failure to disclose material information during voir dire

Three incidents are raised with regard to this ground.

The first incident involves juror, Linda Withers. Petitioner asserts that she is related to a key prosecution witness by marriage and her family knows petitioner's family. The petition states that those relationships were not disclosed during voir dire. A review of the trial transcript, however, indicates that during the trial, counsel for petitioner was advised by petitioner's mother that the Withers family and the Vernon family know each other. Counsel advised the court of that fact. The court examined petitioner's mother and examined Ms. Withers. The court found that the juror did not know petitioner or the witnesses and allowed Ms. Withers to remain on the jury.

The second incident involves an unknown juror who purportedly "dropped something just in front of [petitioner's father.] As the man was bending down to pick up the object, he turned to [petitioner's father] and asked if [he] was the brother of Jack Vernon." Declaration of William Vernon. When petitioner's father said yes, the juror responded by saying, "Oh. Good." This evidence is vague and speculative as to what could be implied. (*In re Swain* (1949) 34 C.2d 300, 303-304.)

-1-

1   The third incident occurred in the jury deliberation room when a juror wrote a
2   note to the court indicating that he understood that the use of allergy or asthma
    medication may give a false positive in blood testing for amphetamine use.

3   A review of the entire record reveals that petitioner admitted to shooting the
4   deceased, Robin McClary. The issue for the jury was to determine petitioner's state of
    mind at the time of the shooting. The record shows that the jury focused upon
5   petitioner's own testimony about his thoughts during the struggle for the gun, just prior
    to the shooting. With that evidence, the jury decided that petitioner shot Ms. McClary
6   with the intent to kill her. Thus, when looking at the record as a whole, there is no
    showing that the juror's statements about whether Robin McClary had ingested
7   amphetamines or allergy medicine may have influenced the jury's verdict.

8   <u>Juror Misconduct--contact and discussions with third parties</u>

9   The evidence presented in support of this writ indicates that the conversations at
    issue were "very friendly conversations with various members of the jury, during the
10  recesses and breaks. ... [T]he jurors and [the district attorney would] be laughing and
    smiling during these exchanges." The conversations were described as "friendly and
11  jovial." See Declaration of William Vernon.

12  There is no evidence of any sort as to the substance of the conversations or the
    length of the conversations.

13  <u>Prosecutorial misconduct--speaking with jurors and facilitating conversations</u>
14  <u>between jurors and victim's family</u>

15  The basis for this ground is the same as discussed above; that is, the district
    attorney engaged in three-way conversations with jurors and the victim's family in the
16  courtroom during breaks and the district attorney accepted food offered by a juror.

17  There is no evidence of any sort as to the substance of the conversations or
    interaction.

18  <u>Exclusion of petitioner's mother from courtroom during voir dire</u>

19  By way of the Declaration of Ernestine Vernon, petitioner asserts that his mother
    was informed by petitioner's counsel that she could not be in courtroom during voir dire
20  because there was not enough room in the courtroom. After the jury was picked, she
    returned to the courtroom.
21
22  There is no evidence to suggest that the trial court closed voir dire to the public
    or even that the *trial court* excluded petitioner's mother from voir dire.

23  <u>Petitioner deprived of right to effective assistance of counsel</u>

24  There are two grounds upon which this argument is made. First, petitioner
    asserts that the trial court refused to substitute counsel for the second trial (after a
25  mistrial occurred in the first trial when the jury was unable to reach of verdict). Second,
    petitioner states that defense counsel, appointed over his objection, provided
26  ineffective assistance.

27  In order to prevail on his claim of ineffectiveness of counsel, petitioner must
    establish the performance of counsel was both deficient and caused him prejudice
28  (*Strickland v. Washington* (19840 466 US 668; *People v. Pope* (1979) 23 C3d 412).

1   Prejudice is shown when there is reasonable probability that, but for counsel's
    performance or lack thereof, the result of the proceedings would have been different
2   (*People v. Lucas* (1995) 12 C.4th 415,436.)

3       The record reflects that after the jury in the first trial was unable to reach a
    verdict, defense counsel, Ralph Cingcon, asked to be relieved as counsel for the
4   second trial because petitioner had no funds to retain him.  The trial court expressed its
    opinion that "there was no attorney better prepared to proceed at this time" and
5   appointed Mr. Cingcon as attorney of record, over Mr. Cingcon's objection.  Mr.
    Cingcon represented petitioner for the duration of the second trial.
6
        Petitioner states that during the second trial, defense counsel failed to
7   adequately investigate ballistics testing and failed to consult with forensic experts.
    Petitioner continues that defense counsel improperly excluded petitioner's mother from
8   the voir dire process, failed to adequately question prospective jurors, failed to review
    petitioner's presentence report prior to sentencing and failed to preserve trial files.[1]
9   This, petitioner asserts, constitutes ineffective assistance of counsel.

10      As stated above, the record reflects that at the second trial, petitioner admitted
    that he shot Robin McClary, but claimed that it was manslaughter, rather than murder.
11  The issue was petitioner's state of mind at the time of the shooting.  The jury had a
    portion of petitioner's testimony reread while deliberating.  The jury concluded that
12  petitioner shot with the intent to kill.

13      Petitioner offers nothing in the way of evidence to suggest how the claimed
    deficiencies affected the verdict or the outcome of the trial.
14
    Conclusion
15
        For the specific reasons stated above, the court finds that petitioner has failed to
16  establish a prima facie case for habeas corpus relief.  (*In re Bower* (1985) 38 Cal.3d
    865, 872.)  Petitioner is obliged to state with particularity the facts upon which the
17  petition is based; vague, conclusionary allegations are insufficient to warrant issuance
    of a writ.  (*In re Swain* (1949) 34 C.2d 300, 303-304.)
18

19      The petition is therefore DENIED as to all issues raised.

20      Date:   OCT - 1 2001

21                                              JUDGE OF THE SUPERIOR COURT

22                                              STEPHEN G. DEMETRAS

23

24

25

26  _____

27  [1]According to the petition, writ counsel has communicated with defense counsel
    in an effort to obtain the trial files.  It appears that the files may have been destroyed or
28  discarded.  There was a flood due to a water pipe break which is believed to have
    damaged the files.  One box of files was located and turned over to writ counsel.

FILED
SUPERIOR COURT-STOCKTON
01 OCT -1 PM 1:09
JEANNE MILLSAPS, CLERK
BY LAURA VITEK
DEPUTY

1

2

3

4          SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

5

6    In the Matter of the Petition of          )

7    KENNETH VERNON                            )
                                               )      CASE NO.  SC059609 A
8    For Writ of Habeas Corpus                 )
                                               )      CERTIFICATE OF SERVICE
9                                              )      BY MAIL

10   _____

11         I, the undersigned, declare that I am a deputy of the Clerk of the Superior Court

     of San Joaquin County, State of California, and not a party to the within action.  On
12   _____OCT - 1 2001_____, I deposited in the United States Post Office at Stockton,

13   California, true and correct copies of the Order regarding the above-entitled petition for

14   writ of habeas corpus, a printed copy of which is hereto attached and  made a part

     hereof, one copy of which is addressed to each of the following named persons at the
15   following named addresses:

16

17   MARK R. VERMEULEN                  COURTESY COPY:

18   755 Florida Street #4              San Joaquin County District Attorney

19   San Francisco, CA 94110-2044       P.O. Box 990
                                        Stockton, CA 95201
20

21                                      VIA INTER OFFICE MAIL

22

23         I further declare that each of said copies so mailed and addressed was enclosed

     in a separate envelope, sealed, with the postage thereon fully prepaid.
24         I declare under penalty of perjury that the foregoing is true and correct.

25         Executed at Stockton, California on the date above identified.  LAURA VITEK

26

27                                      _____
                                        Deputy Court Clerk
28

Exhibit H:
*Motion For Ruling On Earlier-Filed Requests For Discovery*
*(Filed Contemporaneously With Petition For Writ Of Habeas Corpus)*
*And For Reconsideration Of Denial Of Petition*
(San Joaquin County Superior Court, No. SC059609A)

1   Mark R. Vermeulen [State Bar No. 115381]
    Law Office of Mark R. Vermeulen
2   755 Florida Street  #4
    San Francisco, CA  94110.2044
3   Telephone: 415.824.7533
    Fax: 415.824.4833
4

5   Attorney for Petitioner
    KENNETH VERNON
6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF SAN JOAQUIN

10

11  In the Matter of the Petition of        )        No. SC059609 A
                                            )
12          KENNETH VERNON                  )
                                            )
13  For Writ Of Habeas Corpus.             )
                                            )
14  ─────────────────────────────────────

15       **MOTION FOR RULING ON EARLIER-FILED REQUESTS FOR DISCOVERY**
                    **(FILED CONTEMPORANEOUSLY**
16        **WITH PETITION FOR WRIT OF HABEAS CORPUS)**
          **AND FOR RECONSIDERATION OF DENIAL OF PETITION**
17

18  TO THE HONORABLE COURT:

19          Petitioner Kenneth Vernon hereby moves for a ruling on his earlier-filed Request For

20  Discovery In Connection With Petition For Writ Of Habeas Corpus, which was filed on

21  September 11, 2000 contemporaneously with the Petition For Writ Of Habeas Corpus, and

22  which requests for discovery were also set forth in the prayer of the Petition.  Petitioner also

23  requests, in light of these earlier requests for discovery, which are highly relevant to and which

24  will address the bases upon which the Court denied the Petition, that the Court reconsider its

25  denial of the Petition and thereafter issue a writ of habeas corpus or order to show cause and

26  thereafter grant the relief requested in the Petition.

27  / / /

28  / / /
    / / /

                                  - 1 -

Specifically, in the earlier-filed Request For Discovery, Petitioner requested, and hereby requests, that the Court order that the following discovery be produced in connection with the Petition:

1.  All transcripts of the voir dire examination of the jurors (including alternate jurors) in the case from which the underlying conviction arises (<u>People v. Kenneth Vernon</u>, San Joaquin County Superior Court, No. SC059609A); and

2.  The names, addresses and telephone numbers of all jurors (including alternate jurors) in the case from which the underlying conviction arises.

This motion is made on the grounds that the discovery was requested earlier (both in the Petition and in the Request For Discovery) and it was requested specifically that the discovery be ordered produced prior to the date by which any denial or traverse is due and sufficiently in advance of that date so that Petitioner, through counsel, could adequately and effectively review and investigate the information provided by the discovery.  This motion is made on the additional grounds that the discovery is necessary to develop fully the facts and evidence supporting the claims alleged in the Petition and to ensure that this Court has an adequate record with which to review the Petition.  The request for reconsideration of the denial of the Petition is made on these same grounds.

This motion is based on this Motion, the earlier-filed Request For Discovery and Petition For Writ Of Habeas Corpus, all files and records in this matter and in the related case from which the conviction arises (<u>People v. Kenneth Vernon</u>, San Joaquin County Superior Court, No. SC059609A), and all other matters that may be presented to the Court.

**ORIGINAL SIGNED BY**
**MARK R. VERMEULEN**

Date: October 27, 2001

_____
Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

- 2 -

## MEMORANDUM OF POINTS AND AUTHORITIES

On September 11, 2000, Petition filed three (3) pleadings: (1) his Petition For Writ Of Habeas Corpus ("Petition"); (2) his Request For Discovery In Connection With Petition For Writ Of Habeas Corpus ("Request For Discovery"); and (3) his Notice Of Related Case. In the Request For Discovery and in the prayer within the Petition, Petitioner requested, *inter alia*, that the Court "[o]rder that discovery be produced as set forth in the Request For Discovery In Connection With Petition For Writ Of Habeas Corpus filed herewith." (*See* Petition at 14.) In the Request For Discovery, Petitioner requested that the following discovery be ordered produced:

> 1. All transcripts of the voir dire examination of the jurors (including alternate jurors) in the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin County Superior Court, No. SC059609A)[, and]
> 2. The names, addresses and telephone numbers of all jurors (including alternate jurors) in the case from which the underlying conviction arises.

(*See* Request For Discovery at 1.)

Petitioner further requested that this discovery be ordered produced prior to the date on which any denial/traverse is due and sufficiently in advance of that date so that Petitioner, through counsel, could adequately and effectively review and investigate the information involved in the discovery. (*Ibid.*)

On October 1, 2001, the Court issued an Order denying the Petition. The Order did not address the requests for discovery.

The requested discovery is necessary to develop fully the facts and evidence supporting the claims alleged in the Petition and to ensure that the Court has an adequate record with which to review the Petition, particularly given the bases upon which the Court denied the Petition.

Petitioner respectfully requests that the Court grant the requests for discovery, permit Petitioner sufficient time to review, investigate, and present to the Court evidence obtained as a result of the discovery, and that the Court reconsider its denial of the Petition.

Date: October 27, 2001

Respectfully submitted,

**ORIGINAL SIGNED BY**
**MARK R. VERMEULEN**

Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

- 3 -