1  Mark R. Vermeulen [State Bar No. 115381]
2  Law Office of Mark R. Vermeulen
   755 Florida Street #4
3  San Francisco, CA 94110.2044
   Phone: 415.824.7533
4  Fax: 415.824.4833
5
6  Attorney for Petitioner
   KENNETH VERNON
7

**FILED**

NOV 4 2002

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8
9  UNITED STATES DISTRICT COURT
10  NORTHERN DISTRICT OF CALIFORNIA
11

12  KENNETH VERNON,                        )  No. C 00-3311 MJJ
                                           )
13          Petitioner,                    )  **PETITION FOR WRIT OF HABEAS**
                                           )  **CORPUS BY A PERSON IN STATE**
14      v.                                 )  **CUSTODY**
                                           )  **[28 U.S.C. § 2254]**
15  ANTHONY A. LAMARQUE, Warden,           )
                                           )
16  and DOES 1-10,                         )
                                           )
17          Respondents.                   )
   _____ )

18
19      Petitioner Kenneth Vernon, by and through counsel, hereby petitions for a writ of habeas corpus
20  and by this verified Petition states as follows:
21

22          **ALLEGATIONS APPLICABLE TO EACH CLAIM**
22      1.  Petitioner is unlawfully confined and restrained of his liberty at Salinas Valley State Prison,
23  Soledad, California by Edward S. Alameida, Jr., Director, California Department of Corrections and
24  Anthony A. Lamarque, Warden, Salinas Valley State Prison.
25      2.  Petitioner is confined as a result of his conviction and sentence entered in the Superior Court
26  of San Joaquin County in *People v. Kenneth Vernon*, San Joaquin County Superior Court No.
27  SC059609A.  This conviction arises from the jury trial in that action, in which Petitioner was convicted
28
29
30

-1-

on March 7, 1997 of murder in the first degree (California Penal Code[1] § 187).  The jury also found true the enhancement allegation that Petitioner personally used a firearm (§ 12022.5).

3.  Petitioner has no sentence to serve other than the sentence which is challenged by this Petition.

4.  Petitioner's imprisonment is the result of a fundamentally unfair trial in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and related provisions of the California Constitution.

5.  Petitioner requests this Court to take judicial notice of the certified record on appeal and the records and pleadings on file in the Superior Court, the Court of Appeal, and the California Supreme Court regarding the underlying matter, including the records from both Superior Court trials.

6.  Any exhibits and declarations that accompany this Petition are hereby incorporated by reference to the extent applicable.  Moreover, to the extent applicable, each claim stated herein incorporates the facts stated in other parts of this Petition and in any accompanying exhibits and declarations.

7.  Any legal authorities provided here are identified in summary form only and Petitioner reserves the right to present additional authority.  Each claim is based on both the United States Constitution and the California Constitution.

8.  To the extent that any facts set forth herein, or those included in exhibits and/or declarations and/or which are subject to judicial notice could not reasonably have been discovered or found by defense counsel, these matters constitute newly discovered evidence that casts fundamental doubt on the accuracy and reliability of the proceedings and undermines the convictions and sentence, such that Petitioner's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and related provisions of the California Constitution have been violated.

9.  The claims asserted in this Petition are cognizable in a habeas corpus proceeding and have been brought in a timely manner.

/ / /

/ / /

/ / /

---

[1]  All further statutory references are to the California Penal Code unless specified otherwise.

-2-

**PROCEDURAL HISTORY**

10.  The underlying judgment was entered in the San Joaquin County Superior Court on April 4, 1997.  Petitioner was sentenced to state prison for a total term of 35 years to life (25 years to life on the § 187 conviction, plus 10 years on the § 12022.5 enhancement, with the 10-year determinate term to be served before the indeterminate term).

11.  Petitioner appealed from his conviction and judgment to the California Court of Appeal, Third Appellate District.  The issues raised on appeal were as follows:

Issue 1:  Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder under the due process clause;

Issue 2:  Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and

Issue 3:  Whether Petitioner's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

The Court of Appeal affirmed the trial court's judgment in an unpublished opinion issued March 8, 1999 (People v. Kenneth Jerome Vernon, California Court of Appeal, Third Appellate District, No. C026244). A copy of the Court of Appeal's unpublished opinion is submitted herewith.  (See accompanying filing entitled Exhibits In Support Of Petition For Writ Of Habeas Corpus By A Person In State Custody, Exhibit A.)

12.  Petitioner sought review of the Court of Appeal's affirmance in the California Supreme Court through a petition for review filed on April 16, 1999.  The issues raised in the petition for review were as follows:

Issue 1:  Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder under the due process clause;

Issue 2:  Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and

Issue 3:  Whether defendant's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

The California Supreme Court denied the petition for review on June 16, 1999 (People v.

1  Kenneth Jerome Vernon, California Supreme Court No. S078530). A copy of the order denying the

2  petition for review is submitted herewith. (See Exhibit B.)

3      13. Petitioner was represented at his trial and sentencing by Ralph Cingcon of Stockton,

4  California. Petitioner was represented in his appeal and in his petition for review to the California

5  Supreme Court by Kyle Gee of Oakland, California. Petitioner thereafter has been represented by Mark

6  R. Vermeulen.

7      14. Through current counsel, petitioner filed a petition for writ of habeas corpus in the San

8  Joaquin County Superior Court (In the Matter of the Petition of Kenneth Vernon For Writ of Habeas

9  Corpus, San Joaquin Superior Court No. SC059609A). The claims raised in the petition were as

   follows:

10          Claim 1: One or more of the jurors committed prejudicial misconduct by failing to

11      disclose to the Court and counsel during voir dire material information which demonstrated juror

12      bias and knowledge, by which petitioner was deprived of due process of law, the right to trial by

13      impartial jurors, and the right to confront and challenge the evidence received against him under

14      the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 15

15      and 16 of the California Constitution;

16          Claim 2: One or more of the jurors committed prejudicial misconduct by having contact

17      with third parties (namely, the deceased victim's mother, friends, and relatives, and the District

18      Attorney), by which petitioner was deprived of due process of law, the right to trial by impartial

19      jurors, and the right to confront and challenge the evidence received against him under the Sixth

20      and Fourteenth Amendments to the United States Constitution, and Article I, sections 15 and 16

       of the California Constitution;

21          Claim 3: The prosecutor at trial committed prejudicial misconduct by having contact

22      with the jurors and by facilitating communications between jurors and third parties (namely, the

23      deceased victim's mother, friends, and relatives), by which petitioner was deprived of due

24      process of law, the right to trial by impartial jurors, and the right to confront and challenge the

25      evidence received against him under the Sixth and Fourteenth Amendments to the United States

26      Constitution, and Article I, sections 15 and 16 of the California Constitution;

27          Claim 4: Petitioner was prejudicially deprived of his right to a public trial and to due

28      process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under

29      article I, section 15 of the California Constitution, due to the exclusion of the public (including

30      Petitioner's family) from the courtroom during voir dire;

Claim 5: Petitioner was prejudicially deprived of his right to the effective assistance of counsel, to a fair trial, and to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, sections 15 and 16 of the California Constitution, due to the trial court's refusal to substitute counsel for the second trial (after a mistrial occurred in the first trial when the jury was unable to reach a verdict), due to the court's quick resetting of the second trial, and due to trial counsel's consequent inability to provide Petitioner with adequate and effective representation at the second trial, and there was no tactical reason for the failure of trial counsel to undertake the matters complained of herein; and

Claim 6: If any of the claims or issues raised in the petition are deemed waived through previous counsels' failure to timely raise and litigate the claim(s) and/or issue(s), petitioner was prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and his right to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, sections 15 and 16 of the California Constitution, for there was no tactical reason not to raise these claims or issues, and petitioner was prejudiced thereby.

15. Simultaneously with filing of the petition for writ of habeas corpus in the San Joaquin County Superior Court, Petitioner filed a separate request for discovery by which Petitioner sought an order for the production of (1) all transcripts of the voir dire examination of the jurors (including alternate jurors) in the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin County Superior Court No. SC059609A), and (2) the names, addresses and telephone numbers of all jurors (including alternate jurors) in the case from which the underlying conviction arises.

16. On October 1, 2001, the San Joaquin County Superior Court denied the petition without specifically addressing the separately-filed requests for discovery. A copy of the Superior Court's order is submitted herewith. (See Exhibit C.) On October 30, 2001, Petitioner filed a motion with the San Joaquin County Superior Court requesting that the court rule on the earlier-filed requests for discovery and requesting that, in light of the requests for discovery, the court reconsider its denial of the petition. On November 27, 2001, the San Joaquin County Superior Court issued an order denying the motion and the request for reconsideration of the denial of the writ. A copy of the Superior Court's order is submitted herewith. (See Exhibit D.)

17. On December 10, 2001, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District (In the Matter of the Petition of Kenneth Vernon For Writ of Habeas Corpus, Court of Appeal No. C039943.) That petition raised the same issues as those raised in the petition filed previously in the San Joaquin County Superior Court. (See ¶14, *ante*.) On January 10,

1   2002, the Court of Appeal denied the petition.  A copy of the Court of Appeal's order denying the

2   petition is submitted herewith.  (See Exhibit E.)

3       18.  On January 15, 2002, Petitioner filed a petition for writ of habeas corpus in the California

4   Supreme Court (In re Kenneth Vernon on Habeas Corpus, California Supreme Court No. S103597).

5   That petition raised the same issues as those raised in the petition previously filed in the San Joaquin

6   County Superior Court and in the Court of Appeal.  That petition is still pending

7                                    **CLAIMS FOR RELIEF**

8   **Claim 1:  Insufficiency Of Evidence To Convict Of First Degree Murder**

9       19.  Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional.  They

10  were obtained in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution because the

11  evidence adduced at trial was insufficient to support a conviction for murder in the first degree.  At

12  most, the evidence supported a conviction for murder in the second degree, or manslaughter.

13      20.  The facts which support this claim, among others to be developed after full investigation,

14  discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further

15  develop and support the merits of this claim, and other available court processes, are as follows.

16                          **Facts Underlying Claim 1**

17                              **i.  Introduction**

18      21.  In this case, there was no question at trial as to who fatally shot the decedent, Robin

19  McClary.  Petitioner, in his own testimony, admitted that he had done so.  The issue at trial concerned

20  the type and degree of homicide: was this premeditated murder, second degree murder, or manslaughter?

21      22.  In the context of this insufficiency-of-evidence claim, the factual discussion here is lengthy,

22  of necessity.  It is derived from the trial transcripts.  For readability, the discussion is categorized into

23  the testimony of the key witnesses and/or the key events relevant to establishing the claim.  The

24  evidence adduced at trial was as follows.

25                              **ii.  The gardener**

26      23.  On August 24, 1995, Robert Perry was to meet Petitioner at approximately 5:00 p.m. at 8201

27  Arroyo Way in Stockton, California to discuss gardening work.  Mr. Perry went by the house at 3:00 or

28  4:00 p.m., but no one was home.  He returned shortly after 5:00 p.m., and Petitioner answered the door.

29  Petitioner showed him around outside.  Mr. Perry asked Petitioner if he could run power from either the

30  garage or the house, and Petitioner brought out an extension cord through the garage.

24. Mr. Perry began to trim the shrubs by the front door. Another man came by to work on a broken sprinkler on the side of the house. The sprinkler man left but returned and began talking to Petitioner in front of the house. A woman (Robin McClary, who was Petitioner's girlfriend and who is the deceased in this case) came out and listened to what they were saying. Mr. Perry spoke to her, and she did not seem upset. Thereafter, she and Petitioner re-entered the house.

25. Mr. Perry worked his way to the side yard. At one point he turned off his clippers and heard a stereo and a television, which were "kind of loud." He could also vaguely hear people talking. While at the front of the house later, Mr. Perry heard "what sounded like a plate . . . being broke and a glass." Back at the side of the house, he heard someone walking heavily. In addition, he "heard off in the distance like a firecracker . . . ." Thereafter, there was a thump, like shoes being thrown.

26. About 15 to 25 minutes after Petitioner and Ms. McClary had gone back inside the house, Petitioner came out carrying what appeared to be clothes and a towel. He was wearing a T-shirt and a pair of shorts. He called to Robin to turn down the stereo. He then got into his truck.[2]

27. About 10 minutes later, Petitioner returned and stopped in front of the house. A red pickup pulled into the driveway, and a man got out and got into Petitioner's truck, which again left. The man in the red pickup was Doyle Dubois, who shared the house with Petitioner and Ms. McClary.

28. The two men returned 25 to 45 minutes later, shortly before 7:00 p.m. A young man had been waiting to talk to Petitioner about repairing the roof, and he spoke to Petitioner. Thereafter, Petitioner and Mr. Dubois went inside. Both ran out soon thereafter, screaming, "She's dead, she's dead."[3]

---

[2] The total time that Petitioner was inside the house was not made clear at trial. Mr. Perry testified that it had been 20 to 25 minutes, but he told a deputy that same night that it had been about 10 minutes. At the first trial, he testified that it had "felt like 15 minutes." He also testified that Petitioner came out of the house 15 to 20 minutes after Mr. Perry had heard the last noise from inside the house, but he had previously testified that he thought it had been "maybe 5 minutes" thereafter. In any event, he told police that he had looked at his watch and believed that Petitioner had left at about 5:50 p.m.

[3] Philip Mosqueda had been working on the sprinkler. He had been at the house the week before, when he repaired the air conditioning unit and checked the broken dishwasher, which could not be repaired. When he told Ms. McClary that the dishwasher needed to be replaced, she had not seemed upset.

On August 24, 1995, Mr. Mosqueda arrived at the house at approximately 4:45 p.m., knocking on the front door and telling Ms. McClary he would be working on the sprinkler. After two trips for parts, the job was finished, and Mr. Mosqueda went to the door. Petitioner and Ms. McClary came out, and they talked for a few minutes. Mr. Mosqueda did not smell any alcohol on Ms. McClary's breath, and she did not appear to be upset. Mr. Mosqueda left at approximately 5:30 p.m.

### iii. The roommate

29. Doyle Dubois was living at 8201 Arroyo with Petitioner, Ms. McClary, and her son, Nicholas. Mr. Dubois' bedroom was in the southeast corner, Nicholas' was in the southwest area, and the north bedroom was occupied by Petitioner and Ms. McClary.

30. Mr. Dubois got off work at 5:00 p.m. He stopped at an auto parts store, a bank, and fast food place before heading home. On the way home, Mr. Dubois saw Petitioner in his truck. Petitioner asked Mr. Dubois if he wanted to go to a music store, and Mr. Dubois dropped off his truck at the house, seeing the gardener in the front yard. Mr. Dubois and Petitioner went to Tower Records in Petitioner's truck.

31. At the store, Petitioner somehow collided with the door, "hard." Inside the store, Petitioner seemed highly agitated and said he had been cut. He displayed cuts on his arm and leg. After talking to one of the clerks, Petitioner left, saying he was going to clean up his cuts.[4] When Petitioner returned ten minutes later, he seemed angry and said that he would not buy anything at that store. After leaving Tower Records, they went home.

32. Upon arriving back at the house, Mr. Dubois got his books and handgun out of his truck. A man came up and talked to Petitioner about the roof. Petitioner and Mr. Dubois then entered the house.

33. After Mr. Dubois asked why the phone was on the floor in the kitchen, Petitioner began calling to Ms. McClary. Petitioner walked through the house, seeming "upset and worried." When Petitioner looked into the bedroom, he said, "Oh, my God!"

34. Mr. Dubois saw Ms. McClary on the floor in the bed room. There was a kitchen knife by her hand. Petitioner and Mr. Dubois went outside. At this point, Petitioner was crying. Mr. Dubois was carrying his gun, which he locked in his truck.

35. The next-door neighbor testified that sometime 6:00 and 7:00 p.m., he heard "pounding" at her door and found Petitioner in an "agitated" state, saying "Call 911. My girlfriend's been shot." Petitioner also stated, "I think she's been raped."

---

[4] A Tower Records employee testified that at about 6:00 p.m., Petitioner and another man had approached the store. Petitioner had walked into the door as the other man was opening it. After they entered, they walked to the back for awhile. Petitioner then came to the counter and showed her the cuts on his arm and leg. She told him he could not have cut himself on the door, and she saw that the blood was already coagulated. Petitioner left alone and returned later.

36. Petitioner and Mr. Dubois sat down in the yard. Petitioner was very upset. He was crying "hard" and saying that he could not believe that this had happened. At one point, he vomited on the lawn.

### iv. The first officers at the scene

37. Sheriff's deputies arrived just before 7:00 p.m., finding Petitioner and Mr. Dubois on the lawn. Petitioner was in a fetal position, crying and distraught. He said that his girlfriend was in the house and had been shot.[5]

38. Police entered the house, finding the television at high volume. A pair of glasses was on the floor in the living room, near the coffee table. A cordless telephone had been knocked to the floor. In the hall were blood drops on the carpet. The bathroom window was on the floor, with the glass broken. Inside the bedroom was a woman lying face down on the floor. Her pants and underpants were partially down, and a knife lay near her arms. A black purse was on the corner of the bed nearest the body.

### v. Examination of the house

39. The house had an entry hall, with the living room immediately to the left, and a kitchen and dining room area farther down the hall to the right. Inside the living room was a couch with a grease spot on the back. On the floor behind the couch was a piece of broken plate. A pair of glasses was on the floor by the coffee table, and there were blood spots on the living room rug. Blood spots were located on the metal strip separating the living room rug from the kitchen floor, and in the hallway.

40. On the floor of the dining area was part of a Cornish game hen. There was also a phone with the wall plug missing.

41. In the kitchen was the telephone wall jack in which the plug and a piece of cord remained. The garbage included pieces of a plate that matched the piece found behind the couch. Also in the garbage were two beer bottles and a Franzia wine container.[6]

42. The bathroom window screen was on the ground directly below the window. The window itself was in the bathroom, with the frame and glass broken. Drops of blood were located on the sink

---

[5] Police had difficulty obtaining information from Petitioner because he was so upset. He identified the woman as Robin McClary. He said he had gotten home from work, after which the gardener had arrived. Petitioner and Mr. Dubois had gone to Tower Records for about an hour. When they got home, he and Mr. Dubois discovered Ms. McClary in the bedroom.

[6] One of the first police in the house had been looking for something to use to cover the knife. He dumped out the kitchen garbage, intending to use the can to cover the knife. The officer then saw a large bowl and decided to use it to cover the knife instead of the garbage can, which was left in the kitchen.

and countertop, on the floor, on the toilet paper roll, on the step leading down to the shower, and in the upper right-hand corner inside the shower.

43.  In the north bedroom was a waterbed frame containing a regular mattress, with the corner of the bed nearest the body knocked off its pedestal. A long bloodstain led from just inside the door to the body. An open black purse was on the corner of the bed, and a knife was on the floor. The door's strike-plate and jamb were broken.

44.  A hunting bow and arrows were between the bed and the wall. A second phone was on the floor, also with the wall plug missing. Near the phone was a gold chain broken in the middle. Two feet to the side of the door, and two feet above the floor, was a hole in the wall. A bullet was imbedded in the stud behind the sheetrock.

### vi.  The testimony of Ms. McClary's mother

45.  Ms. McClary's mother testified that she last saw her daughter three or four days before her death when she came to visit in her white Volkswagen with her son and Petitioner. Petitioner's brother and sister-in-law came in another car.

46.  Ms. McClary had a handgun when she visited. Ms. McClary's mother did not notice any injuries to her daughter's face. The Volkswagen was not running properly, and when they left they rode home with Petitioner's brother. Police later found a box of 9- millimeter cartridges in the glove compartment of the Volkswagen.

### vii.  Petitioner's first statements to police, on the night of the homicide.

47.  Deputy Mayoya interrogated Petitioner at the sheriff's department the evening of the incident soon after 8:00 p.m. A videocassette tape of the interrogation was played at the trial. In that first statement, Petitioner denied any involvement in Ms. McClary's death. He asserted that he left to go to the record store, leaving Ms. McClary in the house and the gardener outside. He said he ran into Mr. Dubois, and the two went together to the record store and returned after about an hour to find Ms. McClary dead.

48.  Deputy Mayoya interrogated Petitioner again later that night at approximately 1:00 a.m., after Petitioner had been taken to the emergency room where a physician cleaned his injuries.[7] In this second hour-long interrogation, Petitioner was advised of his rights, and the deputy told Petitioner that the deputy did not believe Petitioner's original story. When Petitioner was accused of being involved,

---

[7]  It was stipulated that the physician would testify that the injuries were consistent with having been cut by a sharp object.

-10-

he denied it.  The deputy testified that his intention in this interrogation was to "float out theories" such as "maybe this is what happened," and he posed several different "theories."  The first theory was that this was perhaps an accident, which Petitioner denied.[8]  Another was that this involved self-defense, which Petitioner also denied.  The deputy conceded that he had raised these theories in the hope that Petitioner would adopt one that could be disproved.

### viii.  The towels in the dumpster

49.  A Sheriff's sergeant was told by Detective Mayoya that Petitioner had stated that he had cut himself at Tower Records and cleaned himself up at Burger King.  The sergeant checked the dumpsters in the nearby Payless shopping center, but they had been emptied.  Inside the Burger King dumpster were a large terry cloth bath towel and two other towels.

### ix.  The August 27 telephone conversation

50.  On August 27, Deputy Mayoya left a message at Petitioner's house, and Petitioner called back.  Petitioner was asked about his Browning Hi-Power pistol, because police had been unable to locate it.  Petitioner responded that Ms. McClary carried the gun in her purse most of the time.  When asked when Petitioner had last seen the gun, he answered that it had been on Wednesday (August 23).  When Petitioner was told that the gardener had said he had seen him carrying something out of the house, Petitioner denied it.  Petitioner was asked if dishes had been broken, and he said that they had not.  Petitioner also denied knowing how the bedroom door had been broken.

### x.  The August 30 arrest and subsequent interrogations

51.  Petitioner was arrested on August 30 at the cemetery just after Ms. McClary's funeral had ended.  He was taken to the Sheriff's office and he was again read his <u>Miranda</u> rights.  An interrogation was conducted that afternoon and a final interrogation was conducted at approximately 6:30 p.m.[9]

52.  Videotapes of both August 30 interrogations were played at trial.  In the first August 30 interrogation, Petitioner was advised by Deputy Mayoya at length why Petitioner's story was not credible.  Petitioner denied involvement for some time.  However, he eventually admitted that he had shot Ms. McClary, stating that it had been an accident.

53.  After his arrest, Petitioner was put in a holding cell.  During a periodic check, he was found to have removed his socks and tied them around his neck.  When asked what he was doing, Petitioner

---

[8] During the second interrogation, the deputy made reference to "accident" as many as fifty times.  During the fourth interrogation, Petitioner actually adopted the "accident" theory.

[9] At the time of his arrest, Petitioner did not know that the towels had been found.  He found out for the first time on videotape that the police knew of the bloody towels.

responded that he couldn't face his parents.  The knots were so tight that the deputy was unable to untie them.

### xi.  The forensic testimony

54.  A criminalist from the Department of Justice tested a number of blood samples.  Samples consistent with Ms. McClary's blood type were found on the living room carpet, the bedroom floor, the door of the bathroom, a light blue bath towel from the Burger King dumpster, and a dish towel from the Burger King dumpster.  Samples consistent with Petitioner's blood type were found on the "west shower wall", a dark blue bath towel from the Burger King dumpster, and a light blue towel from the Burger King dumpster.

55.  A criminalist had also gone to the house to do a bullet trajectory reconstruction using a probe and a protractor.  The criminalist testified that the angle of entry was approximately 80 degrees from the wall (plus or minus 5 degrees) and approximately horizontal.  When fired, the gun would have been approximately two feet above the floor.  The criminalist introduced into evidence a photograph of an officer with his head in approximately the position which would account for the wounds and the hole in the wall.  He would have expected to see some blood spatter if the decedent had been within 1-1/2 to 2 feet of that wall.

### xii.  The autopsy

56.  The forensic pathologist who performed the autopsy described a variety of injuries.  There were superficial injuries in Ms. McClary around the face, including bruises on the lips, a "pattern" bruise on the left cheek that might have been caused by a ring, and a one-inch scratch on the chin.  Her nose had not been broken and she had no black eyes, no swelling, and no open cuts or lacerations.  There was a 1/4-inch by 1/8-inch abrasion to the left scapula, an abrasion next to the right elbow, and bruises to the left hip.  There were no injuries to the hands.

57.  Below the thyroid prominence were four purple petechial contusions (caused by blunt force injuries), which could have been caused by pressure.  However, there were no internal neck injuries.

58.  Also noted were petechial hemorrhages to the eyelids.  These can occur by various means, including pressure to the neck and direct trauma.[10]

_____

[10]  The body was not moved until 3:00 a.m. The pathologist agreed that petechiae can occur as a result of lividity and decomposition. The pathologist deemed this possible, but not likely, for the following reasons: (1) seven to eight hours of decomposition is not long; (2) little decomposition was observed; and (3) there were fewer petechiae in the left eyelid as compared with the right, and the left side of the face had been down.

-12-

59. There was a gunshot wound to the head, with the entrance point 1-1/2 inches behind the left ear with stipple marks, which generally indicates a shot fired from a distance of 18 to 24 inches. The bullet did not enter the skull but passed through the large muscle on the left side of the neck in an almost level path with no significant front or back deviation.

60. There was blood on the right shirt sleeve which showed a pattern of lines. The knife with the serrated edge found near the body could have caused that pattern.

61. Robin McClary was 5 feet 5 inches tall and weighed 124 pounds. It was stipulated that ethyl alcohol (0.08% blood alcohol content) and methamphetamine (0.13 milligrams per liter) were detected in her blood. For a woman Ms. McClary's size, 0.08% blood alcohol content would have required her to ingest a little over two drinks (e.g., 2 12-ounce beers or 8 ounces of wine). An "effective level" of methamphetamine is present at 0.03 to 0.25 milligrams per liter, and methamphetamine makes a person agitated, irritable, paranoid, suspicious, and aggressive.

### xiii. Petitioner's testimony

62. Petitioner testified that he had known Ms. McClary in school and had become romantically involved with her in approximately March, 1995. After a few weeks, she moved into his house with her son.

63. Before Ms. McClary moved in, Petitioner had purchased a 9-mm. Browning "Hi-Power" handgun.[11] Sometime in June, Ms. McClary began to carry the gun for protection. They had been out shooting together, and she usually kept the gun in her purse. Ms. McClary got her hunting license sometime in July, after taking a gun safety class.

64. When Petitioner left the gun with Ms. McClary, he would chamber a cartridge and lower the hammer. In order to fire the gun, all she would have to do is cock the hammer.

65. Petitioner and Ms. McClary had argued verbally perhaps three times before this incident. He described these arguments as "just kind of a huff and puff and ignore."

66. When Petitioner and Mr. Dubois had originally moved into the house, the dishwasher was broken and the sprinklers and the air conditioner had not been working. After Ms. McClary moved in, it began to get hot, so Petitioner called the property manager several times about the dishwasher and air conditioner in late April or May. Petitioner never got a response, but in August the landlord came by and was upset that the lawn was dying. Petitioner explained that the sprinkler was broken and that he

---

[11] This is a single-action, semi-automatic pistol. The gun is cocked when a cartridge is chambered. Alternatively, a cartridge can be chambered and the hammer lowered; thereafter, the gun must be cocked in order to fire.

had called the landlord without success about the sprinkler, dishwasher and air conditioner. The landlord said he would send his gardener to see Petitioner.

67. About a week or so later, a three-day notice was served on Ms. McClary by the property manager. She called Petitioner at work, and he called the landlord who said that if they were hiring a gardener to disregard the notice. When Petitioner got home from work that day, a repairman had already repaired the air conditioner but had said the dishwasher could not be repaired.

68. On August 24, Petitioner got off work at 2:30 p.m. He arrived home at 3:00 p.m. and took Ms. McClary to the doctor at about 3:30 p.m. When they arrived home a little after 4:00 p.m., they changed clothes and talked in the living room. She had him sign papers for the Department of Motor Vehicles. He did not yet notice anything unusual about her behavior.

69. Ms. McClary started making dinner, while Petitioner began watching a movie. She was drinking wine, and he saw her have two glasses. Again, Petitioner did not notice anything unusual about her behavior.

70. The sprinkler repairman arrived at around 4:30 p.m. After Petitioner had shown him the broken sprinkler, he left to get a part, and Petitioner went back inside. Petitioner and Ms. McClary ate dinner in the living room.

71. As Petitioner was finishing dinner, at approximately 5:00 p.m., the gardener arrived. They looked at the job and agreed on a price. While the gardener went to his truck for his tools, Petitioner showed the sprinkler repairman the sprinkler valves.

72. When Petitioner returned to the front of the house, Ms. McClary was on the front steps talking to the gardener. Petitioner got an extension cord and plugged it into the garage for the gardener. Petitioner and Ms. McClary walked over to the sprinkler repairman, and Ms. McClary commented that he needed to replace all the sprinkler heads. When Petitioner told her that the sprinkler man knew what he was doing, she replied that she had lived in the country and knew the sprinkler heads all needed to be replaced. At that time, she had not appeared angry but had seemed to be becoming irritated.

73. At around 5:30 p.m., Petitioner and Ms. McClary went back inside the house. In the living room, she began making comments about the landlord. She complained that the landlord was sending his relatives to fix things when he should be paying a repairman. She began to get "a little angrier" and said she would call the landlord herself. When Petitioner said that he had already talked to the landlord, she asked about the dishwasher, which he had already explained was to be replaced in October, when the landlord had more money. Ms. McClary said that the landlord had the money and that "that's bullshit." Her demeanor at this point was "irate and getting loud."

-14-

74. As they were arguing, Petitioner knew that Ms. McClary had had a "couple of drinks" but he did not know she had taken drugs. He did not learn that she had taken drugs until three months after he was arrested.

75. Ms. McClary began saying that she would call and tell the landlord he needed to "get this shit done." She said she was going to "jump his ass." When Petitioner replied that, if she did so, the landlord would "kick us out," she accused him of "taking the landlord's side, to fuck [him]." Then she "stormed into the bedroom" and slammed the door.

76. Petitioner began to yell at Ms. McClary, telling her to "fucking knock it off, you've had a few drinks." Petitioner went to the bedroom and started yelling at her about slamming the door. She told him to "fuck off" and walked back to the living room, slamming the bedroom door again.

77. Petitioner walked to the living room and yelled at her again as she sat on the couch, staring and angry. When he leaned over her, she put her hand in his face and pushed him back. He did the same to her, pushing her on the right side of her face. He called her a "bitch" and turned to walk away.

78. Petitioner heard Ms. McClary jump up and he heard the sound of "glass banging together." She swung a plate at him and it broke over his arm, cutting him, with one piece flying into the kitchen. Petitioner then pushed her in her chest and face, and she went down onto the couch and dropped the piece of plate she was holding. They continued yelling and cursing at each other.

79. There was blood dripping from Petitioner's arm, and he saw blood dripping from her hand. After she walked into the bedroom, he threw the piece of plate that had landed in the kitchen into the garbage.

80. She was in the bedroom "yelling and cussing." Petitioner went to the bedroom because he knew she was cut, finding her by the bathroom door with bloody tissues in her hand. She continued yelling and cursing about the landlord. He gave her a towel, and she began swinging at him. Petitioner pushed her again, and she fell into the shower, knocking down the curtain rod. After she got up, she cursed Petitioner and tackled him onto the bed, which collapsed. She was on top, hitting him, and he hit her in the face. In the struggle on the bed, Mr. Vernon received a cut to the inside of his lip.

81. Petitioner threw her off, and she landed beside the bed near the hunting bows and arrows. When Petitioner got up, she hit him in the leg with an arrow that had a hunting tip. The aluminum shaft hit Petitioner's leg, and when Ms. McClary "jerked it back," the blade cut the side of his leg. When she tried to hit him again with the arrow, he jerked it from her hands and threw it into the corner.

82. She continued screaming. When Petitioner turned to grab a towel, he heard her yell that she was going to kill him. When he turned back she was cocking the gun while on her knees. He tackled her, wanting to get the gun away from her.

83. Petitioner testified that he had not wanted to be shot, and he had been angry, upset, and scared. They struggled, and he wrested the gun from her and pulled away. He explained, ". . . [I] just shot, I just reacted . . . I pulled it away and I just pulled the trigger." Petitioner stated that he had not formed the thought that he "want[ed] to shoot her." Petitioner also testified as follows with regard to the shooting, "[It was] just all the emotions, it's just like there was no time to think at the time, it just happened, everything happened so quick."[12]

84. The bullet struck Ms. McClary as she was looking downward. This occurred within 10 to 15 minutes of their having re-entered the house after talking to the sprinkler repairman.

85. Upon being shot, Ms. McClary fell across Petitioner's legs, and he could see that she had been shot in the head. He "just sat there," not knowing what to do and thinking that no one would believe what had happened. He was scared to go to prison. Although he told police that this had been an accident, that was not true. He had decided to say it was an accident because the police kept repeating that they could understand if it had been an accident.

86. Petitioner got up and pulled Ms. McClary away from the door so that it could be opened. He walked to the living room, recalling that the gardener was outside. He looked out and saw the gardener continuing to work.

87. Petitioner returned to the bedroom and formed the idea of making it appear that somebody had broken in. When Petitioner grabbed a towel to wrap the gun, he saw the cartridge casing lying against the wall by the vanity, and he picked it up. He opened the sliding door to the bedroom. He closed and locked the bedroom door, and then kicked it open to make it look like a forced entry. He took the bathroom window out, threw it down, and pushed out the screen.

88. Petitioner threw the piece of broken plate on the living room couch into the trash. He took a knife from the kitchen counter to the bedroom, put blood on it, and placed it beside Ms. McClary, to

---

[12] He admitted that at the first trial he had answered "yes" when asked whether he had "intended to shoot her" and had "intended to kill her."

simulate a fight.  He pulled down her pants to suggest sexual assault.  He pulled the phones in the bedroom and kitchen from the wall.  He put the gun and towels in his truck and left.[13]

89.  After Petitioner had driven two blocks, he saw Mr. Dubois on his way home.  Petitioner felt that he couldn't let Mr. Dubois go home because Petitioner had just came from the house, so Petitioner asked Mr. Dubois if he wanted to go to the record store.  Mr. Dubois agreed, and they drove in Petitioner's truck to Tower Records.

90.  In order to explain the cuts on his arm and legs, Petitioner tried to walk through the glass door at Tower Records, but that did not work.  He told Mr. Dubois that he had cut himself on the door and was going to clean up at Burger King.  He drove behind Payless and threw the gun in a dumpster there.  Then he drove to Burger King, cleaned up, and threw the towels in their dumpster.

91.  When they got home, he found a man in front talking to the gardener. Petitioner and Mr. Dubois went past them and entered the house.  Petitioner began calling to Ms. McClary, as if he did not know what had happened.  After he found her, he went to the neighbor's house to call the police.

92.  As the police arrived, Petitioner was on the lawn throwing up.  He was crying real tears, because he had shot his girlfriend.  He did not want to admit the truth because he "just was in denial, didn't want to believe that [he] did something like that . . . ."

93.  Petitioner did not tell police the truth in his first interrogations because he had "already started lying."  Later, Petitioner stated that this had been an accident, which also was not true.[14]  When he tied the socks around his neck, he was trying to kill himself out of shame.

## Claim 2:  Erroneous Jury Instructions Re: "Consciousness Of Guilt" Evidence

94.  Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional.  They were obtained in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution due to the trial court's erroneously instructing the jury that they were allowed to consider "consciousness of guilt"

---

[13]  He denied having turned around and said "turn that TV down" as he was leaving the house after the shooting.

[14]  Before his arrest, Petitioner went to Michael King's house because he had falsely told police that Mr. King might have had something to do with the homicide.  He intended to get into an argument with Mr. King, as if he had been involved.

Mr. King testified that Robin had once been his girlfriend and had lived with him in 1994.  On August 30, 1995 at around 3:00 a.m., he saw Petitioner at his front door and saw Petitioner's truck outside.  He called 911 but hung up.  When the 911 operator called him back, he heard the truck start and leave.

evidence to affix the degree of murder, and due to the trial court's refusal to give an instruction requested by the defense that would have clarified and limited the use of such evidence.[15]  Instructing the jury in this manner erroneously permitted the jury to convict Petitioner of first-degree murder based on irrelevant and irrational inferences, rather than on inferences based on reason and rational experience.

95.  The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

### Facts Underlying Claim 2

96.  The facts set forth in Claim 1, *ante*, are incorporated by reference.

97.  As noted previously, Petitioner testified that he shot and killed the victim. The only issues for the jury related to Petitioner's mental state, namely: did he premeditate and deliberate, or did he act in the heat of passion or with some other less culpable mental state.

98.  Despite the limited issues at trial, the trial court instructed the jury with California Jury Instructions – Criminal (hereinafter "CALJIC") 2.03, over defense objection. The instruction advised the jury as follows:

> CALJIC 2.03
>> If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt.
>> However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination.

99.  Additionally, the trial court refused to give an instruction requested by the defense which would have clarified CALJIC 2.03 by informing the jury of the proper parameters for considering such evidence.  The requested instruction read as follows:

>> Evidence that the defendant attempted to hide or cover up the killing by false or evasive statements made after the killing cannot be considered by you in determining whether the killing was deliberate and premeditated.

100.  By the instructions given and refused, the jury was permitted to convict Petitioner based on improper considerations in violation of his right to due process of law, and Petitioner was prejudiced thereby.

---

[15]  In the state courts, these two arguments regarding instructional error were stated as separate claims.  They are combined here due to their inter-relationship.

## FURTHER PROCEEDINGS AND INCORPORATION OF MATERIALS

101. Petitioner needs and is entitled to adequate funding, discovery, subpoena power, an evidentiary hearing, and other resources so that he has an opportunity to fully and fairly develop the claims raised herein. Further investigation must be conducted in connection with the instant Petition. After Petitioner is provided access to these resources and after investigation is completed, Petitioner may have further claims to present, as well as further evidence to present in support of the claims set forth herein. At that time, Petitioner will seek leave to amend or supplement the Petition as appropriate.

102. Petitioner requests an evidentiary hearing to further develop the allegations contained in this Petition and to examine other witnesses from whom declarations have not yet been obtained.

103. Petitioner has no plain, speedy, or adequate remedy at law because the claims in the Petition are based in whole or in part upon facts outside the record on appeal.

104. Petitioner hereby incorporates into the allegations of the Petition all of the facts and court records contained in the underlying Superior Court action, the Court of Appeal action, and the California Supreme Court action. Petitioner also requests the Court to take judicial notice of the contents of the entire trial court record and the entire record on appeal, including any exhibits admitted or marked for identification at trial; the briefs, motions, pleadings and orders filed in Petitioner's appeal.

## PRAYER

WHEREFORE, Petitioner respectfully requests that the Court:

1. Issue a writ of habeas corpus or order to show cause to inquire into the lawfulness of Petitioner's conviction and sentence;

2. Take judicial notice of the record in People v. Kenneth Vernon, San Joaquin County Superior Court No. SC059609A, and of all other matters and documents of which judicial notice is requested elsewhere in the present Petition;[16]

3. Take judicial notice of the record on appeal and the briefing in People v. Kenneth Vernon, Court of Appeal, Third Appellate District, No. C026244;

4. Take judicial notice of the record and the briefing in People v. Kenneth Vernon, , California Supreme Court, No. S103597.

5. Order that the original exhibits in the underlying case be preserved;

_____

[16] Petitioner will provide the court with copies of the necessary documents at a later time, after the claims currently pending in the California Supreme Court are exhausted and the present Petition is amended to add the exhausted claims.

6. Order that discovery be produced as will be requested;

7. Grant Petitioner, who is indigent, sufficient funds to secure investigation and expert assistance as necessary to prove the facts alleged in this Petition;

8. Authorize Petitioner to conduct discovery and grant Petitioner the authority to obtain subpoenas for witnesses, documents, and materials with respect to the claims pleaded herein;

9. Stay consideration of this Petition and hold it in abeyance, thereafter allowing Petitioner to amend the Petition after exhausting the additional claims which are now pending in the state courts, and once the additional claims are exhausted, allow Petitioner to amend the petition to add the newly exhausted claims into the petition (see, e.g., *Calderon v. United States Dist. Ct. (Taylor)*, 134 F.3d 981, 985-988 (9th Cir.), *cert. denied*, 525 U.S. 920 (1998));

10. Allow Petitioner a reasonable opportunity to amend or supplement this Petition to include legal and factual grounds for claims which become apparent from further investigation or from allegations made in any return or informal opposition to the Petition;

11. Issue an order to show cause, returnable before this Court, why Petitioner's conviction and judgment should not be set aside;

12. Grant Petitioner an evidentiary hearing at which proof may be offered concerning the allegations of this and any supplemental or amended petition, with Petitioner being personally present at the hearing;

13. Order that Petitioner has not waived any applicable privileges by the filing of this petition and the exhibits, including the attorney-client privilege or the work-product privilege; that any waiver of a privilege may occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has occurred and, if so, the scope of any such waiver; and that Petitioner is granted "use immunity" for each and every disclosure he has made and may make in support of this Petition;

14. After full consideration of the issues raised in this petition, vacate the judgment and sentence imposed upon Petitioner in <u>People v. Kenneth Vernon</u>, San Joaquin County Superior Court No. SC059609A; and

/ / /

/ / /

/ / /

15. Grant Petitioner whatever further relief is appropriate in the interest of justice.

Dated: November 1, 2002

Respectfully submitted,


_____
Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

1

**VERIFICATION**

2

I, Mark R. Vermeulen, declare as follows:

3

1.  I am an attorney admitted to practice law in the State of California.  I represent Petitioner,

4

who is confined and restrained of his liberty at Salinas Valley State Prison, Soledad, CA.

5

2.  I am authorized to file this Petition For Writ Of Habeas Corpus on Petitioner's behalf.  I make

6

this verification because Petitioner is incarcerated in a county different from that of my law office and

7

because many of the facts alleged are within my knowledge as much as or more than Petitioner's

8

knowledge.

9

3.  I have read the Petition and know the contents of the Petition to be true.

10

I declare under penalty of perjury that the foregoing is true and correct.

11

Executed on November 1, 2002 at San Francisco, CA.

12

13

14

_____

Mark R. Vermeulen

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30