1   Mark R. Vermeulen [State Bar No. 115381]
2   Law Office of Mark R. Vermeulen
3   755 Florida Street #4
    San Francisco, CA  94110.2044
4   Phone: 415.824.7533
    Fax: 415.824.4833
5
6   Attorney for Petitioner
    KENNETH VERNON
7

FILED

NOV  4 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8
9                UNITED STATES DISTRICT COURT
10              NORTHERN DISTRICT OF CALIFORNIA
11
    KENNETH VERNON,                    )   No. C 00-3311 MJJ
12                                     )
          Petitioner,                  )
13                                     )   **EXHIBITS IN SUPPORT OF**
          v.                           )   **PETITION FOR WRIT OF HABEAS**
14                                     )   **CORPUS BY A PERSON IN STATE**
    ANTHONY A. LAMARQUE, Warden,       )   **CUSTODY**
15                                     )   **[28 U.S.C. § 2254]**
    and DOES 1-10,                     )
16                                     )
          Respondents.                 )
17                                     )
                                       )
18

19          Petitioner Kenneth Vernon hereby submits the following exhibits regarding the Petition For Writ

20   Of Habeas Corpus filed herewith.

21          Exhibit A     California Court of Appeal's unpublished opinion filed March 8, 1999 in <u>People v.</u>
                          <u>Kenneth Jerome Vernon</u>, California Court of Appeal, Third Appellate District, No.
22                        C026244 (affirming the judgment of the Superior Court)

23          Exhibit B     California Supreme Court's order filed June 16, 1999 in <u>People v. Kenneth Jerome</u>
24                        <u>Vernon</u>, California Supreme Court No. S078530 (denying petition for review)

25          Exhibit C     San Joaquin County Superior Court's order filed October 1, 2001 in <u>In the Matter</u>
26                        <u>Of The Petition Of Kenneth Vernon For Writ Of Habeas Corpus</u>, San Joaquin
                          County Superior Court No. SC059609A (denying petition for writ of habeas
27                        corpus without specifically addressing the separately-filed requests for discovery)

28   / / /

29   / / /

30

                                              - 1 -

Exhibit D    San Joaquin County Superior Court's order filed November 27, 2001 in <u>In the Matter Of The Petition Of Kenneth Vernon For Writ Of Habeas Corpus,</u> San Joaquin County Superior Court No. SC059609A (denying petitioner's motion for discovery and petitioner's request for reconsideration of the denial of the writ)

Exhibit E    California Court of Appeal's order filed January 10, 2002 in <u>In re Kenneth Vernon on Habeas Corpus,</u> California Court of Appeal, Third Appellate District, No. C039943 (denying petition for writ of habeas corpus)

[end]

## Exhibit A

California Court of Appeal's unpublished opinion filed March 8, 1999
in <u>People v. Kenneth Jerome Vernon</u>, California Court of Appeal,
Third Appellate District, No. C026244
(affirming the judgment of the Superior Court)

NOT TO BE PUBLISHED

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

- - - -

| | |
|---|---|
| THE PEOPLE, | C026244 |
| Plaintiff and Respondent, | (Super. Ct. No. SC059609A) |
| v. | |
| KENNETH JEROME VERNON, | |
| Defendant and Appellant. | |

# F I L E D

MAR - 8 1999

COURT OF APPEAL-THIRD DISTRICT
ROBERT L. LISTON, Clerk

BY _____ Deputy


A jury convicted defendant of first degree murder in the

shooting death of his girlfriend Robin McClary and it found true

the allegation that he used a firearm. (Pen. Code, §§ 187,

12022.5.) Sentenced to state prison for an indeterminate term of

25 years to life and a determinate term of 10 years, defendant

appeals. He contends the evidence is insufficient to support a

1

verdict of first degree murder and raises instructional error.
We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant lived at 8201 Arroyo Way in Stockton with his girlfriend Robin McClary, her son, and Doyle Dubois. Defendant worked as a warehouseman from 6 a.m. until 2:30 p.m. On August 24, 1995, he got home at about 3:00 p.m. and took McClary to the doctor for her allergy shot. Her son was visiting his grandparents.

Philip Mosqueda's brother owned 8201 Arroyo Way. Mosqueda was there that afternoon to fix the sprinklers. One week earlier he had repaired the air conditioning unit and checked the dishwasher. When he told McClary the dishwasher did not work, she was not upset. On August 24, he arrived at 4:45 p.m. and McClary answered the door; defendant came out later. After 5:00 p.m. Mosqueda went to the door and spoke with defendant. McClary came out; she was not upset and he smelled no alcohol on her breath.

Robert Perry worked as a gardener and repairman. He went to 8201 Arroyo Way that day at the owner's request. When he first arrived in the early afternoon, no one was home. Perry returned a little after 5:00 p.m. and defendant answered the door. They agreed on a price for gardening work and Perry began working; he used an extension cord to the garage for his trimmer and lawn mower.

Perry saw McClary; she was pleasant and did not smell of intoxicants. Defendant and McClary went back in the house at

5:30 p.m. Perry heard the television and stereo very loud. He heard a plate being broken and glass shattering. He heard the sound of a firecracker in the distance. Perry heard heavy walking and the sound of shoes being thrown. After 20 to 25 minutes in the house, defendant came out carrying clothes and a towel. As he left, defendant told McClary to turn down the stereo.

Defendant returned in 10 minutes. His roommate Dubois also arrived, parked, and got in defendant's truck and left. Dubois got off work at 5:00 p.m. and was usually home by 5:30. This day he stopped at Kragen Auto Parts, the bank, and Jack-in-the-Box. He saw defendant on his way home and defendant asked if he wanted to go to the music store. Dubois went with defendant to Tower Records. At the store, defendant walked into the door. Inside defendant claimed he was cut; he had cuts on his arm and leg. He went to the counter to complain. The clerk told him he could not have cut himself on the door as there were no sharp edges. She noticed the blood on his cuts was dried. Defendant left his name, address, and phone number. He left angry and came back in 10 to 20 minutes.

Defendant and Dubois returned home. Defendant spoke briefly with a man who wanted roofing work and went inside. As they entered the house, Dubois noticed the phone pulled out of the wall in the kitchen and asked defendant about it. Defendant began calling for McClary. They found her in the bedroom, face down in blood, with her pants pulled down. There was a knife by her hand.

3

Defendant and Dubois left the house, screaming "She's dead." Defendant went to the neighbor's and pounded on the door, yelling, "Call 911. My girlfriend's been shot." He came back and said, "I think she's been raped. Her panties are down."

A sheriff's deputy got the call about 6:47 p.m. When the sheriff arrived, Perry was still mowing the lawn and defendant and Dubois were sitting on the grass. Defendant told the officer his girlfriend was in the house, her face was blue and her tongue hanging out. She had been shot.

The officer entered the house and noticed the television was loud. The phone was on the floor in the kitchen. In the bathroom the window frame was on the floor and the glass broken. The screen was bent from the inside and the dirt on the window sill was not disturbed. In the north bedroom McClary was face down on the floor with her pants pulled below her buttocks.

In the living room, there were glasses on the floor and blood on the rug. Part of a broken plate was behind the couch. The blood was McClary's. McClary's blood was also found at the door of the bathroom; defendant's blood was in the shower. There was a trail of blood next to the body in the bedroom, indicating it had been moved. The strike plate and door jam to the bedroom door were broken. The waterbed had been knocked off its pedestal. There was a hunting bow and arrows on the floor. A broken gold chain was near the phone and the phone wire was missing. On the corner of the bed was an open purse. There was an empty box for a 9 mm. gun; the gun was never found.

4

McClary was killed by a gunshot wound to the head. The bullet entered an inch and a half behind her left ear, passed through the large muscle in her neck, fractured the base of her skull, and exited behind her right ear. The gunshot was almost level, upwards five degrees. There was a bullet hole in the wall two feet above the floor. The bullet struck the sheetrock horizontally. The gun was fired from about two feet off of the floor.

McClary had several other injuries. There were abrasions and a scrape on her left shoulder blade. She had petechial hemorrhages--dot-like areas of blood--on her eyelids. These could have been caused by pressure to the neck or direct trauma. There were no internal injuries to the neck to indicate strangling. There were petechiae to the mouth area and a contusion on her lower lip. A bruise on her left cheek may have been caused by a ring. McClary had four purple petechial contusions at her Adam's apple and contusions on the right side of her neck. She had a scratch on her chin. There were six contusions on her left hipbone caused by blunt force trauma, bruises below her nipple, and an abrasion to her right elbow. There were no injuries to her hands.

Methamphetamine and ethyl alcohol were found in McClary's blood. Her blood alcohol level was .08; the level of methamphetamine was .13 grams per liter. methamphetamine is a stimulant that can make one agitated, irritable, paranoid, suspicious, and aggressive. The amount of methamphetamine found in McClary was above the effective level at which there are

5

clinical symptoms, but below the potentially toxic level at which the effects are undesirable.

Defendant was interviewed several times, at first denying any involvement in McClary's death. He suggested other suspects, including a black man who came to the house one week earlier, three Mexicans who tried to break in, and a gang who tried to kill his parents while they were in his car. Defendant also tried to implicate McClary's former boyfriend, Michael King. Late one night he went to King's. King recognized defendant's truck, called 911, and defendant left.

Defendant was arrested at McClary's funeral and charged with murder. His first trial resulted in a hung jury. The jurors voted 11 to 1 for murder, with one holding out for manslaughter. The prosecution offered defendant second degree murder with the low term for the use allegation, for a total prison term of 18 years to life.

On retrial, defendant admitted he shot McClary, but claimed it was manslaughter. Defendant testified when he moved into 8201 Arroyo Way, the sprinklers, air conditioning, and dishwasher did not work. The landlord got upset that the lawn was dying and sent a three-day notice. The landlord told him if he hired a gardener, he could forget the notice. The landlord fixed the air conditioning. The dishwasher could not be fixed but the landlord would buy a new one in October.

Defendant had purchased a gun in March. McClary kept it in her purse. McClary noted their arguments on a calendar.

Defendant described them as "Just kind of a huff and puff and ignore."

On August 24, McClary was fixing dinner and drinking wine. She had two glasses of wine. She complained about the landlord not fixing things. She got angrier and said she would call him. Defendant told her not to; he had taken care of it. McClary brushed past him saying "fuck you" and stormed into the bedroom, slamming the door. Defendant got mad and told her not to slam the door; she slammed it again.

McClary went to the living room and sat on the couch. Defendant followed and yelled in her face. She pushed him and he pushed her harder, cussing. She threw a plate at him which broke on his arm. He pushed her down on the couch and saw blood on her hand. .She stormed to the bedroom, yelling. Defendant followed, telling her to calm down. She tried to hit him and he pushed her into the shower. Defendant was bleeding from his arm.

Defendant backed up and McClary tackled him on the bed, causing it to collapse. She hit defendant and he hit her in the face. He threw her off the bed and she landed near the wall. She grabbed an arrow and struck him in the leg. He grabbed the arrow and jerked it from her. McClary was screaming that she would kill him. He turned and saw she had a gun. He tackled her and they struggled on the ground over the gun. He pulled away and fired. She fell on top of him.

He thought no one would believe what happened so he came up with the idea to make it look like someone broke in. He opened the sliding glass door, kicked in the bedroom door, took out the

7

bathroom window, and pushed the screen out.  He threw the broken plate in the trash, grabbed a knife and put blood on it, and pulled down McClary's pants.

He intercepted Dubois and ran into the door at Tower records to explain his cuts.  He threw the gun in the dumpster at Payless and towels in the dumpster at Burger King.[1]  Defendant admitted he had lied.  He was scared and in denial.

On cross-examination, the prosecutor asked defendant if he intended to shoot McClary.  Defendant answered repeatedly only that he pulled the trigger.  Finally, defendant admitted he meant to shoot her in the head.  In the previous trial, he had testified he intended to kill her.  The prosecutor then asked what defendant was thinking while they were wrestling for the gun.

"Q.   Okay.  Do you remember again testifying on cross-examination -- counsel, page 1214 -- in the last trial:

"All I remember when we were wrestling with the gun, uh, at a certain time in my head right before I had pulled the gun away from her I was like, 'I've got to shoot.'  I pulled the gun away and I just shot with, uh, no time to think or nothing.  Just happened quick, real quick.

---

[1]   Defendant had told the police he cleaned up at Burger King. When they checked the dumpsters the next day, the one behind Payless had already been emptied.  They found bloody towels in the dumpster at Burger King.  Both defendant's and McClary's blood was on the towels.

"A.   Yes.

"Q.   So you thought about it for at least a moment before you got the gun away, about 'I have to shoot her?'

"A.   Yes, right -- right when I had got somewhere through there."

The prosecutor argued it was a deliberate, premeditated murder.  Defendant turned up the television to hide the noise and pulled the phone out when McClary tried to call for help.  He kicked the bedroom door in during the fight.  The violence escalated with every encounter.  Three times McClary walked away from defendant; each time he followed and continued the fight. The prosecutor argued defendant's deliberate acts after the killing showed he acted with cool, rational thought, not out of heat of passion.  In rebuttal, the prosecutor reminded the jury defendant said he was going to kill her before he had the gun.

During deliberations, the jury asked for a rereading of defendant's testimony on cross-examination about whether he intended to kill McClary.  It then asked for the portion of defendant's testimony where he discussed wrestling the gun from her.  "We believe he said to himself that he knew he had to kill her."  After this testimony was read, the jury returned a first degree murder verdict.

<div align="center">DISCUSSION</div>

<div align="center">I</div>

Defendant contends there is insufficient evidence of first degree murder.  Specifically, he contends there is insufficient evidence to show premeditation and deliberation.

<div align="center">9</div>

"In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent. As *People* v. *Basset* [1968] 69 Cal.2d 122, explained, 'our task . . . is twofold. First, we must resolve the issue in light of the *whole record*--i.e., the entire picture of the defendant put before the jury--and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in the light of other facts."' [Citation.]" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577, italics in original.)

The elements of first degree murder are properly set forth in CALJIC No. 8.20. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1021.) CALJIC No. 8.20 provides:

"All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder in the first degree.

"The word 'willful' as used in this instruction means intentional.

10

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.

"The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time, but rather the extent of reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[s] an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing, and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill."

The jury was instructed in this language.

11

In *People* v. *Anderson* (1968) 70 Cal.2d 15, the Supreme Court
reviewed cases on first degree murder.  It found the type of
evidence sufficient to sustain a finding of premeditation and
deliberation falls into three basic categories:  "(1) facts about
how and what the defendant did *prior* to the actual killing which
show that the defendant was engaged in activity directed toward,
and explicable as intended to result in, the killing--what may be
characterized as 'planning' activity; (2) facts about the
defendant's *prior* relationship and/or conduct with the victim
from which the jury could reasonably infer a 'motive' to kill the
victim, which inference of motive, together with facts of type
(1) or (3), would in turn support an inference that the killing
was the result of 'a pre-existing reflection' and 'careful
thought and weighing of considerations' rather than 'mere
unconsidered or rash impulse hastily executed' [citation];
(3) facts about the nature of the killing from which the jury
could infer that the *manner* of killing was so particular and
exacting that the defendant must have intentionally killed
according to a 'preconceived design' to take his victim's life in
a particular way for a 'reason' which the jury can reasonably
infer from facts of type (1) or (2).  [¶]  Analysis of the cases
will show that this court sustains verdicts of first degree
murder typically when there is evidence of all three types and
otherwise requires at least extremely strong evidence of (1) or
evidence of (2) in conjunction with either (1) or (3)."  (*Id.* at
pp. 26-27, italics in original.)

12

Defendant contends the evidence in this case is insufficient to sustain a finding of premeditation and deliberation because there is no evidence of planning. Rather, the killing occurred with the gardener outside and the entire episode took at most 25 minutes. Defendant claims the motive is pure speculation. The manner of killing was a single shot from two feet off the ground. The gardener heard no cries for help. Defendant further argues his post-killing conduct cannot be relied upon to show premeditation.

The Attorney General contends the circumstantial evidence meets the *Anderson* guidelines. He argues turning up the television shows planning activity, "[t]he evidence of motive was very strong," and the manner of killing, following a beating, shows premeditation and deliberation.

"Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. [Citation.]" (*People* v. *Thomas* (1992) 2 Cal.4th 489, 517.) "The *Anderson* guidelines are descriptive, not normative. [Citation.]" (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1125.)

In analyzing this case under the *Anderson* guidelines, both defendant and the Attorney General ignore the direct evidence of premeditation and deliberation on which the jury focused. On

13

cross-examination, using defendant's testimony in the prior
trial, the prosecutor forced defendant to admit he fired the gun
intending to kill McClary.  Further, he admitted he decided he
had to shoot her during the struggle over the gun, before he had
the weapon.  The jury asked to have this portion of defendant's
testimony reread, indicating, "We believe he said to himself that
he knew he had to kill her."  In fact, defendant testified,
"right before I had pulled the gun away from her I was like,
'I've got to shoot.'"  He then shot with the intent to kill her.

Although this evidence may not fit neatly within the
*Anderson* framework, it is direct evidence that defendant thought
about killing McClary and intended to do so before he shot.  It
indicates the killing was not a "rash impulse hastily executed."
(*People* v. *Anderson, supra*, 70 Cal.2d at p. 27.)  Bolstering this
evidence is defendant's post-killing conduct in attempting to
cover up his crime by planting a knife, breaking a window, and
pulling down the victim's pants to suggest a motive of sexual
assault.  While this evidence alone cannot establish a cold,
calculated decision to kill, it may be considered in relation to
the manner of killing.  (*People* v. *Perez, supra*, 2 Cal.4th at p.
1128.)  While the beating of McClary is suggestive of rage, the
evidence indicated it occurred all over the house, with defendant
following McClary from room to room to continue his attack.
Further, "premeditation and deliberation can occur in a very
short period of time.  [Citation.]  The test is not time, but
reflection.  'Thoughts may follow each other with great rapidity

14

and cold, calculated judgment may be arrived at quickly. . . .'
[Citation.]"  (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 348.)

The record taken as a whole supports a finding that
defendant decided to kill McClary before he got the gun and that
his actions were the result of cool deliberation rather than rash
impulse.  This evidence is sufficient to support the verdict of
first degree murder.

II

Defendant requested and the trial court refused a special
instruction based on *People* v. *Anderson, supra*, 70 Cal.2d 15.
The proposed instruction read:

"Before you may find that the killing in this case was
deliberate and premeditated you must find evidence of planning
activity, motive to kill, and a calculated killing; or extremely
strong evidence of planning activity; or evidence of motive to
kill, in conjunction with either planning activity or a
calculated killing.

"Planning activity refers to facts about how and what the
defendant did before the actual killing which show that he was
engaged in activity directed toward and intended to result in the
killing.

"Motive to kill refers to a reason for the killing which may
be inferred from defendant's prior relationship and/or conduct
with the victim.

"A calculated killing, as opposed to an explosion of
violence, may be inferred from facts about the nature of the
killing and its commission in a particular and exacting manner

15

such that the defendant must have intentionally killed according to a preconceived design to take the victim's life in a particular way for a reason."

Defendant contends it was prejudicial error to reject the proposed instruction without any attempt to modify it. We disagree.

First, the instruction is an incorrect statement of law. It requires the jury to apply the *Anderson* analysis in order to find first degree murder. The *Anderson* analysis provides only guidelines; it does not restate the elements of first degree murder. (*People* v. *Thomas, supra*, 2 Cal.4th 489, 517.)

Defendant contends the court should have modified the instruction to replace the language "you must find." He contends a court may not reject an instruction because it uses an improper word. Defendant relies on a line of cases which held patterned eyewitness instructions should be given even if those proposed by defendant need slight modification. (*People* v. *Aho* (1984) 152 Cal.App.3d 658, 663; *People* v. *Coates* (1984) 152 Cal.App.3d 665, 670-671; *People* v. *Brown* (1984) 674, 678; *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 386.) These cases found error because under *People* v. *Hall* (1980) 28 Cal.3d 143, the courts should have given the requested instructions.

Here, there was no error in refusing to give a requested instruction based on *People* v. *Anderson, supra*, 70 Cal.2d 15. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 869-870; *People* v. *Lucero, supra*, 44 Cal.3d 1006, 1021.) The *Anderson* analysis is intended as a framework for reviewing the sufficiency of the

16

evidence; it is not intended as the basis for a jury instruction.
(*Ibid.*)

### III

Over defendant's objection, the trial court gave the
standard instruction on willfully false statements (CALJIC No.
2.03). "If you find that before this trial defendant made a
willfully false or deliberately misleading statement concerning
the crime for which he is now being tried, you may consider such
statement as a circumstance tending to prove a consciousness of
guilt. [¶] However, such conduct is not sufficient by itself to
prove guilt and its weight and significance, if any, are matters
for your determination."

The trial court also rejected a special instruction proposed
by the defense which read: "Evidence that the defendant
attempted to hide or cover up the killing by false or evasive
statements made after the killing cannot be considered by you in
determining whether the killing was deliberate and premeditated."

Defendant contends the trial court violated due process by
giving the first instruction and rejecting the second. As
defendant recognizes, the California Supreme Court has found no
due process violation in giving CALJIC No. 2.03 where the
defendant's mental state at the time of the killing was the only
contested issue. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 579.)
Further, the high court has held there is no due process
violation in failing to give a limiting instruction that
defendant's deceptive or evasive behavior, while it may indicate
consciousness of guilt, is not probative of defendant's state of

17

mind at the time the crime was committed.  (*People* v. *Jackson*
(1996) 13 Cal.4th 1164, 1224.)

    The judgment is affirmed.


                                        _____MORRISON_____, J.


We concur:


    _____BLEASE_____, Acting P.J.


    _____RAYE_____, J.

**Exhibit B**
California Supreme Court's order filed June 16, 1999
in <u>People v. Kenneth Jerome Vernon</u>, California Supreme Court No. S078530
(denying petition for review)

Third Appellate District No. C026244
S078530
IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, Respondent

v.

KENNETH JEROME VERNON, Appellant

SUPREME COURT
# FILED

JUN 1 6 1999

**Robert Wandruff Clerk**

DEPUTY

Appellant's petition for review DENIED.

_____
Chief Justice

<div style="border: 1px solid black; padding: 10px; text-align: center;">

## Exhibit C

San Joaquin County Superior Court's order filed October 1, 2001

in <u>In the Matter Of The Petition Of Kenneth Vernon For Writ Of Habeas Corpus,</u>

San Joaquin County Superior Court No. SC059609A

(denying petition for writ of habeas corpus without specifically addressing

the separately-filed requests for discovery)

</div>

SU___ IOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter ___ ie Petition of

KEN___ H VERNON

For Writ of ___ eas Corpus.

CASE NO.  SC059609 A

ORDER

TO: KENN___ H VERNON, and his attorney of record, MARK R. VERMEULEN:

It ap___ earing that a petition for a Writ of Habeas Corpus having been filed herein on <u>September 11, 2000</u>, and good cause appearing therefor, IT IS HEREBY ORDERED that the Petition for Writ of Habeas Corpus is **denied** for the reasons indicated.

**REASON:** Counsel for petitioner has raised several grounds for this habeas corpus writ.

<u>Juror Misconduct--failure to disclose material information during voir dire</u>

Three incidents are raised with regard to this ground.

The first incident involves juror, Linda Withers.  Petitioner asserts that she is related to a key prosecution witness by marriage and her family knows petitioner's family.  The petition states that those relationships were not disclosed during voir dire. A review of the trial transcript, however, indicates that during the trial, counsel for petitioner was advised by petitioner's mother that the Withers family and the Vernon family know each other.  Counsel advised the court of that fact.  The court examined petitioner's mother and examined Ms. Withers.  The court found that the juror did not know petitioner or the witnesses and allowed Ms. Withers to remain on the jury.

The second incident involves an unknown juror who purportedly "dropped something just in front of [petitioner's father.] As the man was bending down to pick up the object, he turned to [petitioner's father] and asked  if [he] was the brother of Jack Vernon." Declaration of William Vernon.  When petitioner's father said yes, the juror responded by saying, "Oh. Good." This evidence is vague and speculative as to what could be implied.  (*In re Swain* (1949) 34 C.2d 300, 303-304.)

-1-

The third incident occurred in the jury deliberation room when a juror wrote a note to the court indicating that he understood that the use of allergy or asthma medication may give a false positive in blood testing for amphetamine use.

A review of the entire record reveals that petitioner admitted to shooting the deceased, Robin McClary. The issue for the jury was to determine petitioner's state of mind at the time of the shooting. The record shows that the jury focused upon petitioner's own testimony about his thoughts during the struggle for the gun, just prior to the shooting. With that evidence, the jury decided that petitioner shot Ms. McClary with the intent to kill her. Thus, when looking at the record as a whole, there is no showing that the juror's statements about whether Robin McClary had ingested amphetamines or allergy medicine may have influenced the jury's verdict.

<u>Juror Misconduct--contact and discussions with third parties</u>

The evidence presented in support of this writ indicates that the conversations at issue were "very friendly conversations with various members of the jury, during the recesses and breaks. ... [T]he jurors and [the district attorney would] be laughing and smiling during these exchanges." The conversations were described as "friendly and jovial." See Declaration of William Vernon.

There is no evidence of any sort as to the substance of the conversations or the length of the conversations.

<u>Prosecutorial misconduct--speaking with jurors and facilitating conversations between jurors and victim's family</u>

The basis for this ground is the same as discussed above; that is, the district attorney engaged in three-way conversations with jurors and the victim's family in the courtroom during breaks and the district attorney accepted food offered by a juror.

There is no evidence of any sort as to the substance of the conversations or interaction.

<u>Exclusion of petitioner's mother from courtroom during voir dire</u>

By way of the Declaration of Ernestine Vernon, petitioner asserts that his mother was informed by petitioner's counsel that she could not be in courtroom during voir dire because there was not enough room in the courtroom. After the jury was picked, she returned to the courtroom.

There is no evidence to suggest that the trial court closed voir dire to the public or even that the *trial court* excluded petitioner's mother from voir dire.

<u>Petitioner deprived of right to effective assistance of counsel</u>

There are two grounds upon which this argument is made. First, petitioner asserts that the trial court refused to substitute counsel for the second trial (after a mistrial occurred in the first trial when the jury was unable to reach of verdict). Second, petitioner states that defense counsel, appointed over his objection, provided ineffective assistance.

In order to prevail on his claim of ineffectiveness of counsel, petitioner must establish the performance of counsel was both deficient and caused him prejudice (*Strickland v. Washington* (19840 466 US 668; *People v. Pope* (1979) 23 C3d 412).

Prejudice is shown when there is reasonable probability that but for counsel's
performance or lack thereof, the result of the proceedings would have been different
(*People v. Lucas* (1995) 12 C.4th 415,436.)

The record reflects that after the jury in the first trial was unable to reach a
verdict, defense counsel, Ralph Cingcon, asked to be relieved as counsel for the
second trial because petitioner had no funds to retain him. The trial court expressed its
opinion that "there was no attorney better prepared to proceed at this time" and
appointed Mr. Cingcon as attorney of record, over Mr. Cingcon's objection. Mr.
Cingcon represented petitioner for the duration of the second trial.

Petitioner states that during the second trial, defense counsel failed to
adequately investigate ballistics testing and failed to consult with forensic experts.
Petitioner continues that defense counsel improperly excluded petitioner's mother from
the voir dire process, failed to adequately question prospective jurors, failed to review
petitioner's presentence report prior to sentencing and failed to preserve trial files.[1]
This, petitioner asserts, constitutes ineffective assistance of counsel.

As stated above, the record reflects that at the second trial, petitioner admitted
that he shot Robin McClary, but claimed that it was manslaughter, rather than murder.
The issue was petitioner's state of mind at the time of the shooting. The jury had a
portion of petitioner's testimony reread while deliberating. The jury concluded that
petitioner shot with the intent to kill.

Petitioner offers nothing in the way of evidence to suggest how the claimed
deficiencies affected the verdict or the outcome of the trial.

Conclusion

For the specific reasons stated above, the court finds that petitioner has failed to
establish a prima facie case for habeas corpus relief. (*In re Bower* (1985) 38 Cal.3d
865, 872.) Petitioner is obliged to state with particularity the facts upon which the
petition is based; vague, conclusionary allegations are insufficient to warrant issuance
of a writ. (*In re Swain* (1949) 34 C.2d 300, 303-304.)

The petition is therefore DENIED as to all issues raised.

Date:    OCT - 1 2001

_____
JUDGE OF THE SUPERIOR COURT

STEPHEN G. DEMETRAS

---

[1]According to the petition, writ counsel has communicated with defense counsel
in an effort to obtain the trial files. It appears that the files may have been destroyed or
discarded. There was a flood due to a water pipe break which is believed to have
damaged the files. One box of files was located and turned over to writ counsel.

-3-

1

2

3

4                 SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

5

6     In the Matter of the Petition of            )
                                                   )
7          KENNETH VERNON                          )
                          *                        )        CASE NO.  SC059609 A
8                                                  )
      For Writ of Habeas Corpus                    )        CERTIFICATE OF SERVICE
9                                                  )        BY MAIL
      _____ )

10

11         I, the undersigned, declare that I am a deputy of the Clerk of the Superior Court
      of San Joaquin County, State of California, and not a party to the within action.  On

12    ____OCT - 1 2001____, I deposited in the United States Post Office at Stockton,

13    California, true and correct copies of the Order regarding the above-entitled petition for

14    writ of habeas corpus, a printed copy of which is hereto attached and made a part
      hereof, one copy of which is addressed to each of the following named persons at the

15    following named addresses:

16

17    MARK R. VERMEULEN                       COURTESY COPY:

18    755 Florida Street #4                   San Joaquin County District Attorney
      San Francisco, CA 94110-2044            P.O. Box 990
19                                            Stockton, CA 95201

20

21                                            VIA INTER OFFICE MAIL

22         I further declare that each of said copies so mailed and addressed was enclosed

23    in a separate envelope, sealed, with the postage thereon fully prepaid.

24         I declare under penalty of perjury that the foregoing is true and correct.

25         Executed at Stockton, California on the date above identified.

26                                            _____

27                                            Deputy Court Clerk

28

## Exhibit D
San Joaquin County Superior Court's order filed November 27, 2001
in <u>In the Matter Of The Petition Of Kenneth Vernon For Writ Of Habeas Corpus,</u>
San Joaquin County Superior Court No. SC059609A
(denying petitioner's motion for discovery
and petitioner's request for reconsideration of the denial of the writ)

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Motion of

KENNETH VERNON

For  Ruling on Request for Discovery and
Reconsideration of Denial of Writ
of Habeas Corpus.

CASE NO.  SC059609 A

ORDER

TO: KENNETH VERNON, and his attorney of record, MARK R. VERMEULEN:

It appearing that a Motion for Ruling on Requests for Discovery and for Reconsideration of Denial of a Writ of Habeas Corpus having been filed herein on October 30, 2001, and good cause appearing therefor, IT IS HEREBY ORDERED that the Motion for Ruling on Requests for Discovery and for Reconsideration of Denial of a Writ of Habeas Corpus is **denied** for the reasons indicated.

**REASON:**

Petitioner submitted his Request for Discovery contemporaneously with and as a part of his Petition for Writ of Habeas Corpus on September 11, 2000.  This Court denied the writ by addressing each raised ground for the writ and concluding:

"For the specific reasons stated above, the court finds that petitioner has failed to establish a prima facie case for habeas corpus relief. (*In re Bower* (1985) 38 Cal.3d 865, 872.) Petitioner is obliged to state with particularity the facts upon which the petition is based; vague, conclusory allegations are insufficient to warrant issuance of a writ. (*In re Swain* (1949) 34 C.2d 300, 303-304.)

The petition is therefore *DENIED as to all issues raised.*" (Emphasis added.)

Accordingly, the Order denied Petitioner's Request for Discovery.

-1-

As to Petitioner's request to reconsider the denial, no new facts or new law has been presented by Petitioner which would warrant reconsideration. (*In re Terry* (1971) 4 C.3d 911, 921, ftnt 1.)  Because no appeal lies from the denial of a petition for writ of habeas corpus, Petitioner may seek review of the denial by filing a new petition with the Court of Appeal. (*In re Clark* (1993) 5 C.4th 750, ftnt. 7)

The motion is therefore DENIED as to all issues raised.

Date:    NOV 2 7 2001

JUDGE OF THE SUPERIOR COURT

STEPHEN G. DEMETRAS

FILED
SUPERIOR COURT STOCKTON
01 NOV 27 ᴹᴵ⁰¹ 28
JEANNE MILLARES, CLERK
BY ____ LAURA VITEY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Motion of          )
                                          )
    KENNETH VERNON                        )
                                          )    CASE NO.  SC059609 A
For Ruling on Request for Discovery       )    CERTIFICATE OF SERVICE
and Reconsideration of Denial of Writ     )    BY MAIL
of Habeas Corpus.                         )
_____)

        I, the undersigned, declare that I am a deputy of the Clerk of the Superior Court

of San Joaquin County, State of California, and not a party to the within action.  On

_____NOV 2 8 2001_____, I deposited in the United States Post Office at Stockton,

California, true and correct copies of the Order regarding the above-entitled petition for

writ of habeas corpus, a printed copy of which is hereto attached and made a part

hereof, one copy of which is addressed to each of the following named persons at the

following named addresses:


MARK R. VERMEULEN
755 Florida Street #4
San Francisco, CA 94110-2044



        I further declare that each of said copies so mailed and addressed was enclosed

in a separate envelope, sealed, with the postage thereon fully prepaid.

        I declare under penalty of perjury that the foregoing is true and correct.

        Executed at Stockton, California on the date above specified.


                                    _____
                                            LAURA VITEY

                                    Deputy Court Clerk

**Exhibit E**
Court of Appeal's order filed January 10, 2002
in <u>In re Kenneth Vernon on Habeas Corpus,</u>
California Court of Appeal, Third Appellate District, No. C039943
(denying petition for writ of habeas corpus)

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

## THIRD APPELLATE DISTRICT

# FILED

### JAN 1 0 2002

COURT OF APPEAL-THIRD DISTRICT
DEENA C. TRUJILLO, Clerk

BY_____, Deputy

In re KENNETH VERNON on Habeas Corpus.

C039943
San Joaquin County
No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated: January 10, 2002

BLEASE, Acting P.J.

--------------------------------

cc: See Mailing List