1  Mark R. Vermeulen [CSBN 115381]
2  Law Office of Mark R. Vermeulen
   755 Florida Street #4
3  San Francisco, CA 94110.2044
   Phone: 415.824.7533
4  Fax: 415.824.4833

**FILED**

**RECEIVED**

MAR – 4 2008

OCT 2 4 2007

5  Attorney for Petitioner
6  KENNETH VERNON

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8                    UNITED STATES DISTRICT COURT
9                    NORTHERN DISTRICT OF CALIFORNIA
10                      SAN FRANCISCO DIVISION
11

12  KENNETH VERNON,                          )  No. C 00-3311 MJJ
                                             )
13              Petitioner,                  )
                                             )  **SECOND AMENDED PETITION FOR WRIT**
14      v.                                   )  **OF HABEAS CORPUS BY A PERSON IN**
                                             )  **STATE CUSTODY**
15  ANTHONY A. LAMARQUE, Warden,             )  **[28 U.S.C. § 2254]**
    and DOES 1-10,                           )
16                                           )
                Respondents.                 )
17                                           )

18

19       Petitioner Kenneth Vernon, by and through counsel, hereby petitions for a writ of habeas corpus
20  and by this verified petition states as follows:

21                    **ALLEGATIONS APPLICABLE TO EACH CLAIM**

22       1.      Petitioner is unlawfully confined and restrained of his liberty at Folsom State Prison,
23  Represa, California by James E. Tilton, Secretary of the California Department of Corrections and
24  Rehabilitation, and by Matthew C. Kramer, Warden of Folsom State Prison.[1]

25       2.      Petitioner is confined as a result of his conviction and sentence entered in the Superior
26  Court of San Joaquin County in People v. Kenneth Vernon, San Joaquin County Superior Court No.
27  SC059609A. This conviction arises from the jury trial in that action, in which Petitioner was convicted

28
   _____

29       [1] At the time this action was initially filed, Petitioner was held at Salinas Valley State Prison,
30  whose warden was Anthony A. Lamarque, and his name therefore appears above as the lead defendant.

-1-

on March 7, 1997 of murder in the first degree (California Penal Code[2] § 187). The jury also found true the enhancement allegation that Petitioner personally used a firearm (§ 12022.5).

3.    Petitioner has no sentence to serve other than the sentence which is challenged by this petition.

4.    Petitioner's imprisonment is the result of a fundamentally unfair trial in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

5.    Petitioner requests this Court to take judicial notice of the certified record on appeal and the records and pleadings on file in the Superior Court, the California Court of Appeal, and the California Supreme Court regarding the underlying matter, including the records from both Superior Court trials.

6.    Any exhibits and declarations that accompany this petition are hereby incorporated by reference to the extent applicable. Moreover, to the extent applicable, each claim stated in this petition incorporates the facts stated in other parts of this petition and in any exhibits and declarations.

7.    Any legal authorities provided here are identified in summary form only and Petitioner reserves the right to present additional authority. Each claim is based on the United States Constitution.

8.    To the extent that any facts set forth in this petition (or those included in exhibits and/or declarations and/or which are subject to judicial notice) could not reasonably have been discovered or found by defense counsel, these matters constitute newly discovered evidence that casts fundamental doubt on the accuracy and reliability of the proceedings and undermines the convictions and sentence, such that Petitioner's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution have been violated.

9.    The claims asserted in this petition are cognizable in a habeas corpus proceeding in this Court and have been brought in a timely manner.

### PROCEDURAL HISTORY

10.    The underlying judgment was entered in the San Joaquin County Superior Court on April 4, 1997. Petitioner was sentenced to state prison for a total term of 35 years to life (25 years to life on the § 187 conviction, plus 10 years on the § 12022.5 enhancement, with the 10-year determinate term to be served before the indeterminate term).

11.    Petitioner appealed from his conviction and judgment to the California Court of Appeal, Third Appellate District. The issues raised on appeal were as follows:

---

[2] All further statutory references are to the California Penal Code unless specified otherwise.

-2-

1
2
Issue 1:  Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder under the due process clause;

3
4
Issue 2:  Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and

5
6
Issue 3:  Whether Petitioner's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

7   The Court of Appeal affirmed the trial court's judgment in an unpublished opinion issued March 8, 1999

8   (People v. Kenneth Jerome Vernon, California Court of Appeal, Third Appellate District, No. C026244).

9   A copy of the Court of Appeal's unpublished opinion is submitted as Exhibit A within the *Exhibits In*

10   *Support Of Petition For Writ Of Habeas Corpus By A Person In State Custody* (Doc. 13), filed

November 4, 2002 in conjunction with the earlier-filed petition.[3]

11
12   12.    Petitioner sought review of the Court of Appeal's affirmance in the California Supreme

13   Court through a petition for review filed on April 16, 1999.  The issues raised in the petition for review were as follows:

14
15
Issue 1:  Whether there was substantial evidence to support a verdict of guilty of premeditated and deliberate first degree murder under the due process clause;

16
17
Issue 2:  Whether the trial court erred in refusing a special defense instruction regarding the jury's consideration of planning, motive, and the method of killing in relation to its resolution of the issues of premeditation and deliberation; and

18
19
Issue 3:  Whether defendant's due process rights were violated when the trial court instructed the jury on false statements as evidence of consciousness of guilt, and in refusing a special defense instruction on the limited role of "consciousness of guilt" evidence.

20   The California Supreme Court denied the petition for review on June 16, 1999 (People v. Kenneth

21   Jerome Vernon, California Supreme Court No. S078530).  A copy of the order denying the petition for

22   review is submitted as Exhibit B.

23   13.    Petitioner was represented at his trial and sentencing by Ralph Cingcon of Stockton,

24   California.  Petitioner was represented in his appeal and in his petition for review to the California

25

26   [3]  References to Exhibits A through E refer to the exhibits filed November 4, 2002 (Doc. 13).
27   References to Exhibits F through J refer to the exhibits filed May 8, 2003, in Petitioner's *Additional*
*Exhibits In Support Of Petition For Writ Of Habeas Corpus By A Person In State Custody* (Doc. 16),
28   which was filed in conjunction with the *First Amended Petition* (Doc. 14).  References to Exhibits K
through L refer to the exhibits filed in *Petitioner's Additional Exhibits In Support Of Second Amended*
29   *Petition For Writ Of Habeas Corpus By A Person In State Custody*, which is filed with this *Second*
30   *Amended Petition*.

Supreme Court by Kyle Gee of Oakland, California. Petitioner thereafter has been represented by current counsel Mark Vermeulen.

14. Through current counsel, Petitioner filed a petition for writ of habeas corpus in the San Joaquin County Superior Court (In the Matter of the Petition of Kenneth Vernon For Writ of Habeas Corpus, San Joaquin County Superior Court No. SC059609A). The claims raised in the Superior Court petition were as follows:

Claim 1: One or more of the jurors committed prejudicial misconduct by failing to disclose to the Court and counsel during voir dire material information which demonstrated juror bias and knowledge, by which petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 16 of the California Constitution;

Claim 2: One or more of the jurors committed prejudicial misconduct by having contact with third parties (namely, the deceased victim's mother, friends, and relatives, and the District Attorney), by which petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, sections 15 and 16 of the California Constitution;

Claim 3: The prosecutor at trial committed prejudicial misconduct by having contact with the jurors and by facilitating communications between jurors and third parties (namely, the deceased victim's mother, friends, and relatives), by which petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, sections 15 and 16 of the California Constitution;

Claim 4: Petitioner was prejudicially deprived of his right to a public trial and to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, section 15 of the California Constitution, due to the exclusion of the public (including Petitioner's family) from the courtroom during voir dire;

Claim 5: Petitioner was prejudicially deprived of his right to the effective assistance of counsel, to a fair trial, and to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, sections 15 and 16 of the California Constitution, due to the trial court's refusal to substitute counsel for the second trial (after a mistrial occurred in the first trial when the jury was unable to reach a verdict), due to the court's quick resetting of the second trial, and due to trial counsel's consequent inability to provide Petitioner with adequate and effective representation at the second trial, and there was no tactical reason for the failure of trial counsel to undertake the matters complained of herein; and

Claim 6: If any of the claims or issues raised in the petition are deemed waived through previous counsels' failure to timely raise and litigate the claim(s) and/or issue(s), petitioner was prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and his right to due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and under article I, sections 15 and 16 of the California Constitution, for there was no tactical reason not to raise these claims or issues, and petitioner was prejudiced thereby.

15. Simultaneously with filing of the petition for writ of habeas corpus in the Superior Court, Petitioner filed a separate request for discovery in the same court, through which Petitioner sought an order for the production of (1) all transcripts of the voir dire examination of the jurors (including alternate jurors) in the case from which the underlying conviction arises (People v. Kenneth Vernon, San Joaquin County Superior Court No. SC059609A), and (2) the names, addresses and telephone numbers of all jurors (including alternate jurors) in the case from which the underlying conviction arises.

16. On October 1, 2001, the Superior Court denied the petition without specifically addressing the requests for discovery. A copy of the Superior Court's order denying the petition is submitted as Exhibit C. On October 30, 2001, Petitioner filed a motion with the Superior Court requesting that the court rule on the earlier-filed requests for discovery and FURTHER requesting, in light of the requests for discovery, that the court reconsider its denial of the petition. On November 27, 2001, the Superior Court issued an order denying the motion and the request for reconsideration of the denial of the writ. A copy of that order is submitted as Exhibit D.

17. On December 10, 2001, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, Third Appellate District (In the Matter of the Petition of Kenneth Vernon For Writ of Habeas Corpus, California Court of Appeal No. C039943.) That petition raised the same issues as those raised in the petition filed previously in the Superior Court. *See* ¶14, *ante*. On January 10, 2002, the Court of Appeal denied the petition. A copy of the Court of Appeal's order denying the petition is submitted as Exhibit E.

18. On January 15, 2002, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court (In re Kenneth Vernon on Habeas Corpus, California Supreme Court No. S103597). That petition raised the same issues as those raised in the petitions filed previously in the Superior Court and in the Court of Appeal. On April 9, 2002, the California Supreme Court denied the petition. A copy of the California Supreme Court's order denying the petition is submitted as Exhibit F.

19. On October 24, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. That petition is now pending. The claims raised in that petition are as follows:

Claim 1: The imposition of the upper term sentence on the gun use enhancement violated petitioner's constitutional rights.

Claim 2: Petitioner's constitutional rights were violated when he was forced to wear a stun belt at trial.

Claim 3: The use of the stun belt and other measures at trial constituted excessive courtroom security.

Claim 4: If any claims are deemed waived, counsel provided ineffective assistance.

1

**CLAIMS FOR RELIEF**

2

**Claim 1:**     **Petitioner's Constitutional Rights Were Violated When He Was Forced To Wear A Stun Belt At Trial[4]**

3

4

20.     Petitioner was forced to wear a stun belt during trial, including while testifying. There

5

was no manifest need and no factual support for the use of a stun belt (nor for any other security

6

measure); the trial court improperly delegated or abdicated to the sheriff and/or the district attorney the

7

responsibility for deciding whether such a security measure was needed and/or appropriate; petitioner

8

was not provided with an opportunity to challenge the imposition of the stun belt;  and the use of the

9

stun belt prejudicially impeded petitioner's ability to pay attention, to communicate with counsel, to

10

think and concentrate, to testify, and to be mentally present and participate meaningfully in the defense.

11

As a result, petitioner's conviction, sentence and confinement were unlawfully obtained in violation of

12

petitioner's rights to due process, confrontation, the effective assistance of counsel, the presumption of

13

innocence, and a fair, accurate and reliable guilt determination based solely on record evidence and

14

reason, not passion or prejudice, under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and their counterparts under the California Constitution.

15

21.     In support of this claim, petitioner alleges the following facts, among others to be

16

presented after full discovery,[5] investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

17

22.     At trial, petitioner was forced to wear a stun belt, which is a restraining device that

18

applies severe electrical voltage to an individual.

19

23.     This requirement was imposed at the request or direction of the district attorney, or with

20

his knowledge, and it was implemented by the bailiff.  The trial court improperly abdicated this decision

21

to the district attorney and/or the court's security personnel.

22

24.     Upon being told that he was going to be required to wear the stun belt, petitioner was

23

taken to the basement of the courthouse.  There, he was required to watch a movie (approximately ten

24

25

[4] The claims new to this *Second Amended Petition* are set forth in Claim 1 (the stun belt claim),

26

Claim 2 (the related claim regarding excessive courtroom security), and Claim 8 (the claim under *Cunningham v. California,* 549 U.S. ___, 127 S.Ct. 856 (2007). The other claims in this *Second*

27

*Amended Petition* all were alleged previously in the *First Amended Petition*, and they are presented here

28

as set forth previously, though they have been renumbered here.

29

[5] Petitioner will seek leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, requesting materials and information necessary to

30

properly and fully litigate this Petition.

minutes long) regarding the stun belt. The movie showed the stun belt being placed on others and activated, shocking the person, who obviously was in great pain and distress. Petitioner was required to sign a piece of paper confirming that he had watched the movie and that he knew what would happen if the bailiff activated the stun belt. Petitioner also was told that any verbal outburst or any sudden move would trigger the use of the device and would result in his being shocked.

25.    The bailiff who forced petitioner to wear the stun belt and who controlled the stun belt informed petitioner that it was the first time that the bailiff had ever used and controlled the stun belt. This added to petitioner's concern for his own safety and to his inability to participate meaningfully in the defense.

26.    The stun belt petitioner was required to wear consisted of a waist belt with an attached battery pack that measured approximately 6 inches by 6 inches and was made to be worn in the small of the back, from which it protruded. It was apparent to anyone viewing petitioner (including the jurors) that he was wearing some type of device, as the protrusion was readily visible, including when he sat, and especially when he walked from counsel table to the witness stand in front of the jurors. The physical size and configuration of the stun belt prevented petitioner from sitting normally in his chair, both at counsel table and on the witness stand, forcing him to sit bent forward unnaturally toward the edge of his seat. This negatively affected his ability to think, to pay attention, to concentrate, and to communicate. It also negatively affected the jurors' perception of him as a person and as a witness, and their assessment of his credibility. It denied petitioner the right to be brought before the court and the jury with the appearance, dignity and self respect of a free and innocent man.

27.    There was no reason and no manifest need for petitioner to be required to wear a stun belt, nor for any other restraint to be imposed. He had not done anything in the courtroom or in custody that would lead someone to think that he was a threat to courtroom security. This was true as to both the first trial in this case and the second (re)trial. There was no showing and no objective evidence or facts specific to petitioner individually which would justify requiring him to wear a stun belt. The trial court never made an independent determination of the necessity of the stun belt, nor did the trial court afford petitioner a fair opportunity to challenge the use of the stun belt or the basis for requiring him to wear it.

28.    The fact that the trial court and/or the district attorney and/or the bailiff saw fit to require the defendant to wear a stun belt conveyed to the jury a belief on the part of the court, the district attorney and/or the bailiff that the defendant was dangerous. Conveying the belief to the jurors that the defendant was dangerous inevitably prejudiced the jurors' ability to objectively make any determination that might result in the defendant becoming or remaining free to hurt others.

29. While petitioner was testifying at trial, wearing the stun belt, he was extremely nervous and worried that he would be shocked by the stun belt, and that he could be shocked even if he did nothing wrong. While testifying, his concerns about the stun belt and about being shocked manifested in several ways. For example, he was hesitant to speak and at times spoke more quietly than he would have otherwise. When he did so, he was told by the judge more than once to speak up, which raised petitioner's level of concern about being shocked. He also was nervous and uncomfortable, inwardly and outwardly, which was apparent to anyone viewing his demeanor on the witness stand, including the jurors. This falsely conveyed to the jurors a lack of credibility on petitioner's part.

30. Petitioner's nervousness and concern regarding the use of the stun belt and the potential that he would be electrically shocked was increased and exacerbated by several conditions and by an incident from his past. Petitioner suffers from epilepsy and has had grand mal seizures. In January 1995, he had been shocked by a stun device. This occurred when he interrupted two burglars who were burglarizing his garage and attempting to steal his tools. As petitioner confronted the burglars, one of them shocked petitioner with a stun device, causing petitioner to fall to the ground immediately and to be in pain. The experience of being shocked by this stun device was significant, physically and psychologically, causing petitioner to experience anxiety, jumpiness and headaches for a considerable period of time after the incident. While he was on the stand testifying in this case he was very conscious of and fearful of this past experience with a stun device and he was afraid of being shocked again, for the memories of being shocked earlier were at the forefront of his mind, especially while he was testifying. The Sheriff's Department and the District Attorney's Office were aware of this past incident with the stun device.

31. At the trial, petitioner informed trial counsel about the stun belt and told counsel that petitioner was being required to wear it, that it caused him concern and discomfort, and that it impacted his ability to sit, to participate, to concentrate, to testify, and to help in his defense. Counsel did nothing to raise the issue or challenge the use of the stun belt.

32. Petitioner also informed appellate counsel about this issue on more than one occasion, but petitioner never received a response to his communications. Petitioner's mother also sought to communicate with appellate counsel regarding this and other issues on behalf of her son, but she, too, received no response from appellate counsel.

33. The unconstitutional use of the stun belt had a substantial and injurious effect on the jury's verdicts and was prejudicial to petitioner. Petitioner's attention to trial matters was diverted by the use of the belt. He focused on the stun belt and the potential that he would be shocked by it, rather

-8-

than on the evidence at trial and the issues and tasks necessary to present a defense. He was physically uncomfortable. The use of the stun belt was in fact prejudicial for all of the reasons the law deems its use undesirable: it suggested to the jury that petitioner was dangerous and guilty, it impaired his mental faculties, it was visible to the jury, and it was painful to petitioner.

**Claim 2:     The Use Of The Stun Belt And Other Measures At Trial Constituted Excessive Courtroom Security**

34.     As a result of the use of the stun belt, and the concomitant increased level of security in the courtroom throughout the trial, petitioner's conviction, sentence and confinement were unlawfully obtained in violation of petitioner's rights to due process, confrontation, the effective assistance of counsel, the presumption of innocence, and a fair, accurate and reliable guilt determination based solely on record evidence and reason, not passion or prejudice, under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and their counterparts under the California Constitution.

35.     In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing.

36.     Defendants are rarely required to wear a stun belt. At the time of petitioner's trial, normal courtroom security in trials in California consisted typically of a single bailiff and one plainclothes investigating officer, who was designated as the start of trial to sit at the prosecution table.

37.     The level of security at petitioner's trial was greater than the normal level of courtroom security.

38.     Trial counsel actively advocated against petitioner's interests or failed to protect them by his silence concerning matters of courtroom security.

39.     The increased level of security had a substantial and injurious effect on the jury's verdicts because the jurors drew the predictable inference that petitioner was untrustworthy and dangerous.

**Claim 3:     Jurors Committed Misconduct By Failing To Disclose Material Information During Voir Dire**

40.     Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional. Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when one or more of the jurors committed prejudicial misconduct by failing to disclose to the trial court and counsel, during voir dire, material information which demonstrated juror bias and knowledge.

1    41.    The facts which support this claim, among others to be developed after full investigation,

2   discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further

3   develop and support the merits of this claim, and other available court processes, are as follows.

4    42.    There were at least three instances in which jurors concealed material information and

5   bias on voir dire.

6    43.    First, one of the jurors (Linda Withers, who will be referred to here as "Juror 1") is

7   related to one of the key prosecution witnesses by marriage, and the Withers family has known

    Petitioner's family for many years. The prosecution witness to whom Juror 1 is related is Doyle Dubois;

8   Doyle Dubois' uncle is Tom Dubois, who is married to Lavanda Withers; Lavanda Withers is related to

9   Juror 1. *See* Exhibit G (Declaration Of Ernestine Vernon) and Exhibit H (Declaration Of William

10  Vernon).[6] Additionally, Petitioner's family has known Lavanda Withers and the Withers family almost

11  all of their lives. For example, Petitioner's father (William Vernon) has known Alan Withers almost all

12  his life, having gone through school together in their childhood, and Alan Withers and the Withers

13  family are related to Juror 1. *Ibid.* These relationships involving Juror 1 were not revealed during voir

14  dire.

15   44.    A second juror ("Juror 2") knew or was acquainted with Petitioner's uncle, Jack Vernon

16  and had knowledge or beliefs regarding Jack Vernon and the Vernon family such that Juror 2 was

17  prejudiced and biased and could not be fair and impartial. This relationship likewise was not revealed

18  during voir dire. *See* Exhibit G, Exhibit H, and Exhibit I (Declaration Of Shirley Washburn).

19   45.    A third juror ("Juror 3") was familiar with the means by which blood levels of d-

20  amphetamine and amphetamine could show up in a person's blood, as demonstrated by the note

    submitted by the jury on March 5, 1997. That note states:

21
22           Q. Concerning blood levels of d-amphetamine and amphetamine found in
             [deceased victim] Robin McClary. There was no evidence produced to
23           substantiate the use of amphetamines by inhalation, oral ingestion of [sic]
             injection. However, Robin McClary did suffer from allergies and a bronchial
24           disorder.
25
26
27   ---
     [6] Regarding the declarations filed with the initial petition in this Court (see Docs. 12 & 13),
28  copies were submitted, rather than the originals, because the originals of the declarations had been filed
    previously with the San Joaquin County Superior Court with the petition filed in that court. Should this
    Court require the originals rather than the copies, Petitioner respectfully requests that the Court order the
29  Clerk of the San Joaquin County Superior Court to lodge the original declarations/exhibits with this
30  Court.

-10-

1
2
3
4

> If Robin took prescription medication for breathing and any over the counter medication for allergies or asthma those drugs will show a false positive test for amphetamines.
>
> The statement by both defense and prosecution that she used amphetamine may not be valid.

5   *See* Exhibit J (juror note submitted on March 5, 1997). This knowledge was relevant because levels of

6   these substances were found in the deceased victim. This fact was relevant to the issue of whether the

7   death constituted murder or manslaughter, and the degree of murder or type of manslaughter. Juror 3

8   did not reveal this knowledge and familiarity during voir dire. Furthermore, the trial court failed to

9   admonish the jury when they submitted this note during deliberations.

10   **Claim 4:    Jurors Committed Misconduct By Contact And Discussions With Third Parties**

11   46.    Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional.

12   Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to

13   confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth

14   Amendments to the United States Constitution when one or more of the jurors committed prejudicial

15   misconduct by having contact with third parties (namely, the deceased victim's mother, friends, and

16   relatives, and the District Attorney).

17   47.    The facts which support this claim, among others to be developed after full investigation,

18   discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further

19   develop and support the merits of this claim, and other available court processes, are as follows.

20   48.    During the trial, several jurors had inappropriate and prejudicial contact with the District

21   Attorney and with the deceased victim's mother, friends, and relatives. In connection with the District

Attorney, the juror contact occurred by the jurors conversing with the District Attorney during recesses

22   and breaks in the trial. *See, e.g.*, Exhibit G, Exhibit H, and Exhibit I. In connection with the deceased

23   victim's mother, friends, and relatives, the juror contact likewise occurred during recesses and breaks in

24   the trial during which the jurors would converse with the deceased victim's family and friends in the

25   courtroom (with the conversation sometimes also involving the District Attorney) and outside the

26   courthouse in or near an area where people would congregate to converse and to smoke. *Ibid.* In

27   addition, the jurors on more than one occasion brought fruit and/or other food to the District Attorney

28   during the trial, which he accepted. *Ibid.* During these various contacts, one or more of the jurors

29   discussed aspects of the case with the non-jurors and the jurors were prejudicially influenced by these

30   contacts.

**Claim 5:    Prosecutorial Misconduct Occurred By Contact And Discussions With Jurors**

49.    Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional. Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when the prosecutor committed prejudicial misconduct by having contact with the jurors and by facilitating communications between jurors and third parties (namely, the deceased victim's mother, friends, and relatives).

50.    The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

51.    During the trial, the District Attorney had inappropriate and prejudicial contact with several of the jurors and failed to report this contact to the Court and defense counsel. *See, e.g.*, Exhibit G, Exhibit H, and Exhibit I. This contact occurred by the District Attorney's conversing with the jurors during the recesses and breaks in the trial. At times, this conversation also involved members of the deceased victim's family, who were seated in the audience in the courtroom. The District Attorney engaged in and facilitated three-way conversations with the jurors and the deceased victim's family and friends. Improper and prejudicial contact also occurred by the District Attorney accepting fruit and/or other food from the jurors during the trial. During the contacts noted herein, one or more of the jurors discussed the case and the trial with the District Attorney and were prejudicially influenced by these contacts.

**Claim 6:    Petitioner's Rights Were Violated By The Exclusion Of The Public (Including His Parents) From Voir Dire**

52.    Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional. Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when the public (including Petitioner's family) was excluded from the courtroom during voir dire.

53.    The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

54.    During voir dire the public, including Petitioner's parents, was excluded from the courtroom without reason or necessity.

**Claim 7:      Petitioner's Rights Were Violated When The Trial Court Refused To Substitute Other Counsel For The Second Trial**

55.      Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional. Petitioner was deprived of due process of law, the right to trial by impartial jurors, and the right to confront and challenge the evidence received against him under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when the trial court refused to substitute counsel for the second trial (after a mistrial was declared in the first trial of this matter when the jury was unable to reach a verdict), due to the trial court's quick resetting and commencement of the second trial, and due to trial counsel's consequent inability to provide Petitioner with adequate and effective representation at the second trial, and there was no tactical reason for the failure of trial counsel to undertake the matters complained of here. Petitioner was prejudiced by these actions.

56.      The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

57.      At the first jury trial in this matter, which took 22 days to complete, a mistrial was declared on December 20, 1996 when the jury was unable to reach a verdict. Counsel returned to court on January 7, 1997. Defense trial counsel informed the Court he was not prepared to go forward on that date, that Petitioner and his family had no funds to retain him a second time, and that he could not continue to represent Petitioner. Among the reasons given by trial counsel as to why he could not retry the case were that retrying the case (particularly on a tight timeline) would impose a severe hardship on him, that he had many other trials set and/or trailing (along with other cases) which he had had to put aside to try this case and to which he must now attend, and that he would be unable to provide adequate and effective assistance at a second trial, all of which were exacerbated by the fact that trial counsel was a sole practitioner. Nevertheless, the trial court denied trial counsel's request. The trial court appointed the same trial counsel to try the case a second time, over counsel's strenuous objection. Trial counsel thereupon requested a trial date of April 1997 in order to be able to prepare properly. The District Attorney noted that he would be prepared to begin in January, and the trial court set the trial for January 27, 1997. Trial counsel pleaded with the trial court for additional time, which requests were denied, the trial court stating: "You're under duress, [defense trial counsel], and the record should note that."

58.      At the second trial, trial counsel failed to undertake several matters necessary to the effective representation of Petitioner, all of which contributed to Petitioner receiving inadequate and ineffective assistance of counsel and which prejudices Petitioner. The actions which trial counsel failed

1  to undertake or which he undertook ineffectively include the following: failure to conduct adequate
2  investigation, including ballistics testing and consulting with forensics experts; failing to object to the
3  exclusion of the public from the courtroom during voir dire and informing Petitioner's mother that she
4  had to remain outside the courtroom during voir dire, failure to adequately question prospective juror
5  Linda Withers regarding juror bias; failure to raise the issue regarding juror Linda Withers' bias at the
6  earliest opportunity in the trial; failure to act as an effective and zealous advocate when trial counsel
7  confirmed the trial judge's limited questioning of juror Linda Withers for bias during the trial; failure to
   review the presentence report prior to sentencing and failure to accept and employ the brief recess
8  offered by the trial court to allow trial counsel to review the presentence report and to prepare for
9  sentencing; and failure to preserve the trial files, including Petitioner's own trial file. There was no
10 tactical reason for trial counsel to fail to undertake these matters or to undertake them in the manner he
11 did.

12 **Claim 8:    The Imposition Of The Upper Term Sentence On The Gun Use
13              Enhancement Violated Petitioner's Constitutional Rights**

14      59.    Petitioner was sentenced to the upper term (i.e., 10 years) on the gun use enhancement (§
15 12022.5) based on facts neither submitted to nor found true by the jury beyond a reasonable doubt, and
16 this sentence was imposed consecutively. As a result, this determinate term of petitioner's sentence and
17 confinement is unlawful and in contravention of rights guaranteed him by the Fifth, Sixth and
18 Fourteenth Amendments to the U.S Constitution. *Cunningham v. California,* 549 U.S. ___, 27 S.Ct. 856
   (2007); *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531 (2004).

19      60.    Petitioner's sentence included the consecutive upper term of 10 years on the § 12022.5
20 enhancement. A true copy of the abstract of judgment is provided as Exhibit K in the accompanying
21 *Petitioner's Additional Exhibits to Second Amended Petition For Writ Of Habeas Corpus.* In selecting
22 the upper term, the trial court stated its reasons as follows: "The defendant is statutorily ineligible for
23 probation under [§] 1203.06(a)(1), the jury having found that he used a firearm in commission of the
24 offense. [¶] But if he were eligible for probation, the Court would deny probation because the victim
25 was vulnerable, because it was a crime of great seriousness, he deserves punishment, and for the
26 protection of the community. [¶] So probation is denied. [¶] The indeterminate term for a conviction of
27 murder in the first degree is life imprisonment, twenty-five years before parole. And that is the
   Judgment of the Court. [¶] In addition, under [§] 12022.5, there are [sic] a choice of sentences, three,
28 four or ten years. [¶] And for the victim's vulnerability, the Court will impose the upper term of ten
29 years. [¶] That would be consecutive to the indeterminate term and will be served first. And upon
30

-14-

completion of that ten years, the indeterminate term of life will be served." Reporter's transcript of the sentencing hearing held April 4, 1997, San Joaquin County Superior Ct. No. SC059609A, at p. 1683. A true copy of the reporter's transcript is submitted as Exhibit L.

61.     Petitioner's conviction became final on September 14, 1999, ninety days after the petition for review was denied by this Court.

62.     Although *Cunningham* was decided after petitioner's judgment became final for purposes of direct review, it should be applied retroactively to him. Since he could not have raised the claim presented here under *Cunningham* in the Superior Court, the Court of Appeal or the California Supreme Court as part of his direct appeal or his initial petition, petitioner has no other plain, speedy or adequate remedy at law.

## Claim 9:     Counsel Provided Ineffective Assistance If Any Claims Are Deemed Previously Waived

63.     If any of the claims or issues raised in this petition are deemed waived by previous counsels' failure to timely raise and litigate the claim(s) and/or issue(s), Petitioner was prejudicially deprived of his right to the effective assistance of counsel, his right to a fair trial, and his right to due process of law under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, for there was no tactical reason not to raise these claims or issues, and Petitioner was prejudiced by these actions.

64.     The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

65.     See facts set forth in the preceding Claims, *ante*.

## Claim 10:     The Evidence Was Insufficient To Convict Of First Degree Murder

66.     Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional. They were obtained in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution because the evidence adduced at trial was insufficient to support a conviction for murder in the first degree. At most, the evidence supported a conviction for murder in the second degree, or manslaughter.

67.     The facts which support this claim, among others to be developed after full investigation, discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further develop and support the merits of this claim, and other available court processes, are as follows.

/ / /

/ / /

/ / /

-15-

### i.     Introduction

68.     In this case, there was no question at trial as to who fatally shot the decedent, Robin McClary: Petitioner, in his own testimony, admitted he had done so. The issue at trial concerned the type and degree of homicide: was this premeditated murder, second-degree murder, or manslaughter?

69.     In the context of this insufficiency-of-evidence claim, the factual discussion here is lengthy, of necessity. It is derived from the trial transcripts. For readability, the discussion is categorized into the testimony of the key witnesses and/or the key events relevant to establishing this claim. The evidence adduced at trial was as follows.

### ii.     The gardener

70.     On August 24, 1995, Robert Perry was to meet Petitioner at approximately 5:00 p.m. at 8201 Arroyo Way in Stockton, California to discuss gardening work. Mr. Perry went by the house at 3:00 or 4:00 p.m., but no one was home. He returned shortly after 5:00 p.m., and Petitioner answered the door. Petitioner showed him around outside. Mr. Perry asked Petitioner if he could run power from either the garage or the house, and Petitioner brought out an extension cord through the garage.

71.     Mr. Perry began to trim the shrubs by the front door. Another man came by to work on a broken sprinkler on the side of the house. The sprinkler man left but returned and began talking to Petitioner in front of the house. A woman (Robin McClary, who was Petitioner's girlfriend and who is the deceased in this case) came out and listened to what they were saying. Mr. Perry spoke to her, and she did not seem upset. Thereafter, she and Petitioner re-entered the house.

72.     Mr. Perry worked his way to the side yard. At one point he turned off his clippers and heard a stereo and a television, which were "kind of loud." He could also vaguely hear people talking. While at the front of the house later, Mr. Perry heard "what sounded like a plate . . . being broke and a glass." Back at the side of the house, he heard someone walking heavily. In addition, he "heard off in the distance like a firecracker . . . ." Thereafter, there was a thump, like shoes being thrown.

73.     About 15 to 25 minutes after Petitioner and Ms. McClary had gone back inside the house, Petitioner came out carrying what appeared to be clothes and a towel. He was wearing a T-shirt and a pair of shorts. He called to Robin to turn down the stereo. He then got into his truck.[7]

---

[7] The total time that Petitioner was inside the house was not made clear at trial. Mr. Perry testified that it had been 20 to 25 minutes, but he told a deputy that same night that it had been about 10 minutes. At the first trial, he testified that it had "felt like 15 minutes." He also testified that Petitioner came out of the house 15 to 20 minutes after Mr. Perry had heard the last noise from inside the house, but Mr. Perry previously had testified that he thought it had been "maybe 5 minutes" thereafter. In any

1  74. About 10 minutes later, Petitioner returned and stopped in front of the house. A red

2 pickup pulled into the driveway, and a man got out and got into Petitioner's truck, which again left. The

3 man in the red pickup was Doyle Dubois, who shared the house with Petitioner and Ms. McClary.

4  75. The two men returned 25 to 45 minutes later, shortly before 7:00 p.m. A young man had

5 been waiting to talk to Petitioner about repairing the roof, and he spoke to Petitioner. Thereafter,

6 Petitioner and Mr. Dubois went inside. Both ran out soon thereafter, screaming, "She's dead, she's

7 dead."[8]

### iii. The roommate

8  76. Doyle Dubois was living at 8201 Arroyo with Petitioner, Ms. McClary, and her son,

9 Nicholas. Mr. Dubois' bedroom was in the southeast corner, Nicholas' was in the southwest area, and

10 the north bedroom was occupied by Petitioner and Ms. McClary.

11  77. Mr. Dubois got off work at 5:00 p.m. He stopped at an auto parts store, a bank, and fast

12 food place before heading home. On the way home, Mr. Dubois saw Petitioner in his truck. Petitioner

13 asked Mr. Dubois if he wanted to go to a music store, and Mr. Dubois dropped off his truck at the house,

14 seeing the gardener in the front yard. Mr. Dubois and Petitioner went to Tower Records in Petitioner's

15 truck.

16  78. At the store, Petitioner somehow collided with the door. Inside the store, Petitioner

17 seemed highly agitated and said he had been cut. He displayed cuts on his arm and leg. After talking to

18 one of the clerks, Petitioner left, saying he was going to clean up his cuts.[9] When Petitioner returned ten

21 event, he told police that he had looked at his watch and believed that Petitioner had left at about 5:50
p.m.

22  [8] Philip Mosqueda had been working on the sprinkler. He had been at the house the week

23 before, when he repaired the air conditioning unit and checked the broken dishwasher, which could not
be repaired. When he told Ms. McClary that the dishwasher needed to be replaced, she had not seemed

24 upset. On August 24, 1995, Mr. Mosqueda arrived at the house at approximately 4:45 p.m., knocking on

25 the front door and telling Ms. McClary he would be working on the sprinkler. After two trips for parts,
Mr. Mosqueda finished the job and went to the door. Petitioner and Ms. McClary came out, and they

26 talked for a few minutes. Mr. Mosqueda did not smell any alcohol on Ms. McClary's breath, and she did
not appear to be upset. Mr. Mosqueda left at approximately 5:30 p.m.

27

28  [9] A Tower Records employee testified that at about 6:00 p.m., Petitioner and another man had
approached the store. Petitioner had walked into the door as the other man was opening it. After they

29 entered, they walked to the back for awhile. Petitioner then came to the counter and showed her the cuts
on his arm and leg. She told him he could not have cut himself on the door, and she saw that the blood

30 was already coagulated. Petitioner left alone and returned later.

minutes later, he seemed angry and said that he would not buy anything at that store. After leaving

Tower Records, Petitioner and Mr. Dubois went home.

79.    Upon arriving back at the house, Mr. Dubois got his books and handgun out of his truck.

A man came up and talked to Petitioner about the roof. Petitioner and Mr. Dubois then entered the

house.

80.    After Mr. Dubois asked why the phone was on the floor in the kitchen, Petitioner began

calling to Ms. McClary. Petitioner walked through the house, seeming "upset and worried." When

Petitioner looked into the bedroom he said, "Oh, my God!"

81.    Mr. Dubois saw Ms. McClary on the floor in the bed room. There was a kitchen knife by

her hand. Petitioner and Mr. Dubois went outside. At this point, Petitioner was crying. Mr. Dubois was

carrying his gun, which he locked in his truck.

82.    The next-door neighbor testified that sometime between 6:00 p.m. and 7:00 p.m. he

heard "pounding" at her door and found Petitioner in an "agitated" state, saying, "Call 911. My

girlfriend's been shot." Petitioner also stated, "I think she's been raped."

83.    Petitioner and Mr. Dubois sat down in the yard. Petitioner was very upset. He was

crying "hard" and saying that he could not believe that this had happened. At one point, he vomited on

the lawn.

### iv.    The first officers at the scene

84.    Sheriff's deputies arrived just before 7:00 p.m., finding Petitioner and Mr. Dubois on the

lawn. Petitioner was in a fetal position, crying and distraught. He said that his girlfriend was in the

house and had been shot.[10]

85.    Police entered the house, finding the television at high volume. A pair of glasses was on

the floor in the living room, near the coffee table. A cordless telephone had been knocked to the floor.

In the hall were blood drops on the carpet. The bathroom window was on the floor, with the glass

broken. Inside the bedroom was a woman lying face down on the floor. Her pants and underpants were

partially down, and a knife lay near her arms. A black purse was on the corner of the bed nearest the

body.

/ / /

---

[10] Police had difficulty obtaining information from Petitioner because he was so upset.
Petitioner identified the woman as Robin McClary. He said he had gotten home from work, after which
the gardener had arrived. Petitioner and Mr. Dubois had gone to Tower Records for about an hour.
When they got home, he and Mr. Dubois discovered Ms. McClary in the bedroom.

1

**v.    Examination of the house**

2
3
4
5
6

86.    The house had an entry hall, with the living room immediately to the left, and a kitchen and dining room area farther down the hall to the right. Inside the living room was a couch with a grease spot on the back. On the floor behind the couch was a piece of broken plate. A pair of glasses was on the floor by the coffee table, and there were blood spots on the living room rug. Blood spots were located on the metal strip separating the living room rug from the kitchen floor, and in the hallway.

7

87.    On the floor of the dining area was part of a cornish game hen. There was also a phone with the wall plug missing.

8
9
10

88.    In the kitchen was the telephone wall jack in which the plug and a piece of cord remained. In the garbage were pieces of a plate that matched the piece found behind the couch. Also in the garbage were two beer bottles and a Franzia wine container.[11]

11
12
13
14

89.    The bathroom window screen was on the ground directly below the window. The window itself was in the bathroom, with the frame and glass broken. Drops of blood were located on the sink and countertop, on the floor, on the toilet paper roll, on the step leading down to the shower, and in the upper right-hand corner inside the shower.

15
16
17
18

90.    In the north bedroom was a waterbed frame containing a regular mattress, with the corner of the bed nearest the body knocked off its pedestal. A long bloodstain led from just inside the door to the body. An open black purse was on the corner of the bed, and a knife was on the floor. The door's strike-plate and jamb were broken.

19
20
21

91.    A hunting bow and arrows were between the bed and the wall. A second phone was on the floor, also with the wall plug missing. Near the phone was a gold chain broken in the middle. Two feet to the side of the door, and two feet above the floor, was a hole in the wall. A bullet was imbedded in the stud behind the sheetrock.

22

**vi.    The testimony of Ms. McClary's mother**

23
24
25

92.    Ms. McClary's mother testified that she last saw her daughter three or four days before her death when she came to visit in her white Volkswagen with her son and Petitioner. Petitioner's brother and sister-in-law came in another car.

26
27

28
29
30

[11] One of the first police in the house had been looking for something to use to cover the knife. He dumped out the kitchen garbage, intending to use the can to cover the knife. The officer then saw a large bowl and decided to use it to cover the knife instead of the garbage can, which was left in the kitchen.

1    93.    Ms. McClary had a handgun when she visited. Ms. McClary's mother did not notice any

2  injuries to her daughter's face. The Volkswagen was not running properly, and when they left they rode

3  home with Petitioner's brother. Police later found a box of 9-millimeter cartridges in the glove

4  compartment of the Volkswagen.

5          **vii.    Petitioner's first statements to the police, on the night of the homicide**

6    94.    Deputy Mayoya interrogated Petitioner at the Sheriff's office the evening of the incident

7  soon after 8:00 p.m. A videocassette tape of the interrogation was played at the trial. In that first

8  statement, Petitioner denied any involvement in Ms. McClary's death. He asserted that he left to go to

9  the record store, leaving Ms. McClary in the house and the gardener outside. He said he ran into Mr.

10  Dubois, and the two went together to the record store and returned after about an hour to find Ms.
   McClary dead.

11    95.    Deputy Mayoya interrogated Petitioner again later that night at approximately 1:00 a.m.,

12  after Petitioner had been taken to the emergency room where a physician cleaned his injuries.[12] In this

13  second hour-long interrogation, Petitioner was advised of his rights, and the deputy told Petitioner that

14  the deputy did not believe Petitioner's original story. When Petitioner was accused of being involved,

15  he denied it. The deputy testified that his intention in this interrogation was to "float out theories" such

16  as "maybe this is what happened," and he posed several different "theories." The first theory was that

17  this was perhaps an accident, which Petitioner denied.[13] Another was that this involved self-defense,

18  which Petitioner also denied. The deputy conceded that he had raised these theories in the hope that

19  Petitioner would adopt one that could be disproved.

20          **viii.    The towels in the dumpster**

21    96.    A Sheriff's sergeant was told by Detective Mayoya that Petitioner had stated that he had

22  cut himself at Tower Records and cleaned himself up at Burger King. The sergeant checked the

23  dumpsters in the nearby Payless shopping center, but they had been emptied. Inside the Burger King
   dumpster were a large terry cloth bath towel and two other towels.

24          **ix.    The August 27 telephone conversation**

25    97.    On August 27, Deputy Mayoya left a message at Petitioner's house, and Petitioner called

26  back. Petitioner was asked about his Browning Hi-Power pistol, because police had been unable to

27  ───────────────

28    [12] It was stipulated that the physician would testify that the injuries were consistent with having
   been cut by a sharp object.

29    [13] During the second interrogation, the deputy made reference to "accident" as many as fifty
30  times. During the fourth interrogation, Petitioner actually adopted the "accident" theory.

locate it. Petitioner responded that Ms. McClary carried the gun in her purse most of the time. When asked when Petitioner had last seen the gun, he answered that he had seen it Wednesday (August 23). When Petitioner was told that the gardener had said he had seen him carrying something out of the house, Petitioner denied it. Petitioner was asked if dishes had been broken, and he said that they had not. Petitioner also denied knowing how the bedroom door had been broken.

### x.    The August 30 arrest and subsequent interrogations

98.    Petitioner was arrested on August 30 at the cemetery just after Ms. McClary's funeral had ended. He was taken to the Sheriff's office and he was again read his *Miranda* rights. An interrogation was conducted that afternoon and a final interrogation was conducted at approximately 6:30 p.m.[14]

99.    Videotapes of both August 30 interrogations were played at trial. In the first August 30 interrogation, Petitioner was advised by Deputy Mayoya at length why Petitioner's story was not credible. Petitioner denied involvement for some time. However, he eventually admitted that he had shot Ms. McClary, stating that it had been an accident.

100.    After his arrest, Petitioner was put in a holding cell. During a periodic check, he was found to have removed his socks and tied them around his neck. When asked what he was doing, Petitioner responded that he couldn't face his parents. The knots were so tight that the deputy was unable to untie them.

### xi.    The forensic testimony

101.    A criminalist from the Department of Justice tested a number of blood samples. Samples consistent with Ms. McClary's blood type were found on the living room carpet, the bedroom floor, the door of the bathroom, a light blue bath towel from the Burger King dumpster, and a dish towel from the Burger King dumpster. Samples consistent with Petitioner's blood type were found on the "west shower wall", a dark blue bath towel from the Burger King dumpster, and a light blue towel from the Burger King dumpster.

102.    A criminalist had also gone to the house to do a bullet trajectory reconstruction using a probe and a protractor. The criminalist testified that the angle of entry was approximately 80 degrees from the wall (plus or minus 5 degrees) and approximately horizontal. When fired, the gun would have been approximately two feet above the floor. The criminalist introduced into evidence a photograph of

---

[14] At the time of his arrest, Petitioner did not know that the towels had been found. He found out for the first time on videotape that the police knew of the bloody towels.

1 an officer with his head in approximately the position which would account for the wounds and the hole
2 in the wall. He would have expected to see some blood spatter if the decedent had been within 1-1/2 to
3 2 feet of that wall.

### xii. The autopsy

103.    The forensic pathologist who performed the autopsy described a variety of injuries. There were superficial injuries to Ms. McClary around the face, including bruises on the lips, a "pattern" bruise on the left cheek that might have been caused by a ring, and a one-inch scratch on the chin. Her nose had not been broken and she had no black eyes, no swelling, and no open cuts or lacerations. There was a 1/4-inch by 1/8-inch abrasion to the left scapula, an abrasion next to the right elbow, and bruises to the left hip. There were no injuries to the hands.

104.    Below the thyroid prominence were four purple petechial contusions (caused by blunt force injuries), which could have been caused by pressure. However, there were no internal neck injuries.

105.    Also noted were petechial hemorrhages to the eyelids. These can occur by various means, including pressure to the neck and direct trauma.[15]

106.    There was a gunshot wound to the head, with the entrance point 1-1/2 inches behind the left ear with stipple marks, which generally indicates a shot fired from a distance of 18 to 24 inches. The bullet did not enter the skull but passed through the large muscle on the left side of the neck in an almost level path with no significant front or back deviation.

107.    There was blood on the right shirt sleeve which showed a pattern of lines. The knife with the serrated edge found near the body could have caused that pattern.

108.    Robin McClary was 5 feet 5 inches tall and weighed 124 pounds. It was stipulated that ethyl alcohol (0.08% blood alcohol content) and methamphetamine (0.13 milligrams per liter) were detected in her blood. For a woman Ms. McClary's size, 0.08% blood alcohol content would have required her to ingest a little over two drinks (e.g., 2 12-ounce beers or 8 ounces of wine). An "effective level" of methamphetamine is present at 0.03 to 0.25 milligrams per liter, and methamphetamine makes a person agitated, irritable, paranoid, suspicious, and aggressive.

---

[15] The body was not moved until 3:00 a.m. The pathologist agreed that petechiae can occur as a result of lividity and decomposition. The pathologist deemed this possible, but not likely, for the following reasons: (1) seven to eight hours of decomposition is not long; (2) little decomposition was observed; and (3) there were fewer petechiae in the left eyelid as compared with the right, and the left side of the face had been down.

### xiii.    Petitioner's testimony

109.    Petitioner testified that he had known Ms. McClary in school and had become romantically involved with her in approximately March, 1995. After a few weeks, she moved into his house with her son.

110.    Before Ms. McClary moved in, Petitioner had purchased a 9-mm. Browning "Hi-Power" handgun.[16] Sometime in June, Ms. McClary began to carry the gun for protection. They had been out shooting together, and she usually kept the gun in her purse. Ms. McClary got her hunting license sometime in July, after taking a gun safety class.

111.    When Petitioner left the gun with Ms. McClary, he would chamber a cartridge and lower the hammer. To fire the gun, all she would have to do is cock the hammer.

112.    Petitioner and Ms. McClary had argued verbally perhaps three times before this incident. He described these arguments as "just kind of a huff and puff and ignore."

113.    When Petitioner and Mr. Dubois had originally moved into the house, the dishwasher was broken and the sprinklers and the air conditioner had not been working. After Ms. McClary moved in, it began to get hot, so Petitioner called the property manager several times about the dishwasher and air conditioner in late April or May. Petitioner never got a response, but in August the landlord came by and was upset that the lawn was dying. Petitioner explained that the sprinkler was broken and that he had called the landlord without success about the sprinkler, dishwasher and air conditioner. The landlord said he would send his gardener to see Petitioner.

114.    About a week or so later, a three-day notice was served on Ms. McClary by the property manager. She called Petitioner at work, and he called the landlord who said that if they were hiring a gardener to disregard the notice. When Petitioner got home from work that day, a repairman had already repaired the air conditioner but had said the dishwasher could not be repaired.

115.    On August 24, Petitioner got off work at 2:30 p.m. He arrived home at 3:00 p.m. and took Ms. McClary to the doctor at about 3:30 p.m. When they arrived home a little after 4:00 p.m., they changed clothes and talked in the living room. She had him sign papers for the Department of Motor Vehicles. He did not yet notice anything unusual about her behavior.

---

[16] This is a single-action, semi-automatic pistol. The gun is cocked when a cartridge is chambered. Alternatively, a cartridge can be chambered and the hammer lowered; thereafter, the gun must be cocked in order to fire.

116.   Ms. McClary started making dinner, while Petitioner began watching a movie. She was drinking wine, and he saw her have two glasses. Again, Petitioner did not notice anything unusual about her behavior.

117.   The sprinkler repairman arrived at around 4:30 p.m. After Petitioner had shown him the broken sprinkler, he left to get a part, and Petitioner went back inside. Petitioner and Ms. McClary ate dinner in the living room.

118.   As Petitioner was finishing dinner, at approximately 5:00 p.m., the gardener arrived. They looked at the job and agreed on a price. While the gardener went to his truck for his tools, Petitioner showed the sprinkler repairman the sprinkler valves.

119.   When Petitioner returned to the front of the house, Ms. McClary was on the front steps talking to the gardener. Petitioner got an extension cord and plugged it into the garage for the gardener. Petitioner and Ms. McClary walked over to the sprinkler repairman, and Ms. McClary commented that he needed to replace all the sprinkler heads. When Petitioner told her that the sprinkler man knew what he was doing, she replied that she had lived in the country and knew the sprinkler heads all needed to be replaced. At that time, she had not appeared angry but seemed to start becoming irritated.

120.   At around 5:30 p.m., Petitioner and Ms. McClary went back inside the house. In the living room, she began making comments about the landlord. She complained that the landlord was sending his relatives to fix things when he should be paying a repairman. She began to get "a little angrier" and said she would call the landlord herself. When Petitioner said that he had already talked to the landlord, she asked about the dishwasher, which he had already explained was to be replaced in October, when the landlord had more money. Ms. McClary said that the landlord had the money and that "that's bullshit." Her demeanor at this point was "irate and getting loud."

121.   As they were arguing, Petitioner knew that Ms. McClary had had a "couple of drinks" but he did not know she had taken drugs. He did not learn that she had taken drugs until three months after he was arrested.

122.   Ms. McClary began saying that she would call and tell the landlord he needed to "get this shit done." She said she was going to "jump his ass." When Petitioner replied that if she did this, the landlord would "kick us out," she accused him of "taking the landlord's side, to fuck [him]." Then she "stormed into the bedroom" and slammed the door.

123.   Petitioner began to yell at Ms. McClary, telling her to "fucking knock it off, you've had a few drinks." Petitioner went to the bedroom and started yelling at her about slamming the door. She told him to "fuck off" and walked back to the living room, slamming the bedroom door again.

-24-

124.    Petitioner walked to the living room and yelled at her again as she sat on the couch, staring and angry. When he leaned over her, she put her hand in his face and pushed him back. He did the same to her, pushing her on the right side of her face. He called her a "bitch" and turned to walk away.

125.    Petitioner heard Ms. McClary jump up and he heard the sound of "glass banging together." She swung a plate at him and it broke over his arm, cutting him, with one piece flying into the kitchen. Petitioner then pushed her in her chest and face, and she went down onto the couch and dropped the piece of plate she was holding. They continued yelling and cursing at each other.

126.    There was blood dripping from Petitioner's arm, and he saw blood dripping from her hand. After she walked into the bedroom, he threw the piece of plate that had landed in the kitchen into the garbage.

127.    She was in the bedroom "yelling and cussing." Petitioner went to the bedroom because he knew she was cut, finding her by the bathroom door with bloody tissues in her hand. She continued yelling and cursing about the landlord. He gave her a towel, and she began swinging at him. Petitioner pushed her again, and she fell into the shower, knocking down the curtain rod. After she got up, she cursed Petitioner and tackled him onto the bed, which collapsed. She was on top, hitting him, and he hit her in the face. In the struggle on the bed, Petitioner received a cut to the inside of his lip.

128.    Petitioner threw her off, and she landed beside the bed near the hunting bows and arrows. When Petitioner got up, she hit him in the leg with an arrow that had a hunting tip. The aluminum shaft hit Petitioner's leg, and when Ms. McClary "jerked it back," the blade cut the side of his leg. When she tried to hit him again with the arrow, he jerked it from her hands and threw it into the corner.

129.    She continued screaming. When Petitioner turned to grab a towel, he heard her yell that she was going to kill him. When he turned back she was cocking the gun while on her knees. He tackled her, wanting to get the gun away from her.

130.    Petitioner testified that he had not wanted to be shot, and he had been angry, upset, and scared. They struggled, and he wrested the gun from her and pulled away. He explained, ". . . [I] just shot, I just reacted . . . I pulled it away and I just pulled the trigger." Petitioner stated that he had not formed the thought that he "want[ed] to shoot her." Petitioner also testified regarding the shooting, "[It

1  was] just all the emotions, it's just like there was no time to think at the time, it just happened,

2  everything happened so quick."[17]

3  131.    The bullet struck Ms. McClary as she was looking downward. This occurred within 10

4  to 15 minutes of their having re-entered the house after talking to the sprinkler repairman.

5  132.    Upon being shot, Ms. McClary fell across Petitioner's legs, and he could see that she had

6  been shot in the head. He "just sat there," not knowing what to do and thinking that no one would

7  believe what had happened. He was scared to go to prison. Although he told police that this had been

8  an accident, that was not true. He had decided to say it was an accident because the police kept

repeating that they could understand if it had been an accident.

9  133.    Petitioner got up and pulled Ms. McClary away from the door so that it could be opened.

10  He walked to the living room, recalling that the gardener was outside. He looked out and saw the

11  gardener continuing to work.

12  134.    Petitioner returned to the bedroom and formed the idea of making it appear that

13  somebody had broken in. When Petitioner grabbed a towel to wrap the gun, he saw the cartridge casing

14  lying against the wall by the vanity, and he picked it up. He opened the sliding door to the bedroom. He

15  closed and locked the bedroom door, and then kicked it open to make it look like a forced entry. He took

16  the bathroom window out, threw it down, and pushed out the screen.

17  135.    Petitioner threw the piece of broken plate on the living room couch into the trash. He

18  took a knife from the kitchen counter to the bedroom, put blood on it, and placed it beside Ms. McClary,

19  to simulate a fight. He pulled down her pants to suggest sexual assault. He pulled the phones in the

bedroom and kitchen from the wall. He put the gun and towels in his truck and left.[18]

20

21  136.    After Petitioner had driven two blocks, he saw Mr. Dubois on his way home. Petitioner

22  felt that he couldn't let Mr. Dubois go home because Petitioner had just came from the house, so

23  Petitioner asked Mr. Dubois if he wanted to go to the record store. Mr. Dubois agreed, and they drove in

Petitioner's truck to Tower Records.

24  137.    In order to explain the cuts on his arm and legs, Petitioner tried to walk through the glass

25  door at Tower Records, but that did not work. He told Mr. Dubois that he had cut himself on the door

26

27

28  [17] He admitted that at the first trial he had answered "yes" when asked whether he had "intended to shoot her" and had "intended to kill her."

29  [18] He denied having turned around having and said "turn that TV down" as he was leaving the

30  house after the shooting.

-26-

1 and was going to clean up at Burger King. He drove behind Payless and threw the gun in a dumpster
2 there. Then he drove to Burger King, cleaned up, and threw the towels in their dumpster.

3      138.    When they got home, he found a man in front talking to the gardener. Petitioner and Mr.
4 Dubois went past them and entered the house. Petitioner began calling to Ms. McClary, as if he did not
5 know what had happened. After he found her, he went to the neighbor's house to call the police.

6      139.    As the police arrived, Petitioner was on the lawn throwing up. He was crying real tears,
7 because he had shot his girlfriend. He did not want to admit the truth because he "just was in denial,
didn't want to believe that [he] did something like that . . . ."

8      140.    Petitioner did not tell police the truth in his first interrogations because he had "already
9 started lying." Later, Petitioner stated that this had been an accident, which also was not true.[19]

10      141.    When he tied the socks around his neck, he was trying to kill himself out of shame.

11 **Claim 11:    Erroneous Jury Instructions Were Given Re: "Consciousness Of Guilt"**
12 **Evidence**

13      142.    Petitioner's conviction, sentence, and confinement are unlawful and unconstitutional.
14 They were obtained in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution due to
15 the trial court's erroneously instructing the jury that they were allowed to consider "consciousness of
16 guilt" evidence to affix the degree of murder, and due to the trial court's refusal to give an instruction
17 requested by the defense that would have clarified and limited the use of such evidence.[20]  Instructing
18 the jury in this manner erroneously permitted the jury to convict Petitioner of first-degree murder based
on irrelevant and irrational inferences, rather than on inferences based on reason and rational experience.

19      143.    The facts which support this claim, among others to be developed after full investigation,
20 discovery, adequate funding, access to the Court's subpoena power, an evidentiary hearing to further
21 develop and support the merits of this claim, and other available court processes, are as follows.

22
23
24    [19] Before his arrest, Petitioner went to Michael King's house because he falsely had told the
25 police that Mr. King might have had something to do with the homicide. He intended to get into an
26 argument with Mr. King, as if he had been involved.

27    Mr. King testified that Robin had once been his girlfriend and had lived with him in 1994. On
August 30, 1995 at around 3:00 a.m., he saw Petitioner at his front door and saw Petitioner's truck
28 outside. He called 911 but hung up. When the 911 operator called him back, he heard the truck start
and leave.

29    [20] In the state courts, these two arguments regarding instructional error were stated as separate
30 claims. They are combined here due to their interrelationship.

-27-

144. As noted previously, Petitioner testified that he shot and killed the victim. The only issues for the jury related to Petitioner's mental state, namely: did he premeditate and deliberate, or did he act in the heat of passion or with some other less culpable mental state.

145. Despite the limited issues at trial, the trial court instructed the jury with California Jury Instructions – Criminal (hereinafter "CALJIC") 2.03, over defense objection. The instruction advised the jury as follows:

> CALJIC 2.03
>
> If you find before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt.
>
> However, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your determination.

146. Additionally, the trial court refused to give an instruction requested by the defense which would have clarified CALJIC 2.03 by informing the jury of the proper parameters for considering such evidence. The requested instruction read as follows:

> Evidence that the defendant attempted to hide or cover up the killing by false or evasive statements made after the killing cannot be considered by you in determining whether the killing was deliberate and premeditated.

147. By the instructions given and refused, the jury was permitted to convict Petitioner based on improper considerations in violation of his right to due process of law, and Petitioner was prejudiced thereby.

## FURTHER PROCEEDINGS AND INCORPORATION OF MATERIALS

148. Petitioner needs and is entitled to adequate funding, discovery, subpoena power, an evidentiary hearing, and other resources so that he has an opportunity to fully and fairly develop the claims raised herein. Further investigation must be conducted in connection with the instant Petition. After Petitioner is provided access to these resources and after investigation is completed, Petitioner may have further claims to present, as well as further evidence to present in support of the claims set forth herein. At that time, Petitioner will seek leave to amend or supplement the Petition as appropriate.

149. Petitioner requests an evidentiary hearing to further develop the allegations contained in this Petition and to examine other witnesses from whom declarations have not yet been obtained.

150. Petitioner has no plain, speedy, or adequate remedy at law because the claims in the Petition are based in whole or in part upon facts outside the record on appeal.

-28-

1    151.    Petitioner hereby incorporates into the allegations of the Petition all of the facts and

2    court records contained in the underlying Superior Court action, the underlying Court of Appeal action,

3    and the underlying California Supreme Court action, including the related habeas corpus proceedings.

4    Petitioner also requests that the Court take judicial notice of the contents of the entire trial court record,

5    the entire record on appeal, and the entire record in the related habeas corpus proceedings.

6                                    **PRAYER**

7        WHEREFORE, Petitioner respectfully requests that the Court:

8        1.    Issue a writ of habeas corpus or order to show cause to inquire into the lawfulness of

9    Petitioner's conviction and sentence;

10       2.    Take judicial notice of the record in <u>People v. Kenneth Vernon</u>, San Joaquin County

11   Superior Court No. SC059609A, including the related habeas corpus proceedings, and of all other

12   matters and documents of which judicial notice is requested elsewhere in this petition;

13       3.    Take judicial notice of the record on appeal in <u>People v. Kenneth Vernon</u>, California Court

14   of Appeal, Third Appellate District, No. C026244, including the related habeas corpus proceedings;

15       4.    Take judicial notice of the record on appeal in <u>People v. Kenneth Vernon</u>, California

16   Supreme Court, No. S103597, including the related and subsequent habeas corpus proceedings;

17       5.    Order that the original exhibits in the underlying case be preserved;

     6.    Order that discovery be produced as will be requested;

18       7.    Grant Petitioner, who is indigent, sufficient funds to secure investigative and expert

19   assistance as necessary to prove the facts alleged in this petition;

20       8.    Grant Petitioner the authority to obtain subpoenas for witnesses, documents, and materials

21   with respect to the claims pleaded herein;

22       9.    Allow Petitioner a reasonable opportunity to amend or supplement this petition to include

23   legal and factual grounds for claims which become apparent from further investigation or from

24   allegations made in any return or informal response to the petition;

25       10.   Issue an order to show cause, returnable before this Court, why Petitioner's conviction and

26   judgment should not be set aside;

27       11.   Grant Petitioner an evidentiary hearing at which proof may be offered concerning the

28   allegations of this and any supplemental or amended petition, with Petitioner being personally present at

     the hearing;

29

30

12.    Order that Petitioner has not waived any applicable privileges by the filing of this petition and the exhibits, including the attorney-client privilege or the work product doctrine; that any waiver of a privilege may occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has occurred and, if so, the scope of any such waiver; and that Petitioner is granted "use immunity" for each and every disclosure he has made and may make in support of this petition;

13.    After full consideration of the issues raised in this petition, vacate the judgment and sentence imposed upon Petitioner in <u>People v. Kenneth Vernon</u>, San Joaquin County Superior Court No. SC059609A; and

14.    Grant Petitioner whatever further relief is appropriate in the interests of justice.

Dated: October 24, 2007

Respectfully submitted,

_____
Mark R. Vermeulen
Attorney for Petitioner
KENNETH VERNON

1

**VERIFICATION**

2

I, Mark R. Vermeulen, declare as follows:

3      1.      I am an attorney admitted to practice law in the State of California. I represent Petitioner,

4   who is confined and restrained of his liberty at Folsom State Prison, Represa, CA.

5      2.      I am authorized to file this *Second Amended Petition For Writ Of Habeas Corpus By A*

6   *Person In State Custody* on Petitioner's behalf. I make this verification because Petitioner is

7   incarcerated in a county different from that of my law office and because many of the facts alleged are

    within my knowledge as much as or more than Petitioner's knowledge.

8      3.      I have read the petition and know the contents of the petition to be true.

9      I declare under penalty of perjury that the foregoing is true and correct.

10      Executed on October 24, 2007 at San Francisco, CA.

11

12

13                                           _____

14                                           Mark R. Vermeulen

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30