1  Mark R. Vermeulen [CSBN 115381]
2  Law Office of Mark R. Vermeulen
   755 Florida Street #4
3  San Francisco, CA  94110.2044
   Phone: 415.824.7533
4  Fax: 415.824.4833
5
6  Attorney for Petitioner
   KENNETH VERNON
7

**FILED**

MAR – 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**RECEIVED**

OCT 2 4 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11  KENNETH VERNON,                          )   No. C 00-3311 MJJ
                                             )
12       Petitioner,                         )   **PETITIONER'S ADDITIONAL EXHIBITS IN**
                                             )   **SUPPORT OF SECOND AMENDED**
13       v.                                  )   **PETITION FOR WRIT OF HABEAS**
                                             )   **CORPUS BY A PERSON IN STATE**
14  ANTHONY A. LAMARQUE, Warden,             )   **CUSTODY**
    and DOES 1-10,                           )   **[28 U.S.C. § 2254]**
15                                           )
         Respondents.                        )
16                                           )
17

18       Petitioner Kenneth Vernon previously submitted Exhibits A through E with his *Exhibits In*

19  *Support Of Petition For Writ Of Habeas Corpus By A Person In State Custody*, filed November 4, 2002

20  (Doc. 13), and Exhibits F through J with his *Additional Exhibits In Support Of Petition For Writ Of*

    *Habeas Corpus By A Person In State Custody* (Doc. 16), which was filed in conjunction with the *First*

21  *Amended Petition* (Doc. 14).  The exhibits contained here, filed with the *Second Amended Petition*, are

22  as follows:

23       Exhibit K      *Abstract of Judgment*, San Joaquin County Superior Ct. No. SC059609A

24       Exhibit L      Reporter's transcript of the sentencing hearing held April 4, 1997, San Joaquin
                        County Superior Ct. No. SC059609A
25

26

27
    Dated: October 24, 2007
28                                           _____
                                             Mark R. Vermeulen
29                                           Attorney for Petitioner
                                             KENNETH VERNON
30

**Exhibit K**

*Abstract of Judgment*,
San Joaquin County Superior Ct. No. SC059609A

DOB: 11/29/71

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT**
**INDETERMINATE SENTENCE**

FORM CR 292

| [X] SUPERIOR  [ ] MUNICIPAL  [ ] JUSTICE | COURT OF CALIFORNIA, COUNTY OF | San Joaquin | | |
|---|---|---|---|---|

| COURT (I.D.) 39100 | BRANCH OR JUDICIAL DISTRICT: | | Filed | APR 0 4 1997 |
|---|---|---|---|---|

PEOPLE OF THE STATE OF CALIFORNIA versus — [X] PRESENT — SC059609A — -A

DEFENDANT: KENNETH JEROME VERNON — -B

AKA: — [ ] NOT PRESENT — -C — JEANNE MILLSAPS CLERK

COMMITMENT TO STATE PRISON — AMENDED — -D

ABSTRACT OF JUDGMENT — ABSTRACT [ ] — -E — DEPUTY

| DATE OF HEARING (MO) (DAY) (YR) 4-4-97 | DEPT. NO. 4 | JUDGE F CLARK SUEYRES | CLERK TRUDY C CLARK |
|---|---|---|---|

| REPORTER JEANNIE COFFEY | COUNSEL FOR PEOPLE CHARLES SCHULTZ | COUNSEL FOR DEFENDANT RALPH CINGCON | PROBATION NO. OR PROBATION OFFICER ELIZABETH TESCHER |
|---|---|---|---|

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES
[ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES) _____

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTED BY JURY TRIAL | COURT TRIAL | PLEA | CONCURRENT | CONSECUTIVE | 664 SENT. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187 | Murder: 1st deg. | 95 | 3 | 7 | 97 | X | | | | | |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC. For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022.5(A) | 10 | | | | | | | | 10 | 0 |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHER: List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b), list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
| | | | | | | | | | | |

4. Defendant was sentenced to State Prison for an indeterminate term:
   A. [ ] For LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts _____
   B. [ ] For LIFE WITH POSSIBILITY OF PAROLE on counts _____
   C. [ ] For 15 years to life, WITH POSSIBILITY OF PAROLE on counts _____
   D. [X] For 25 years to life, WITH POSSIBILITY OF PAROLE on counts ___1___
   E. [ ] For other term prescribed by law as follows: _____ (Specify term on separate sheet if necessary.)
   PLUS enhancement time shown above:

5. [ ] Indeterminate sentence shall be served [ ] consecutive to [ ] concurrent with any prior incompleted sentence(s).

6. Other Orders: (List all consecutive/concurrent relationships, fines, etc. if not shown above)

   total term is 35 years to life.  Determinate term to be served before the
   indeterminate term

   Deft. to pay rstn. fine of $7,000.00- collected by CDC

(Use an additional page if necessary.)

7. [X] The Court advised the defendant of all appeal rights in accordance with rule 470, California Rules of Court. (AFTER TRIAL ONLY)

8. EXECUTION OF SENTENCE IMPOSED:
   A. [X] AT INITIAL SENTENCING HEARING
   B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL
   C. [ ] AFTER REVOCATION OF PROBATION
   D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))
   E. [ ] OTHER _____

| 9. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) 4-4-97 | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS 671 INCLUDING: | ACTUAL LOCAL TIME 584 | LOCAL CONDUCT CREDITS 87 | STATE INSTITUTIONS [ ] DMH [ ] CDC |
|---|---|---|---|---|---|

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
    [X] FORTHWITH
    [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS
    [ ] INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:
    [ ] CALIF. INSTITUTION FOR WOMEN—FRONTERA
    [ ] WASCO
    [ ] OTHER (SPECIFY)
    [ ] COMF—CHOWCHILLA
    [ ] SAN QUENTIN
    [ ] CALIF. INSTITUTIONS FOR MEN—CHINO
    [ ] R.J. DONAVAN
    [X] DEUEL VOC. INST.

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE 4-4-97 |
|---|---|

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for indeterminate sentences. Attachments may be used but must be referred to in this document.

Form Approved by the Judicial Council of California Effective January 1, 1983

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE**
CR 292

DISTRIBUTION    PINK COPY—COURT FILE    YELLOW COPY—DEPARTMENT OF CORRECTIONS

**646**
Pen. C. § 1213.5

**Exhibit L**

**Reporter's transcript of the sentencing hearing held April 4, 1997,
San Joaquin County Superior Ct. No. SC059609A**

1654

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

---o0o---

THE PEOPLE OF THE STATE
OF CALIFORNIA,

          Plaintiff,    No. SCO59609A

  vs.
                  Dept. 4

**KENNETH JEROME VERNON,**

          Defendant.

SENTENCING

**Friday, April 4, 1997 – 9:10 a.m.**

            The above-entitled matter came on regularly at the date and time above set forth, before the **HON. F. CLARK SUEYRES,** Judge of said Superior Court, in and for the County of San Joaquin.

**APPEARANCES OF COUNSEL:**

            **CHARLES F. SCHULTZ,** Deputy District Attorney, County of San Joaquin, 222 East Weber Avenue, Room 202, Stockton, California 95202, appeared as counsel for and on behalf of the People.

            **RALPH CINGCON,** Attorney at Law, 5250 Claremont Avenue, Suite 221, Stockton, California 95207, appeared as counsel for and on behalf of the Defendant.

Reported by: JEANNE COFFEY, C.S.R. No. 7084

1655

1              (The above-entitled parties being present at

2   9:10 a.m. thereof, the following proceedings were had:)

3

4              MR. SCHULTZ:  Your Honor, just so the Court

5   knows, there is about four or five members of the family

6   that would like to talk to you about this case.

7              THE COURT:  People versus Kenneth Vernon.

8   Mr. Vernon is present with counsel.  People are also

9   present.  Matter comes on for judgment today.

10       Mr. Cingcon, do you waive arraignment for judgment and

11  sentence?

12             MR. CINGCON:  Yes, Your Honor.

13             THE COURT:  Is there any legal cause why

14  sentence should not now be pronounced?

15             MR. CINGCON:  No.

16             THE COURT:  Very well.  Mr. Schultz, you wish

17  to speak to this matter?

18             MR. SCHULTZ:  I don't, Your Honor.  I'd --

19  the People would submit it on the probation report.

20       However, there are members of the McClary family here

21  that would like to address the Court.  I would ask them just

22  to stand up and give their name and their relationship to

23  the victim, Robin McClary, and then address the Court that

24  way.

25       I believe that some people also have some letters that

26  they'd like to present to the Court.

27             THE COURT:  Today?

28             MR. SCHULTZ:  They may read them, Your Honor.

1656

1    I'm not sure.

2                    THE COURT:  All right.  Just before we begin,

3    let me explain what I have.

4         I have received, read, and considered the probation

5    officer's report.  That was filed on March 31st.

6         And I have, separate from the probation officer,

7    received a letter and a videotape from Ernestine Vernon.

8    And at my direction, the clerk furnished copies of the

9    letter to each side.

10                   MR. CINGCON:  What letter?

11                   THE COURT:  The videotape was not copied.  It

12   contains news reports of the dangers of methamphetamine use.

13                   MR. CINGCON:  Your Honor, the -- the -- you

14   asked me if there was any legal cause why we couldn't

15   proceed.

16        The only thing I would like to state for the record is

17   that I received the probation report the other day.  I'm not

18   sure exactly which day it was.  I think it was maybe

19   yesterday or the day before that.

20        And I showed -- I read it and I showed it to my client

21   this morning.  But I'd -- I do notice some items in there

22   that I feel that I will need to respond to.  And I need to

23   consult with my client about those.

24        Legally, have I been in possession of the probation

25   report long enough?  I mean, how many days are we supposed

26   to?

27                   THE COURT:  You want me to pass this matter

28   for an hour or so and then come back to you?

1  |  MR. CINGCON:  Well, I have to go and do the
2  |  trial.  I just want to put that on the record.  We can
3  |  proceed this morning, but I just didn't -- maybe I can talk
4  |  to him now while Mr. Schultz or the other people are
5  |  talking.

6  |  But there is some -- some collateral items that I need
7  |  to address, because I'm going to make a motion to strike
8  |  some of these items from the probation report or have them
9  |  changed.  And I just need -- I just need a few minutes.

10 |  THE COURT:  The better practice, I think, is
11 |  for you to take a look at that.  If you need some time right
12 |  now, I'll give you some time right now.

13 |  Can you -- is it possible to put Mr. Vernon and
14 |  Mr. Cingcon in the jury room so we can bring in Baxter and
15 |  take care of that?

16 |  DEPUTY BREITMAIER:  No.  We will take him
17 |  back over to the holding cell.

18 |  DEPUTY GRIFFIN:  Department 5 is down.  We
19 |  have no problem putting him in the conference room.

20 |  THE COURT:  Can you take Mr. Cingcon with
21 |  you?

22 |  DEPUTY GRIFFIN:  Certainly.

23 |

24 |  (Recess.)

25 |

26 |  (At 9:25 a.m., all parties being
27 |  present, the following proceedings
28 |  were had:)

1658

1    DEPUTY BREITMAIER:  Remain seated.  Come to
2  order.

3    THE COURT:  Okay.  Back on People versus
4  Vernon.

5    Before I forget, in addition to the probation
6  officer's report and the letter from Mrs. Vernon, the Court
7  has also received supplemental reports from the probation
8  officer with the Victim's Claim Form, and a letter from
9  Mr. and Mrs. Roger McClary, and a letter from Veronica
10  Cobarrubias, a caretaker for Robin McClary's son Nickolis,
11  and a letter from Michael W. Polk, submitted by the
12  probation officer, cousin to Robin McClary.

13    Mr. -- Mr. Cingcon, did you want to go over the
14  possible corrections to the probation officer's report
15  before we proceed further?

16    MR. CINGCON:  Well, I classify them, Your
17  Honor, as objections to the probation report.  There is
18  several items in here that I -- I -- I would move to strike,
19  and perhaps correct.

20    Under Collateral Information, the last paragraph
21  states under Jail Incidents that, "He was placed in
22  administrative -- administrative segregation as he beat up
23  another inmate at the County Jail on August 17th, 1996.
24  Although the defendant denied that he takes medication, jail
25  records revealed that on August 21st, 1996, the defendant's
26  cell was searched and an excessive amount of medication was
27  found by jail staff.  He lost seven days of commissary
28  because he was in possession of contraband and had been

1659

1     hoarding medication."

2          First item is "he beat up another inmate."  We

3     disagree with that allegation.  In reality, what happened

4     there was a fight between Mr. Vernon and another inmate

5     because the inmate had stolen some of Mr. Vernon's personal

6     items, and they had a mutual combat situation.

7          When you state it in these pejorative terms, "beat up

8     another inmate," it provides a connotation and a denotation

9     that seems to be consistent with the thrust of the

10    probation's report.

11                    THE COURT:  Excuse me.  Do you have the jail

12    incident report, Miss Tescher?

13                    THE PROBATION OFFICER:  It was in CJIS, Your

14    Honor.

15                    THE COURT:  Well --

16                    MR. CINGCON:  It --

17                    THE COURT:  And with respect to the August 21

18    incident, that -- there was no --

19                    THE PROBATION OFFICER:  That was in CJIS as

20    well.  I read it right off the computer.

21                    MR. CINGCON:  I want to explain that, if I

22    may.

23          The defendant does not take prescription medication.

24    However, they are allowed to purchase, through the

25    commissary, pain medication, such as Tylenol.  And that is

26    what he had.

27          It was taken from him because he was in possession of

28    too much medication.  And so it was a number of pills that

1660

1  -- that he was in lawful possession of, that they can buy at

2  the commissary, that he was entitled to.  But as a

3  precaution, jail staff will take the medication if you have

4  too much of it, because they are concerned about -- about

5  the possible misuse by other inmates or by that particular

6  inmate.

7       That is what happened in that particular incident.  So

8  excessive amount of medication, it was lawful, lawful and

9  lawfully purchased medication, that was, in effect, Tylenol.

10      Now, then the last sentence says, "He lost seven days

11  of commissary because he was in possession of contraband and

12  had been hoarding medication."

13      Well, that makes it appear as if he's in possession of

14  contraband, such as brass knuckles, knives, or sawed-off --

15  some type of weapon to use for escape or something.

16      But it's the same item that is referred to after the

17  conjunctive "had been hoarding medication."  That's a

18  conclusion that's improper, that he had been hoarding

19  medication.  He was in possession of what the jail staff

20  felt was excessive amounts of medication, of pills that

21  he --

22              THE COURT:  All right.  So we just take the

23  words "medication" and "contraband," and substitute the word

24  "Tylenol."

25              MR. CINGCON:  Well, I would like the record

26  to reflect that he had bought it in the commissary, because

27  you can buy the stuff in the commissary.

28      I don't know -- I don't know if my client was aware

1661

1  that you can only have so many or so much, and maybe no one

2  had -- had promulgated the specific number as being

3  excessive.

4              THE COURT:  Well, "lawfully purchased at the

5  commissary."

6              MR. CINGCON:  Correct.

7         And what about the "beat up"?

8              THE COURT:  "In a fight."

9              MR. CINGCON:  "In a fight."  Okay.  That's

10  fine.

11        Under Evaluation, Your Honor -- I don't want to get

12  too extensive on this, but I feel very strongly about this,

13  it is part of our -- it is part of our overall prospective

14  appeal also -- I believe that the -- the second sentence

15  states that, "The defendant's inability to control his anger

16  escalated a domestic dispute, culminating in the shooting

17  and killing of his 24-year old live-in girlfriend."

18        You know, by itself, it doesn't seem to be that --

19  that far out of line.  But the way that it's couched, of

20  course, my client has been convicted and he has to shoulder

21  the responsibility of it, but -- and perhaps it's just my

22  reading of it as an advocate that makes me interpret it

23  differently than perhaps someone else might -- it's couched

24  in terms of "His inability to control his anger escalated a

25  domestic dispute."

26        I -- I take exception to the phraseology "escalated a

27  domestic dispute."  I think that that seems to reflect more

28  of Mr. Schultz's theoretical posture than what I feel what

1  really happened in this case.

2      If the language were, "The defendant's inability to

3  control his anger culminated in the shooting," I think that

4  would be less argumentative, less bias, and more neutral.

5      But I think there is a big argument that we can still

6  engage in about whether or not his inability to control his

7  anger is in fact the escalating factor in this -- in this

8  incident.

9      I think it's -- it's a bias perspective that -- that

10  places all of the blame on my client.  The ultimate blame

11  does, in fact, rest with him because he's the one who has

12  been convicted.

13      But it's -- it's -- it's part of a seamless web that I

14  see in many of these probation reports, including this one,

15  that seems to take a position that it's -- that is not as

16  neutral as -- as a -- as they should be.  And this is just

17  another reflection of that.

18          THE COURT:  Well, in the Evaluation portion,

19  that's the opinion of the probation officer that the

20  officer's entitled to express.  I understand the difference

21  of opinion you have.

22          MR. CINGCON:  It doesn't have to go -- but, I

23  mean, that doesn't make it the gospel.  They can't get

24  carried away with it.  It seems a lot of the probation

25  officers are ready to publish some of these dime novels.  I

26  have seen these patterns over and over again.  And they seem

27  to be stating the same things, you know, just slightly

28  differently.

1663

1       But I think that's argumentative, that the Evaluation

2   section cannot become a forum to just vent their personal

3   viewpoints.  It has to be more in line with what the -- the

4   case has really shown.  I think that's argumentative on the

5   part of the probation officer.

6               THE COURT:  Well, your point is taken,

7   Mr. Cingcon.

8               MR. CINGCON:  All right.  The next -- so you

9   are going to leave that in there that way?

10              THE COURT:  Well, she's entitled to express

11  it.

12              MR. CINGCON:  All right.  All right.  Let me

13  just finish here then, Judge.

14      It's the next sentence, "Although the defendant

15  professed that he loved the victim, the elaborate coverup to

16  lay the blame elsewhere showed only the callousness of a

17  cold-blooded killer."

18      I mean, you know, Judge, I'm not trying to denigrate

19  the -- the appreciated efforts of the Probation Department

20  to -- to do their job.  But, I mean, when I read that, it,

21  you know, it strikes me as this is not a balanced

22  perspective that we are seeing here.

23      "Although the defendant professed that he loved the

24  victim," I mean, this is very carefully worded.  And -- and

25  -- and, you know, perhaps to the Court it seems to pass

26  muster, but, you know, it's attacking his credibility in a

27  way that is going to have -- and the reason that we are

28  doing this is because this is the particular item that will

1    follow the defendant for the rest of his time that he's
2    incarcerated, and will be the basis or the genesis of any
3    factual summary that will be reviewed by the Department of
4    Corrections.

5        That's why we do have under the law the opportunity to
6    contest these items, because once it gets into the -- the
7    system, it's going to always be there. And if it's not
8    challenged here, it really will be ineffective to challenge
9    it later at some point. And five or ten years down the
10   road, it's going to seem like someone is splitting hairs
11   then. But now is the time to correct these -- these errors.

12           THE COURT: Well, Mr. Cingcon, you know,
13   there is no question that the style in that paragraph could
14   have been different, and perhaps would appear more detached.

15       But in terms of the -- the particular adjectives,
16   "callousness," for example, I think those things are all
17   justified by the record, in light of the -- the jury's
18   verdict.

19           MR. CINGCON: Okay. The other comment I had
20   about that sentence, something that I've disagreed with the
21   Court on, and it's part of our appeal in this case, it says,
22   "Although the defendant professed that he loved the victim,"
23   which I think unnecessarily and gratuitously attacks the
24   credibility of the defendant unfairly, and also injects
25   personal bias into -- into a subjective area, I think it
26   shows that -- that in the final analysis --

27           THE COURT: Look, Mr. Cingcon, let's take
28   that one phrase or one clause as an example.

1    "Although the defendant professed that he loved the

2    victim," a more detached and neutral sounding way to say

3    that, but which comes to the same thing, was, "The defendant

4    stated he loved the victim, but he did do X, Y and Z."

5              MR. CINGCON:  Okay.  What about this:

6    Although -- now, that -- that -- wait, okay, I will just

7    take what you said and take it a little bit further to

8    further illustrate my point.

9         The only evidence, the incontrovertible evidence,

10   comes from the defendant about his feelings towards the

11   victim.  There was no evidence presented that he lied about

12   that, to refute that, to say that, "Oh, in fact, he never

13   did care for the victim."  Then we would have a controversy

14   about that.

15        But if you take the testimony of the defendant, and

16   that was not refuted or controverted, the state of the

17   evidence seems to be that, in fact, it's undisputed, that he

18   loved the victim.

19        So a more detached and professional way of stating

20   this would be, "Although the evidence shows that he loved

21   the victim, he did an act that was contrary to that love."

22             THE COURT:  Well, Mr. Cingcon, I --

23             MR. CINGCON:  Okay.  But when you say,

24   "Although the defendant professed," it seems to be

25   pejorative, and it seems --

26             THE COURT:  That's what he -- you know, we

27   are splitting hairs here.  "He said he loved her.  The

28   events that followed calls that into question."  I think

1    that's all the probation officer is saying.

2                 MR. CINGCON:  Well, maybe I have been doing

3    this job too long, Judge.

4         Let me get to the other part of that sentence, because

5    I think this is more substantive.  The elaborate coverup.

6         "Although the defendant professed that he loved the

7    victim, the elaborate coverup to lay the blame elsewhere

8    showed only the callousness of a cold-blooded killer."

9         As the Court will recall, when we strenuously and

10   vociferously disagreed with the logic that is -- that is

11   stated in that sentence, and we did so at the time in the

12   trial, it's a logical non sequitur -- a legal non sequitur,

13   to say that actions taken after the incident can relate back

14   to the state of mind in the time period before the killing

15   to show premeditation and deliberation.

16        I argued to the Court that I thought that was a legal

17   error for the Court to instruct the jury and to let

18   Mr. Schultz make that argument.  And now I say that the

19   probation officer has done the same thing.

20                 THE COURT:  Look --

21                 MR. CINGCON:  The coverup --

22                 THE COURT:  The premeditation of a coverup is

23   not evidence of the premeditation of a crime.

24                 MR. CINGCON:  Well, I think --

25                 THE COURT:  But the -- the -- the immediate,

26   if you will, premeditation of a coverup gives lie or is

27   circumstantial evidence -- let me put it this way:  Is

28   circumstantial evidence that defendant was not, quote, out

1 | of his mind.

2 | MR. CINGCON: Well --

3 | THE COURT: He -- the -- the change from
4 | being out of your mind to being very calculating in an
5 | instant doesn't follow. So it's circumstantial evidence
6 | that he wasn't out of his mind at the time, at the time of
7 | the killing.

8 | MR. CINGCON: That was not the way it was
9 | framed during the trial, and that's not the way we argued,
10 | and that's not the jury instruction that was refused.

11 | Be that as it may, my point is -- my point is this:
12 | This particular phrase, this part of that -- of that
13 | sentence, makes a mistake in that it, like Mr. Schultz and
14 | the Court's instructions, the refusal to give certain
15 | instructions, gives credence to the idea that actions
16 | subsequent to the homicide can be probative on the state of
17 | mind and on the issue of premeditation and deliberation.

18 | Now, I know that the probation officer is at a
19 | disadvantage to some degree with a large trial like this, to
20 | have to read the transcript or summarize it or whatever they
21 | have to do, but the key fundamental legal issue that I'm
22 | putting forth to the Court is that it doesn't follow that a
23 | coverup to hide the -- the fact of the killing shows or
24 | equates to callousness of a cold-blooded killer.

25 | I object to that statement being in there, and I would
26 | ask that it be stricken.

27 | THE COURT: Well, it's within the -- the
28 | ambit of the evidence, and the probation officer can express

1  her opinion in that regard.  She can sum it up.  She's

2  entitled to do that.

3            MR. CINGCON:  Okay.  All right.  I'm not

4  saying she's not entitled to express her opinion.  I think

5  we are entitled to ask the Court for redress when she -- he

6  or she has exceeded their right.

7            THE COURT:  Well, that's what I'm saying.

8            MR. CINGCON:  The right to express their

9  opinion.

10            THE COURT:  There is a range of conclusions

11  anyone could draw and still see the defendant guilty.  I

12  think that is within that range.

13            MR. CINGCON:  Okay.  The other sentence that

14  I object to and ask it be stricken or rephrased is the one

15  that says, "He then inflicted another indignity upon the

16  victim by pulling down her panties and shorts exposing her

17  buttocks for all to see when her body was found."

18       Well, if it were to state that, "Subsequent to a

19  homicide, the defendant pulled down the panties of the

20  victim which exposed her buttocks," and if it were to

21  include the reasons the defendant gave for doing that, that

22  would be -- that would be fine.

23       But this is, I think, an example of hyperbole and

24  histrionics that is uncalled for, even under the Evaluation

25  section of -- of the probation report.

26       He inflicted another indignity, I mean, it seems to be

27  superfluous there, in my opinion.  It seems to go out of its

28  way to cast the defendant in the most unfavorable light for

1  a purpose that I can't discern, other than to engage in an

2  attack to the defendant ceaselessly, Judge.

3       Any homicide is an indignity to some degree, in that

4  you have killed another human being.  But the language is

5  inordinate and is excessive and is not called for.  The

6  phraseology is out of bounds and is improper.  And we are

7  asking the Court to neutralize the -- the blatant prejudice

8  and bias that is reflected in this paragraph, because people

9  reading these things -- that is, Department of Corrections,

10  and that's why we have this probation report, to guide

11  them -- are going to draw certain conclusions and

12  impressions of the defendant that would not be founded just

13  on the evidence, but will be founded on the probation

14  officer's choice of words in this case.

15       And my client will -- and -- and if the -- I don't

16  think the law gives them complete leeway to state their

17  feelings in -- in a way that would be intemperate or

18  improper.  And -- and I think that --

19            THE COURT:  With that principle, I -- I do

20  agree with you, Mr. Cingcon.

21       The question is, is -- is it within the ambit of what

22  was proved at trial?  To that point, I think it is.

23       I mean, could it have been -- could it have been

24  phrased in a way that suggested the probation officer was

25  not feeling some personal indignity or anger over what

26  occurred?  Yes, it could have.

27       But it -- it -- it is factual, and the -- what

28  conclusions there are, are within the ambit of the evidence.

1670

```
 1            MR. CINGCON:  Okay.  Well, I'm almost
 2   finished.
 3         The last sentence -- the last two sentences I object
 4   to.
 5            THE COURT:  Well, Mr. Cingcon, you -- I have
 6   taken a look at that, and in our conversations, I think I'm
 7   going to strike, "The final insult came when..." and just
 8   leave that sentence to begin, "The defendant..."
 9            MR. CINGCON:  All right.  Thank you.  That
10   seems to alleviate some of the problems.
11         The other area, Judge, that I -- that I would like to
12   comment on would be under Circumstances in Aggravation under
13   Sentencing Factors.
14         I think under Criteria Affecting Probation, I don't
15   have any disagreement with the -- with the law.  I think
16   that seems to be the black letter law and it seems to be the
17   posture of the case.
18         "Facts Relating To the Crime:  The crime involved
19   great violence, great bodily harm, threat of great bodily
20   harm, or other acts disclosing a high degree of cruelty,
21   viciousness, or callousness."  This seems to be a circuitous
22   or inappropriate factor that's being related to homicide.  I
23   think that --
24            THE COURT:  I agree with you.
25            MR. CINGCON:  All right.  So that -- number
26   one would be stricken?
27            THE COURT:  Well, the -- the probation
28   officer can -- can recommend it.  That doesn't mean that I
```

1    have to find it.  But I do agree, I don't think that, you

2    know, when you talk about premeditated murder, it's kind of

3    hard to imagine that the crime itself doesn't subsume all of

4    that.

5              MR. CINGCON:  But what's the remedy?  Isn't

6    the remedy to strike that and not find that as a factor in

7    aggravation?

8              THE COURT:  It's what the Court finds; not

9    what the probation officer recommends.

10             MR. CINGCON:  All right.  We would ask the

11   Court not to find under number one, Facts -- under Facts

12   Relating To the Crime, number one.

13        We have no disagreement with number two, because he

14   was armed with a weapon.

15        Number three, we believe that number three should not

16   be found, as it is inappropriate.  I believe that does not

17   fit the facts of the case, and is more appropriate to a

18   minor or senior citizen or someone who was particularly

19   vulnerable, which goes beyond the vulnerability that -- that

20   one would have as a -- as a generic victim of a crime.  That

21   is not what "particularly vulnerable" was meant to be.

22        And even under the facts of this case, I don't think

23   the prosecution can stretch number three to encompass the

24   victim in this case.  Since the evidence seems to suggest,

25   even after we have been convicted, that she was the one that

26   had the weapon initially.

27        So I don't think that number three applies, either

28   factually or legally, because that goes to different

1   scenarios, and none of which are present in this case.

2       If you had an adult with a minor who was sodomized or

3   molested, that's one thing.  If you have a senior citizen

4   who could -- who did not have the means to resist, or

5   someone who was incapacitated, or someone who was not very

6   bright, or someone who was physically in a very vulnerable

7   position.

8       But to say because a man and a woman fight does not

9   make it particularly vulnerable to the extent it must be a

10  factor in aggravation, I mean, that's -- that is a non

11  sequitur and does not make sense, because every man who

12  fights with a woman doesn't make a woman particularly

13  vulnerable.  I think we reached a different level in our

14  society where we don't see that as inherently being

15  particularly vulnerable anymore.  We are more enlightened

16  now, I think.

17      Anyway, I will go on.

18      "Number four, the defendant took advantage of a

19  position of trust or confidence to commit the offense."

20  That is clearly not applicable in this case, and I don't

21  think I really need to go on to illustrate for the Court the

22  types of fact situations that that applies to.

23      "Facts Relating To the Defendant:  The defendant has

24  engaged in violent conduct which indicates a serious danger

25  to society."

26      Well, that reminds me of -- of -- I mean, you could

27  say that about any murder, any -- I think that -- I think

28  that where that could apply is any case where the defendant

1    in the commission, in the final or ultimate commission of

2    the crime, has engaged or has displayed or evidenced violent

3    conduct, such that you hijack someone, pistol-whip them,

4    throw them out of the car, drive your car in there and rob a

5    store and keep on going, and finally you're caught.

6         You can have a violent conduct with different events

7    within the same factual scenario, that particular crime or

8    the ultimate crime that will show violent tendencies and

9    violent conduct.

10        But to say that because you kill someone, you have

11   shown violent conduct which indicates a serious danger to

12   society for the purposes of aggravation as to Facts Relating

13   To the Defendant is the old People versus Ireland argument

14   about -- about merging and bootstrapping a 245 to felony

15   murder.  That's the same type of logic that's being used

16   here.

17        You just can't go down a shopping list, like you are

18   at a Chinese restaurant and pick something from A and

19   something from B and say, "Because they are there, we are

20   picking what we like, and it has to follow."  I think you

21   have to be a little more critical in your analysis.

22        And I don't think that applies to defendant in this

23   case.  There is nothing but a short period of time where the

24   homicide occurs.  And it's not a protracted amount of time

25   with several crimes with several victims, or several

26   criminal offenses in a unbroken chain leading to the

27   ultimate crime.

28                    THE COURT:  Okay.

1   |   MR. CINGCON:  And then under Mitigation, we
2   | object to the absence of any mitigating factors.

3   |   Facts Relating To the Crimes -- excuse me -- probation
4   | officer has stated none.  Well, we disagree with that.  The
5   | factual context of this case illustrates that this crime
6   | happened within 15 minutes; that the domestic tranquillity
7   | of that particular couple was disturbed by an almost
8   | inexplicable way so that it went from cold blood to hot
9   | blood, and we have this tragic situation resulting.

10  |   But it is in the -- it fits under the larger umbrella
11  | of -- of heat of passion.  And I think that with the victim
12  | initiating or introducing deadly force into the situation, I
13  | think that there are facts that relate to the crime that
14  | should be listed in mitigation.

15  |   Number two, to the defendant, although he has had this
16  | instance of domestic violence counseling, my client did not
17  | have a -- a criminal history other than that, that I can
18  | ascertain.

19  |   THE COURT:  Well, the probation officer says
20  | he's been convicted of evading a traffic officer, and
21  | resisting arrest, and 2012 Fish and Game.  I think that's
22  | fishing without a license.

23  |   MR. CINGCON:  I think substantially the
24  | defendant's relative lack of a serious record is a
25  | circumstance in mitigation.

26  |   And I think the facts of the case --
27  |   THE COURT:  I think that's a fair conclusion,
28  | Mr. Cingcon.

1    |    MR. CINGCON:  Other than that, Your Honor, I
2    |  have no further comments at this time.
3    |              THE COURT:  Mr. Schultz?
4    |              MR. SCHULTZ:  Again, we would submit it on
5    |  the probation report, Your Honor.
6    |      I -- without going down a point-by-point argument with
7    |  the -- with what Mr. Cingcon just said, it's just that I
8    |  don't think things are as factually clear or unclear as
9    |  Mr. Cingcon says.  And I think factually, they are as clear
10   |  as the verdict and what the jury found.  And we submit it on
11   |  that.
12   |              THE COURT:  Okay.  Is there family members
13   |  that wish to speak?
14   |              MR. SCHULTZ:  Yes.  I'm not sure what order.
15   |              MS. McCLARY:  Good morning.
16   |      I'm Barbara McClary, sister to Robin McClary.
17   |      I'm standing here speaking to you today to say a few
18   |  words about Robin and the person who murdered her:  Kenny
19   |  Vernon.
20   |      Robin and I always supported each other and stood by
21   |  one another.  Today, I stand alone because of Kenny Vernon.
22   |      Robin was not the average person, nor easy to forget,
23   |  because of that fun-loving, energetic, caring spirit that
24   |  touched everyone's heart.
25   |      If you just met her or known her for years, you would
26   |  never ever forget that lovely loud laugh, and would always
27   |  walk away with a smile.
28   |      Robin was not only my sister, she was my best friend.

1   Not only did Kenny Vernon take her life, but a piece

2   of life from everyone around her -- our mother, our father,

3   myself, our family and friends -- and that huge piece

4   between a mother and her son Nickolis, a love that can never

5   be replaced.   That's a mother's love.

6   Robin was a very caring, loving mother to her son, who

7   at the time was only five-years old, and will only have the

8   memories that a son of five can have.

9   Youth years are the hardest, and the pain is only

10  going to get worse as Nick begins to really understand the

11  painful life, the life without his mother.

12  Mom, dad, myself and family will continually be

13  reminded by such things as Easter, Thanksgiving, Christmas,

14  when there will be laughter; and when done, the deepest

15  silence fills the room, a silent pain, because the greatest

16  laugh of all is missing.   The laugh of my sister Robin is

17  gone.   Her birthday without her, only the pain of such a

18  great loss will be felt at this time, and forever.   Not a

19  day, an hour, or a minute goes by without the pain, the pain

20  one person caused.

21  The only person that shows no pain, no sorrow, or loss

22  is Kenny Vernon.   He should be sentenced to the fullest

23  degree, in which -- and when -- which, when done, will not

24  be enough to ease the pain of the greatest loss of all:

25  Robin.

26  Thank you.

27  THE COURT:   Thank you.

28  Was there other family members that did wish to speak?

1677

1              MR. SCHULTZ:  Yes, I believe there is.

2              THE COURT:  Please tell us your name.

3              MS. ROBERTS:  Kelly Roberts.

4        And Robin was my best friend.  On August 24th, 1995,

5    my best friend, Robin K. McClary, was brutally taken away

6    from me.

7        Robin was a very special friend.  She was so full of

8    life and energy.  I can't begin to tell you how many days

9    and nights I waited for her to call me and want to go

10   shopping or take the kids to the park.  But after many

11   nights and tears, I realized that we would never be doing

12   anything together again, and I would never hear that famous

13   laugh that I had grown so accustomed to in my home.

14       Robin was only 24-years young.  She not only had her

15   life, but her son's entire life ahead of her.  She was not

16   able to take her son to his first day of kindergarten, nor

17   will she be able to take him to his first baseball game, and

18   she will never see him get married and raise a family -- or

19   herself for that matter.

20       There were times Robin and I talked for hours.  She

21   had so many dreams and goals for her future.  Some of them

22   we vowed to do together.  We planned on working together and

23   being friends forever.

24       But, now, none of those dreams or goals will be met.

25       Robin was always there for me when I needed her, for

26   anything, at any time.

27       I remember telling her the day I found out I was

28   pregnant.  She screamed with excitement.  She was as happy

1   as I was.  We picked out the decorations for the baby's room
2   together, and she promised to be there to help me decorate.
3   But when the time came, Robin wasn't there for the first
4   time I needed her.

5       When my baby was born, we named her Kayla Robin, in
6   memory of my best friend.  I only hope she will be as full
7   of life and energy as Robin was.

8       And now the day has come for justice to take place.

9       As you are taken away from your family, Kenny, I feel
10  sorry for them.  But nothing compares to the sorrow I have
11  for Robin's family.  You see, you will receive visits and
12  letters from your family.  All that Robin gets from us are
13  flowers.

14              MS. RITCHIE:  I'm Barbara Ritchie, Robin's
15  aunt.

16      I am writing this letter on behalf of my niece, Robin
17  McClary.  Robin was very loving, warm and kind to people.
18  She loved life itself.  I miss Robin each and every day.
19  Losing her was like losing part of myself.

20      The way Ken Vernon shot and killed her was bad enough.
21  To disgrace her after, I feel that he should pay each and
22  every day for the rest of his life.

23      Your Honor, please consider the maximum time for Ken.
24  He did not shed one tear at Robin's funeral, and showed no
25  remorse during both trials.

26              MS. SMITH:  My name is Marlene Smith.  I'm
27  Robin's aunt.

28      This letter is from her aunt in Washington:

1    The death of Robin has been a

2         devastating hardship on our family due to the

3         cause of her death and the way she died.

4         She was a person in our family that

5         always made us laugh and was very concerned

6         for each one of us.  When we had a problem,

7         she was there to cheer us up and to help in

8         any way she could.  She always was an

9         outgoing and cheerful person, and she will be

10       greatly missed.

11       Due to Kenneth Jerome Vernon's lack of

12       remorse, he is not sorry for the murder of my

13       niece, I am asking the Court to provide an

14       exceptional sentence.

15       Thank you for taking the time to hearing

16       this letter.  My sister is reading it for me.

17       This one is mine:

18       Dear Judge,

19       This letter is about Robin McClary, my niece.  She was

20       a beautiful girl inside and out.  If Robin loved you, she

21       never failed to tell you each and every time she saw you.

22       If anyone was unhappy, she would make it better if she

23       could.  She loved life itself and its challenges.

24       Our family's children grew up together.  On the

25       weekend was fishing, barbecues, cards, camping, hunting.  We

26       were not just a family, we were friends.  We miss her every

27       day, not just on holidays.

28       The loss of Robin is devastating in itself, not to

1    mention the manner in which she was taken from us, her

2    family, and not to mention Nick, her son.

3         Please consider the maximum.  Kenneth Vernon still has

4    no remorse.  I watched him through two trials.  He blames

5    Robin.  His only concern has been, and still is, himself.

6         She is gone for life, for a lifetime.  His time should

7    be a lifetime inside prison.  And if it ever comes -- if he

8    ever comes up for parole, please pull this letter and let

9    them read it.

10                    THE COURT:  Okay.

11                    MS. COBARRUBIAS:  I just have to say a few

12    words.

13                    THE COURT:  Please tell us who you are.

14                    MS. COBARRUBIAS:  I am Veronica Cobarrubias,

15    the caretaker of Nickolis.

16         I would just like Kenny to know the cries that

17    Nickolis has at night, the questions he has.  "Why did Kenny

18    kill my mom?"

19         The -- the misses that Robin has now -- I mean, I have

20    -- I see it all the time, I deal with it every day -- she

21    missed the first day of Nick's kindergarten, she missed his

22    first day of school.  Tomorrow, he celebrates his seventh

23    birthday, his second birthday without his mother because of

24    you.

25         I just want you to realize the little boy whose life

26    you screwed up.  His life -- I'm a mother and I can never

27    replace the love that Robin gave to him in his five years.

28    And it doesn't matter if I hug him every day, every minute.

1   That love is gone.

2        You have your mother.  You know what that love is.  He

3   will never ever know what that is.  You took that away from

4   him.  And as long as he lives, he will never forget what you

5   did.  You took away the biggest thing in his life.  He has

6   his father, he has me, and he has his brother.  But that is

7   nothing compared to what you took away from him.  And I just

8   wanted you to know that.

9                  THE COURT:  Okay.  Very well.

10                 MR. SCHULTZ:  Anyone else?

11                 THE COURT:  Let me make an observation about

12  the facts as the Court saw them, that I don't begin to

13  understand it myself, I have some sense of it, I guess, but

14  -- but there are some -- some people who need other people

15  to control themselves.  I'm being too oblique here.

16       I think Mr. Vernon blamed Robin for whatever argument

17  there was.  I don't know that we can ever say that she ever

18  even had a gun in her hand.  I know he says that, but

19  there's no corroborating evidence of it.  It came from her

20  purse.  She had used it before.  But that she had it in her

21  hand that day is only from -- from his words.

22       It wouldn't be unusual if there were an argument

23  between people.  And if, frankly, if the gun hadn't been

24  used, it would be misdemeanor spousal abuse, 30 days in jail

25  at the most, and -- and that would be it.

26       But I was struck during the course of the trial that

27  -- and he, Mr. Vernon, seemed oblivious to this -- that what

28  he was telling us was whatever she was doing made him angry,

1    and it was up to her to control her behavior and up to her

2    not to make him angry.

3         And I guess that's the pattern of domestic violence,

4    that -- or the occasion of domestic violence for some

5    people, that somehow projecting the responsibility for --

6    for taking care of their anger problem on people they live

7    with.

8         Well, so, in this case, I see really there are two

9    aggravating features.

10        The first is that Mr. Vernon went through a course of

11   domestic violence counseling and should have -- should have

12   been able to diffuse a situation which ultimately he is

13   responsible for.

14        And so in that sense, he does have a -- a history of

15   -- of violence, or maybe a fair way to say that is that his

16   domestic disputes were of increasing violence.  That's

17   certainly found.

18        But beyond that, I think truly that Robin McClary was

19   vulnerable.  You think, who is the one person you expect to

20   defend and protect you?  Your spouse, your significant

21   other.  That's it.  Short of being a child and expecting

22   your parents to.  But between adults, the one person who is

23   supposed to protect, and it goes both ways, would be the

24   defendant.  If he turns on her, who is there to protect her?

25        Beyond that, she was in her own home, the one

26   sanctuary we have in the world.  In her own bedroom.  Who is

27   there to protect her?  Not the man mowing the lawn outside

28   who doesn't have any idea and whose entrance into that home

1  would be extraordinary.  Strangers don't walk in.  Family

2  doesn't just walk in.  That's a private place.

3       So in the setting in which she was, in the

4  relationship in which she was, she was extremely vulnerable.

5       The defendant is statutory ineligible for probation

6  under 1203.06(a)(1), the jury having found that he used a

7  firearm in commission of the offense.

8       Even if he were eligible for probation, the Court

9  would deny probation because the victim was vulnerable,

10  because it was a crime of great seriousness, he deserves

11  punishment, and for the protection of the community.

12       So probation is denied.

13       The indeterminate term for a conviction of murder in

14  the first degree is life imprisonment, twenty-five years

15  before parole.  And that is the judgment of the Court.

16       In addition, under 12022.5, there are a choice of

17  sentences, three, four or ten years.

18       And for the victim's vulnerability, the Court will

19  impose the upper term of ten years.                    and

20       That would be consecutive to the indeterminate term

21  and will be served first.  And upon completion of that ten

22  years, the indeterminate term of life will be served.

23       Pursuant to -- all right, I have to impose a

24  restitution fine.  And I will impose a fine of $200 per year

25  for the -- what amounts to the minimum indeterminate term of

26  thirty-five years, or a total of $7,000 for the restitution

27  fine.

28       The probation officer has computed the actual custody

1684

1    credit of 584 days.  And pursuant to 2933.1, the defendant

2    is entitled to 15 percent conduct credit, or 88 days.  And

3    the Court has computed the conduct credit.  It's a total of

4    672 days credit for time served.

5         The -- when in prison, defendant is entitled to earn

6    credit at the rate of 15 percent, and that credit will be

7    calculated by the Department of Corrections.

8         If you are paroled, your parole will be for life.

9         You are entitled to appeal from the findings and

10   orders of this Court.  That appeal starts with the filing of

11   a notice in writing filed with the clerk of this Court

12   within 60 days of today's date.

13        If you do appeal and are unable to hire a lawyer, the

14   Appellate Court will appoint a lawyer to represent you on

15   appeal, free of charge.

16        You will also have the right to a free transcript and

17   record of the necessary proceedings in this court.

18        A Notice of Appeal must be timely filed.

19        Mr. Vernon, do you understand your -- what you have to

20   do to file an appeal, sir?

21                  THE DEFENDANT:  Yes.

22                  MR. CINGCON:  For the record, Your Honor,

23   he's already signed a Notice of Appeal that I plan to file

24   today.

25                  THE COURT:  Very good.

26                  MR. CINGCON:  Your Honor, the -- I'm sorry,

27   is the Court finished?  There was another matter that I

28   needed to discuss regarding this case.

1685

1       THE COURT:  No.  I got one more thing I got

2   to say.  I got to find my spot.

3       The sheriff is ordered to deliver defendant to the

4   custody of the Department of Corrections at Deuel Vocational

5   Institute for service of his sentence.

6       Yes?

7       MR. CINGCON:  Your Honor, the defendant has

8   requested that the other weapons, other than the weapons

9   used in this case, be returned to the custody of his

10  parents.

11      I have informed the defendant that under the law, the

12  weapon used in the crime will be confiscated and destroyed.

13  But the other weapons have no -- all of the -- all of the

14  items seized, which is mainly the -- the weapons, the guns

15  that he was concerned about, request that they be returned

16  to the custody of his parents.

17      His mother's in court today.

18      THE COURT:  All right.  Well, is there any

19  claim, Mr. Schultz, that those weapons are potential

20  evidence in the event of any retrial?  This -- this isn't --

21  this case isn't final yet, so that's the only concern the

22  Court would have.

23      MR. CINGCON:  We have pictures, Judge.

24      MR. SCHULTZ:  Perhaps one of them.  But only

25  in a little bit.  It is my understanding that there -- that

26  there was a BB gun that actually was given to the victim's

27  young son, and that weapon doesn't belong to --

28      MR. CINGCON:  We are not talking about that.

1686

1          MR. SCHULTZ:  So that wouldn't -- that

2    wouldn't be there.

3          The --

4               THE COURT:  Why don't you do this,

5    Mr. Cingcon, you make a list of the property you want

6    returned.

7               MR. CINGCON:  All right.

8               THE COURT:  Give it to Mr. Schultz.  If he

9    thinks it has some evidentiary value, then put it in an

10   affidavit and submit it to the Court ex parte.  But,

11   otherwise, you are entitled to have any property seized

12   returned.

13              MR. CINGCON:  Thank you, Your Honor.

14              MR. SCHULTZ:  All right.  If we can come to

15   an agreement, perhaps we could have an order prepared.

16   Otherwise, I don't think the sheriff will --

17              MR. CINGCON:  That's fine.

18              THE COURT:  Thanks you, folks.

19              MR. SCHULTZ:  Thank you.

20                   (Proceedings concluded.)

21                        ----o0o----

22

23

24

25

26

27

28

JEANNE COFFEY, C.S.R. No. 7084, STOCKTON, CA (209)468-2840